LAW OFFICE OF MICHAEL J. REISER
MICHAEL J. REISER, ESQ. (SBN 133621)
LILIA BULGUCHEVA, ESQ. (SBN 291374)
961 Ygnacio Valley Road
Walnut Creek, California 94596
Telephone: (925) 256-0400
Facsimile: (925) 476-0304
reiserlaw@gmail.com
lilia.reiserlaw@gmail.com

MEADE & SCHRAG LLP
TYLER R. MEADE, ESQ. (SBN 160838)
MICHAEL L. SCHRAG, ESQ. (SBN 185832)
1816 Fifth Street
Berkeley, CA 94710
Telephone: (510) 843-3670
Facsimile: (510) 843-3679
tyler@meadeschrag.com
michael@meadeschrag.com

Attorneys for Plaintiffs and the Class
ULTI-MATE CONNECTORS, INC., BRUCE
L. BILLINGTON, THIERRY POMBART,
and STEPHEN R. BROCKMAN

## IN THE UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ULTI-MATE CONNECTORS, INC.; BRUCE L. BILLINGTON; THIERRY POMBART; and STEPHEN R. BROCKMAN, on behalf of themselves and all others similarly situated,<br><br>                 Plaintiffs,<br><br>    v.<br><br>AMERICAN GENERAL LIFE INSURANCE COMPANY; SEA NINE ASSOCIATES, INC.; | Case No.  8:14-cv-01051<br><br>CLASS ACTION COMPLAINT FOR DAMAGES FOR:<br><br>1.    RESCISSION;<br><br>2.    VIOLATIONS OF THE RACKETEER INFLUNCED CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c);<br><br>3.    CONSPIRACY TO VIOLATE THE |

-1-

CLASS ACTION COMPLAINT FOR DAMAGES

| | |
|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13 | INNOVATIVE PRIVATE STRATEGIES & INSURANCE SERVICES, INC.; I.P.S. PRIVATE ADVISORS; LALAT PATTANAIK; LABAN PATTANAIK; KENNETH A. ELLIOTT, individually and d.b.a. KAE, KAE CONSULTING and VISTA BARRANCA; PETER MORDIN; and DOES 1 – 50,<br><br>           Defendants. |

On the right side:

RACKETEER INFLUNCED CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d);

4.   VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW, Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

5.   FALSE ADVERTISING, Cal. Bus. & Prof. Code §§ 17500, *et seq.*;

6.   FRAUD BY CONCEALMENT;

7.   FRAUD; and

8.   AIDING AND ABETTING

DEMAND FOR JURY TRIAL

Plaintiffs Ulti-Mate Connectors, Inc., Bruce L. Billington, Stephen R. Brockman, and Thierry Pombart (collectively referred to as "Plaintiffs"), on behalf of themselves and all other similarly situated entities and/or individuals, allege the following on information and belief against Defendants American General Life Insurance Company ("AIG"); Sea Nine Associates, Inc. ("Sea Nine"); Innovative Private Strategies & Insurance Services, Inc. ("Innovative"); I.P.S. Private Advisors ("IPS"); Laban Pattanaik ("Laban"); Lalat Pattanaik ("Lalat"); Peter Mordin ("Mordin"); Kenneth A. Elliott, individual and d.b.a. KAE, KAE Consulting and Vista Barranca (collectively, "Elliott"); and Does 1-50 (collectively and with the DOES, "Defendants"):

## **INTRODUCTION**

1.   For well over a decade, Defendants have organized, promoted, administered, and sold rights to participate in voluntary employee beneficiary association plans that supposedly offer the owners of small, closely-held businesses

CLASS ACTION COMPLAINT FOR DAMAGES

1   a valuable insurance-oriented welfare benefit with significant tax advantages.  (As

2   used herein, the terms "VEBA plan(s)" or "plan(s)" refer to voluntary employee

3   beneficiary associations generally and the terms "VEBA Program(s)" or

4   "Program(s)" refer to the plans established, promoted and administered by

5   Defendants.)  An integral part of these VEBA Programs are specialized whole life

6   insurance policies that, when purchased and initially owned through a VEBA

7   Program and then later exchanged for another policy, supposedly allowed these

8   small business owners to make tax-deductible premium payments and, at later

9   dates, withdraw funds on a tax-free basis ("Policies" or "Policy").

10         2.    The problem is that the Internal Revenue Service ("IRS") has

11   repeatedly ruled that VEBA plans like the ones Defendants established, promoted

12   and administered do not comply with federal tax law, determinations that have been

13   consistently upheld by federal courts.  At all relevant times, Defendants were well

14   aware of the noncompliant nature of their Programs.  By 2001, litigation involving

15   prior versions of the VEBA Programs at issue here and determinations by the IRS

16   put Defendants on notice that their Programs are an unlawful tax avoidance scheme.

17   Nonetheless, Defendants continued to promote, administer, and sell participation

18   rights in their VEBA Programs, and further continued to market and sell the

19   accompanying Policies.  In January 2004, tax attorneys retained by Defendants

20   issued an opinion letter advising them that their VEBA Programs did not did not

21   comply with I.R.C. § 419A(f)(6), the relevant provision of the Tax Code that

22   supposedly permitted the tax-deductible contributions and the tax-free withdrawals

23   ("§ 419A(f)(6)").  In 2013, the U.S. Department of Justice ("DOJ") filed a civil

24   action to enjoin two of the defendants (Sea Nine and Elliott) from continuing to

25   market and sell these Programs.

26         3.    Over time, the small business owners that Defendants successfully

27   targeted with their false and misleading marketing efforts ("Participants"), or in

28

CLASS ACTION COMPLAINT FOR DAMAGES

other words Plaintiffs and members of the Class, discovered the unpleasant truths that Defendants failed to disclose:

    a.    The IRS has deemed VEBA plans like Defendants' Programs to be suspect "Listed Transactions," or in other words, transactions that are the same or substantially similar to ones that the IRS has determined to be illegal tax avoidance schemes. The IRS imposes significant penalties on those who participate in Listed Transactions without disclosing that fact to the IRS.

    b.    Contrary to Defendants' representations, the substantial "contributions" that Participants make to the Programs, which in reality are simply life insurance premium payments routed through the Program, were not tax-deductible as represented.

    c.    Defendants' claims that Participants could withdraw funds on a tax-free basis are false. The IRS considers the features of these Programs that supposedly allowed Participants to withdraw funds on a tax-free basis to be a deferred compensation scheme subject to taxation.

    d.    With their high fees and low cash values, the Policies have few advantages once stripped of their supposed tax advantages.

4.    The Ulti-Mate Connector Plaintiffs are among the victims ensnared in this long-running scheme. In 2006 – more than two years after tax attorneys advised Defendants that these Programs did not comply with federal tax law – Defendants reached out to Plaintiffs' financial planner to convince him to have his clients participate in their VEBA Programs. Defendants, including a senior AIG executive, told the financial adviser that, if his clients joined one of Defendants' VEBA Programs and purchased the related Policies, their premium payments would be tax deductible and they would be allowed to withdraw funds on a tax-free basis at a later date. When Plaintiffs' financial planner raised questions about

- 4 -

CLASS ACTION COMPLAINT FOR DAMAGES

earlier IRS actions against such plans and inquired whether they were Listed Transactions, Defendants assured him that their VEBA Programs had been vetted by counsel and complied with § 419A(f)(6) and all other provisions of law. Defendants also provided him with opinion letters from tax attorneys and an IRS determination letter to that effect. But Defendants kept secret the January 2004 opinion letter that concluded Defendants' Programs did not comply with § 419A(f)(6).

5.     Plaintiffs' financial adviser relayed Defendants' false claims about their VEBA Programs to Plaintiffs. Since he had no knowledge of the January 2004 improperly withheld opinion letter, Plaintiffs financial planner was unable to warn Plaintiffs that the supposed tax advantages were illusory, or that participation in one of Defendants' Programs would likely result in an IRS audit and the imposition of penalties. In this fashion, Defendants persuaded Plaintiffs to join one of their Programs and purchase three Policies from Defendant AIG.

6.     In late 2011 and early 2012, after Plaintiffs paid $914,696.74 in contributions to the Program they joined, which were to be used to pay the premiums on the Policies, the IRS audited Plaintiffs and issued assessments for $362,904.91 in penalties, interest, and back taxes, which Plaintiffs have paid.

7.     Using similar methods and a common marketing plan, Defendants convinced dozens of other entities and individuals to join their Programs and purchase AIG Policies as documented in the DOJ complaint and other cases filed against Defendants herein. The various Programs were essentially identical, although established in the names of different associations.

8.     Defendants knew, or should have known, that their Programs did not comply with § 419A(f)(6) and related regulations, that the IRS would audit and impose penalties on Class Members for deducting the premium payments they paid for the Policies, and that Class Members would not be able to withdraw benefits on a tax-free basis.

CLASS ACTION COMPLAINT FOR DAMAGES

9.     Defendants have violated the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §§ 1961, *et seq.* ("RICO"), as well as California's Unfair Competition and False Advertising laws, Cal. Bus. & Prof. Code §§ 17200, *et seq.* and §§ 17500, *et seq.* (collectively, "UCL").  They also committed fraud by concealment, and common law fraud.  Finally, and in the alternative, Defendant AIG is liable for aiding and abetting the other Defendants' wrongful conduct.

10.     Plaintiffs and members of the California rescission class are entitled to rescind all transactions with Defendants, whether Defendants' material misstatements and failure to disclose material information were intentional, negligent, Cal. Ins. Code §§ 331, 359, or even just the result of a simple mistake. Cal. Civ. Code § 1691(b)(1).  In their action for rescission, members of the California rescission class are entitled to recoup not only their contributions/premiums and related fees, but also consequential damages, including back taxes, interest and penalties, the loss of the time value of their money, and future tax liabilities that they would not otherwise have incurred.  Cal. Civ. Code § 1692.

11.     Defendant AIG had worked closely with the other Defendants on these Programs since 2001 or 2002, supplied some of the most critical marketing materials used to market these Programs, and sold many Policies.  At all relevant times, AIG knew that Plaintiffs and members of the Class were induced by Defendants' conduct to believe that purchasing these Policies through a VEBA Program provided the significant tax advantages described elsewhere in this Complaint.

12.     AIG is responsible for the wrongful conduct of its employees (including Defendant Mordin and David Robinson), its designated agents (including Defendants Innovative, Laban and Elliott), and those defendants who are AIG's agents by operation of law (including Defendants Innovative, Laban, IPS, Lalat, Sea Nine, and Elliott). *See* Cal. Ins. Code § 1704.5.  Further Defendant AIG,

1   is responsible for the materially false and incomplete information that financial

2   advisers obtained from Defendants and innocently relayed to Plaintiffs and

3   members of the Class.  *Id.*

4                              **PLAINTIFFS**

5        13.    Plaintiff Ulti-Mate Connectors, Inc. is a California corporation with a

6   principal place of business in Orange County, California.  At Defendants' urging,

7   Ulti-Mate Connectors joined a VEBA Program established in the name of the

8   Southern California Manufacturers' and Agricultural Producers' League

9   ("SCMAPL"), and thus became a "Participating Employer" in that Program

10  pursuant to an Adoption Agreement described below.

11       14.    Plaintiff Bruce L. Billington ("Billington") is a resident of Orange

12  County, California, a shareholder of Ulti-Mate Connectors, the President of that

13  company, and a "Participating Employee" in the SCMAPL VEBA Program

14  pursuant to the Adoption Agreement.  He is the named Insured of the Policy No.

15  A10225086C issued by Defendant AIG.

16       15.    Plaintiff Stephen R. Brockman ("Brockman") is a resident of Los

17  Angeles County, California, a shareholder of Ulti-Mate Connectors, the Vice-

18  President of Sales and Marketing of that company, and a "Participating Employee."

19  He is the named Insured of the Policy No. A10225085C issued by Defendant AIG.

20       16.    Plaintiff Thierry Pombart ("Pombart") is a resident of Orange County,

21  California, a shareholder of Ulti-Mate Connectors, the Vice-President of Operations

22  of that company, and a "Participating Employee."  He is the named Insured of the

23  Policy No. A10225084C issued by Defendant AIG.

24       17.    Plaintiffs Ulti-Mate Connectors, Billington, Brockman and Pombart

25  are sometimes referred to herein as the "Ulti-Mate Connector Plaintiffs."

26  ///

27  ///

28  ///

CLASS ACTION COMPLAINT FOR DAMAGES

## NON-PARTY ENTITIES AND INDIVIDUALS

18.     The SCMAPL (a.k.a. Southern California Manufacturing and Producers' League) is the "sponsor" of a VEBA Program that Defendants established and administered and that Plaintiffs joined.

19.     From 2007 to the present, Comerica Bank has served as the Trustee of a trust established to hold the assets of Defendants' Programs and serve as the Programs' "funding mechanism."  On information and belief, all of Comerica's activities were directed by Defendants and Comerica did not act in the absence of instructions from Defendants.

20.     R. Wesley Sierk, III ACI, ARM, ChFC, a principal at Pine Avenue Partners, LLC, was Plaintiffs' financial planner.  As alleged more fully elsewhere, Defendants communicated false and misleadingly incomplete information to Sierk who innocently relayed that false and misleadingly incomplete information to Plaintiffs.

21.     At all relevant times, Royce Imhoff ("Imhoff") held senior executive positions at Defendant AIG, including President of Independent Distribution.

22.     At all relevant times, David Robinson ("Robinson") held senior executive positions at Defendant AIG, including senior counsel to AIG and later head of advance sales in the Affluent and Corporate Markets Group.

## DEFENDANTS

23.     Defendant American General Life Insurance Company is a corporation organized and existing under the laws of the State of Texas, with its principal place of business in Houston, Texas, and a wholly-owned subsidiary of American International Group, Inc.  As more fully alleged elsewhere in this Complaint, AIG specifically designed the Policies to be sold in conjunction with the VEBA Programs that Defendants developed and promoted (including the SCMAPL Program) and took a leading role in marketing and selling not only the Policies, but also participation in the noncompliant VEBA Programs.

CLASS ACTION COMPLAINT FOR DAMAGES

24.     On information and belief, Defendant Peter Mordin is an individual residing in Orange County, California who, at all relevant times, held senior positions with Defendant AIG, including National Marketing Director and Regional Vice President.

25.     Defendant Sea Nine Associates, Inc. is a Nevada corporation whose status with the California Secretary of State is now listed as "FTB Suspended" and, thus, lacks the capacity to defend itself in this action and is subject to entry of a default judgment.  Cal. Rev. & Tax Code § 23301.  At all relevant times, Sea Nine served as the Administrator or *de facto* Administrator for the Programs and was responsible for operating them and directing their activities.

26.     Defendant Kenneth Elliott, individually and d.b.a. KAE, KAE Consulting and Vista Barranca, is an individual residing in Orange County, California.  Plaintiffs are informed and believe that, at all relevant times, Elliott was an employee of Defendant Sea Nine and was solely responsible for directing all of Sea Nine's affairs.

27.     Defendants Lalat Pattanaik and Laban Pattanaik are brothers residing, on information and belief, in the State of California, County of Los Angeles.

28.     Defendant Innovative Private Strategies & Insurance Services, Inc. is a California corporation whose status with the California Secretary of State is now listed as "FTB Suspended" and, thus, lacks the capacity to defend itself in this action.  Cal. Rev. & Tax Code § 23301.  At all relevant times, Defendant Laban was the sole owner, shareholder, director and/or principal of Innovative and was solely responsible for directing all of Innovative's affairs.

29.     Defendant I.P.S. Private Advisors LLC is a California limited liability company with its principal place of business in Laguna Hills, California and, on information and belief, is equally owned and controlled by Lalat and his brother, Laban.  Defendants Innovative and Laban retained Defendant IPS to market Defendants' VEBA Programs.

- 9 -

CLASS ACTION COMPLAINT FOR DAMAGES

30.     Defendants Sea Nine, Elliott, Innovative, Laban, IPS, and Lalat are collectively referred to herein as the "Agent Defendants."

31.     The true names and capacities of the Defendants, DOES 1 through 50, whether individual, corporate, associate or otherwise, are unknown to Plaintiffs at the time of filing this Complaint and Plaintiffs, therefore, sue said Defendants by such fictitious names and will ask leave of court to amend this Complaint to show their true names or capacities when the same have been ascertained.  Plaintiffs are informed and believe, and therefore allege, that each of the DOE Defendants is, in some manner, responsible for the events and happenings herein set forth and proximately caused injury and damages to Plaintiffs as herein alleged.

## VICARIOUS LIABILITY ALLEGATIONS

32.     Plaintiffs are informed and believe, and on that basis allege, that each Defendant named in this action, including each of the DOE defendants, was the agent, ostensible agent, servant, aider and abettor, co-conspirator, partner, joint venturer, representative and/or associate of each of the other Defendants, and was at all times relevant herein acting within the course and scope of his, her or its authority as agent, ostensible agent, servant, aider and abettor, co-conspirator, partner, joint venturer, representative and/or associate, and with the knowledge, authorization, consent, permission, and/or ratification of the other Defendants.  On information and belief, all actions of each Defendant alleged herein were ratified and approved by the officers and/or managing agents of each other Defendant, whether DOE or otherwise.

33.     At various times prior to the marketing and sale of the Policies to Plaintiffs, AIG filed "Notices of Agency Appointment" with the California Department of Insurance designating Defendants Innovative, Laban, and Elliott as agents of AIG.  *See* Cal. Ins. Code § 1704.  These Defendants thereby became "life licensees" authorized to sell Policies on behalf of AIG.  Cal. Ins. Code §§ 32(a); 1622(a).  Further, Defendants Innovative and Laban became Master General Agents

(a.k.a. "Level 7 Master General Agents") of AIG pursuant to a contract dated February 17, 2004.  Under California law, Defendant AIG is thus liable for these Agent Defendants' material misstatements to Plaintiffs (directly and through Sierk) and failure to disclose material information to Plaintiffs (directly and through Sierk).

34.     Sierk and all or some of the Agent Defendants jointly presented a proposal for the Policies to Plaintiffs on behalf of Defendant AIG, jointly transmitted applications for those Policies to AIG, and/or received commission payments from AIG.  Pursuant to California Insurance Code § 1704.5, when Defendant AIG issued the Policies pursuant to the aforementioned proposal and transmittal and/or paid commissions to Sierk and all or some of the Agent Defendants, it became liable for: (a) the material falsehoods communicated by the Agent Defendants to Plaintiffs; (b) the failure of Defendants to disclose material information to Plaintiffs; (c) Sierk's innocent reconveyance of materially false information from Defendants to Plaintiffs; and (d) Sierk's innocent failure to disclose the material information that these Defendants failed to disclose to Sierk. *See* 39 Cal. Jur. 3d Insurance Companies § 193.

35.     Because Defendant AIG knew that its Policies were purchased in conjunction with VEBA Programs, participated in a unified marketing scheme that promoted both its Policies and the Programs, and understood all of the details relating to those Programs, all of the conduct of the Agent Defendants alleged in this Complaint was within the course and scope of the agency relationship(s) between AIG and the other Defendants.

36.     Defendant AIG is also responsible for the wrongful acts and omissions of its employees Imhoff, Robinson, and Defendant Mordin under the doctrine of respondeat superior.

///

///

CLASS ACTION COMPLAINT FOR DAMAGES

**JURISDICTION AND VENUE**

37.     This Court has jurisdiction pursuant to 28 U.S.C. §1331 in that certain of the claims alleged herein arise under federal law, namely RICO.  This Court has supplemental jurisdiction over the state law claims.

38.     Jurisdiction in this Court is also proper pursuant to the Class Action Fairness Act.  28 U.S.C. § 1332(d).

39.     Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.  Venue is also proper under 18 U.S.C. § 1965(a) in that all Defendants either reside in the Central District of California and/or have an agent in this judicial district.

**GENERAL ALLEGATIONS**

**A.     The Common Characteristics And Tax Advantages Of § 419A(f)(6) Plans**

40.     A VEBA plan that complies with § 419A(f)(6) involves the creation of a joint trust or other fund that ten or more companies join.  Those companies make tax-deductible contributions to this common trust or fund which, in turn, uses those contributions to purchase insurance contracts and other assets which provide welfare benefits – usually and in this case only life insurance – to certain of the participating companies' employees.  A trustee (often a bank or other financial institution) typically takes formal ownership of the insurance policies purchased by the plan and conducts the day-to-day operations.

41.     Ordinarily, if a company purchases a standard term life insurance policy for an employee, the premium payments would be included as part of the employee's gross income, and therefore taxable (to the employee).  *See* 26 C.F.R. § 1.61-2(d)(ii)(A).  But if the company joins a properly established multiple-employer welfare benefit plan under § 419A(f)(6), its contributions to the plan are deductible (to the company), and the plan may use those contributions to purchase

CLASS ACTION COMPLAINT FOR DAMAGES

1   the same life insurance policy.  In other words, premiums paid in the first case are

2   not tax deductible while contributions (used to buy the exact same policy) in the

3   second case are tax deductible.  This makes a § 419A(f)(6)-compliant plan

4   attractive.

5           **B.     Defendants' VEBA Programs**

6           42.     Defendants' VEBA Programs consist of a series of "Master Plan

7   Documents" drafted by Defendants and a trust established by Defendants to hold

8   the assets of the Program and serve as the "funding mechanism."  The Master Plan

9   Documents include the following: (a) "Master Plan" and "Master Trust" documents

10  to establish the entity of ten or more employers required for a § 419A(f)(6) plan; (b)

11  "Adoption Agreements" that the small businesses targeted by Defendants would

12  sign to join the Program; and (c) "Summary Plan Descriptions" that such

13  Participating Employers could issue to their eligible employees.

14          43.     The following summary is helpful to understand Defendants' VEBA

15  Programs and the facts alleged herein:

16                  a.     First, there is the "Sponsor," an association of employers in

17  whose name the VEBA Program is established.  SCMAPL was one such

18  association.  Each VEBA Program was organized, promoted, administered, and

19  operated by Defendants, without any material involvement by the Sponsor.

20                  b.     Second, the small businesses persuaded to adopt one of

21  Defendants' VEBA Program are known as the "Participating Employers" and their

22  eligible employees who elected to participate – usually the owners of a closely held

23  business – are referred to as "Participating Employees" (collectively,

24  "Participants").  Plaintiff Ulti-Mate Connectors is a Participating Employer, and the

25  individual Plaintiffs are Participating Employees.  (Three other employees of Ulti-

26  Mate Connectors purchased regular term life insurance policies and thus are not

27  parties to this suit.)

28

CLASS ACTION COMPLAINT FOR DAMAGES

c.      Third, there is the "Insurer" who issues the Policies.  In this case, the Insurer is Defendant AIG, which marketed and sold Policies to Plaintiffs and other members of the Class.

d.      Fourth, there are the "Insureds."  In practice, these are the individuals defined above as Participating Employees – the owners of the small businesses that joined Defendants' VEBA Programs.  Plaintiffs Billington, Brockman, and Pombart are Insureds.

e.      Fifth, each VEBA Program has a designated or *de facto* "Administrator" responsible for directing the affairs of the Program.  Defendants Sea Nine and Elliott served as the Administrator for all Programs.

f.      Finally, there is the "Trustee" responsible for holding the assets entrusted to the Program and processing the required financial transactions as directed by Defendants (*e.g.*, receiving "contributions" or in other words premium payments from Class Members, and the payment of those premiums to the Insurer, etc.).  In 2007, Defendants Sea Nine and/or Elliott retained Comerica to serve as Trustee for its Programs.

44.    The Master Plan Documents provided that a "Master Committee" would determine the kind of insurance policies to be purchased with the contributions, and be responsible for all related issues, such as the payment of benefits under the plan.  In reality, the designated or *de facto* Administer (Defendants Sea Nine and Elliott) made all relevant decisions and directed all of the Trustee's actions.

45.    The Master Plan Documents specified: (a) the eligibility requirements for Participants; (b) when and how Participating Employers were to make their contributions; (c) the nature of the insurance benefit to be provided by the Program, which was always life insurance; and (d) the conditions under which Participating Employers could terminate participation and thereby provide the Participating Employees the opportunity to take personal ownership of the life insurance policies.

- 14 -

CLASS ACTION COMPLAINT FOR DAMAGES

46.     According to the DOJ complaint, these Master Plan Documents are "largely identical."  In 2009, Defendants prepared a new set of Master Plan Documents that purportedly brought Defendants' VEBA Programs into compliance with § 419A(f)(6) but (a) according to the DOJ, the 2009 versions do not remedy the deficiencies, and (b) in any event, they were never implemented because none of the victims, Plaintiffs included, adopted them.  In short, none of the Master Plan Documents complied with § 419A(f)(6) and related regulations, and so Participating Employers were not entitled to deduct their contributions as represented.  To the contrary, these were Listed Transactions that Participants were required to disclose to the IRS or pay a penalty.

### C.     Defendant AIG's Involvement In The Scheme

47.     Defendant AIG sold many Policies in conjunction with these VEBA Programs and had been working closely with the Agent Defendants since 2001 or 2002.  On an ongoing basis, Defendant Lalat had extensive discussions with high-level executives at AIG, including Imhoff (AIG's President of the Independent Distribution), Robinson (who held various senior executive positions, including senior counsel to AIG and later head of advance sales in the Affluent and Corporate Markets Group), and Defendant Mordin.[1]

48.     Defendants Lalat and Laban and their staff at IPS met regularly with Defendant Mordin.  In or around August 2002 or 2003, Mordin introduced Robinson to Lalat and IPS.  Thereafter, Robinson was in regular communication with the Agent Defendants about the VEBA Programs.  AIG was aware that Defendant Elliott was involved in the administration of the VEBA Programs and directly communication with him regarding the Programs.

---

[1]     Lalat also had discussions with Dennis Roberts, who was President of AIG's Independent Agency Group; Larry O' Brien, who was a Senior Vice President and Chief Marketing Officer; and Rodney Martin, who was the head of AIG life insurance worldwide.

CLASS ACTION COMPLAINT FOR DAMAGES

49.    Robinson and Defendant Mordin were not only aware of and never objected to the Agent Defendants' marketing strategy for the VEBA Programs, but also they allowed the Agent Defendants to use AIG-generated marketing materials and software in this marketing.  Defendant AIG provided an advisors guide, which included a section on VEBA plans.  This was probably the most significant marketing piece that the Agent Defendants used.  AIG also provided the Agent Defendants with numerous other marketing publications for VEBA plans.

50.    Defendant AIG provided marketing material to the other Defendants with the knowledge and intent that the other Defendants would transmit that material to Plaintiffs and others using the U.S. Mail and/or e-mail transmitted across interstate wires.  AIG knew or should have known that this marketing would be used in conjunction with the fraudulent marketing of Defendants' VEBA Programs and the sale of Policies through those Programs.  AIG knew or should have known that this marketing material was materially false and/or misleading when so used.

### D.    Defendants' VEBA Programs Violate Restrictions On § 419A(f)(6) Plans

51.    There is a long history of companies misusing VEBA plans as tax avoidance schemes.  There are rules to prevent such abuse.  For example, if a participating corporation claims a deduction for contributions actually used to distribute corporate earnings to the corporation's shareholders, the deduction will be disallowed because such contributions are not an "ordinary and necessary" business expense within the meaning of I.R.C. § 162.  Second, a company cannot deduct a contribution to a welfare benefit plan in the year made if the benefits provided constitute deferred compensation as defined in IRC § 404.  *See* I.R.C. § 419(e)(2).  Rather, the deduction must be deferred until the employee includes the compensation in his or her gross income.  I.R.C. § 404(a)(5).

CLASS ACTION COMPLAINT FOR DAMAGES

52.     Defendants represented that their VEBA Programs, including the SCMAPL Program, strictly complied with § 419A(f)(6) and all related rules and regulations.  In fact, these Programs were noncompliant, as Defendants knew.  The contributions Participating Employers made to the Programs for purchase of the Policies far exceeded the actual cost of the primary "welfare benefit" claimed to be the aim of the VEBA Program – the death benefit derived from a life insurance policy; the same death benefit could be purchased for much less money.  The amounts above the true cost of the death benefit were used to obtain the cash value portion of the Policies and, in effect, set aside those excess payments for the benefit of the owners of the companies.

53.     In other words, Defendants' VEBA Programs allowed the excess contributions to be used to pay premiums that mostly flowed through the accumulated cash values of these Policies, and then into the hands of the company owners.  Thus, Defendants' VEBA Programs did not really provide a welfare benefit for Participants, but instead were mechanisms for distributing excess profits to owners and/or providing deferred compensation in a manner that avoided federal taxes.

54.     In 2013, the DOJ filed a civil action in U.S. District Court for the Central District of California (Case No. 13-CV-01582-JLS-JPR) against Defendants Sea Nine and Elliott to enjoin them from continuing to market and sell participation rights in Defendants' VEBA Programs because they do not comply with § 419(f)(6).  As summarized in the DOJ complaint: "[T]he core purpose and effect of the participation in a Sea Nine VEBA plan is to provide participants with a mechanism to accumulate wealth for their personal benefit, unlawfully protecting that income from federal taxation by treating it as a welfare benefit plan when it was that in name only."

55.     The IRS has audited 41 taxpayers who participated in one of Defendants' Programs as of August 2013, and in 36 of those audits determined the

CLASS ACTION COMPLAINT FOR DAMAGES

1  taxpayer was liable back taxes and/or penalties.  The total amount collected in these

2  audits exceeds $13 million.  The IRS knows of a total 205 Participants in these

3  Programs and estimates that, when all audits are completed, its recovery could

4  exceed $70,000,000.

5        **E.**    **Defendants Knew, But Did Not Disclose, That Their VEBA**

6               **Programs Were Noncompliant**

7       56.    At all relevant times, Defendants knew, or in the exercise of ordinary

8  care have known, that their VEBA Programs were Listed Transactions and

9  an unlawful tax avoidance scheme.  For example, Defendants Sea Nine and Elliott

10  were involved in early VEBA Programs promoted in the 1990s that led to

11  determinations by the Tax Court that the Programs were an unlawful tax avoidance

12  scheme.  *See, e.g., Neonatology Assoc., P.A. v. Comm'r*, 229 F.3d 221 (3d Cir.

13  2002) (upholding one such Tax Court determination).  At last one Participant from

14  the 1990s sued Sea Nine and Elliott for RICO violations involving a pattern of

15  racketeering activity almost identical to that allege herein.  *Borah, et al. v.*

16  *Monumental Life Insurance Company, et al.,* U.S. District Court, E.D. Pa. Case No.

17  04-CV-03617-BMS, Dkt. No. 1 at ¶¶ 1, 16, 46-142 (RICO allegations in complaint

18  filed July 30, 2004).  Defendants, and each of them, knew from such experience

19  that Plaintiffs and members of the Class would not obtain the claimed tax

20  advantages and, in fact, would be forced to pay penalties, back taxes, and interest to

21  the IRS as a result of their participation.  Indeed, the following from the DOJ

22  complaint applies with equal force here:

23      "Significantly, the *Neonatology* case involved the participants in a Sea Nine-

24      sponsored and promoted VEBA plan – thus evidencing the Defendants'

25      persistent promotion of the tax scheme at issue in this case despite

26      knowledge of its potential illegality for over 10 years."

27      57.    As noted in the DOJ complaint, Defendants Sea Nine and Elliott

28  continued to use the same Master Plan Documents after 2001 knowing that these

- 18 -

1  documents did not comply with § 419A(f)(6) and that the results for early

2  Participants were disastrous.

3      58.    In 2000, the IRS designated transactions like the VEBA Programs that

4  Defendants marketed and sold as Listed Transactions.  *See* IRS Notice 2000-15; *see*

5  *also* IRS Notice 95-34.  A Listed Transaction is a transaction that is the same as or

6  substantially similar to one of the types of transaction that the IRS has determined

7  to be a tax avoidance transaction, and must therefore be reported by participants to

8  the IRS in accordance with specified regulations.  I.R.C. § 6111(a) and (b); 26

9  C.F.R. § 1.6011-4.  If not reported, the IRS imposes penalties on the taxpayer.

10  Here, Defendants failed to disclose to Plaintiffs and Class Members that their

11  VEBA Programs, including the SCMAPL Program, are Listed Transactions that

12  must be disclosed to the IRS.

13      59.    Moreover, in 2003, the Treasury Department tightened the regulations

14  applicable to plans that purport to be multiple-employer plans under § 419A(f)(6).

15  26 C.F.R. § 1.419A(f)(6)-1.  Defendant AIG (acting through Robinson and Mordin)

16  asked Defendants Lalat and Laban to demonstrate to AIG that their VEBA

17  Programs complied with these newly tightened regulations.  In September 2003, the

18  Agent Defendants advised AIG that they intended to "engage a major law firm to

19  thoroughly analyze numerous items associated with our plan and the impact of the

20  regulations."  In November 2003, the Agent Defendants told AIG that, on AIG's

21  recommendation, they had selected attorney Bruce Ashton of the law firm of Reish

22  Luftman Relcher & Cohen ("Reish") to conduct this review.  That same month,

23  Robinson e-mailed Lalat that AIG was placing Defendants' VEBA Programs on an

24  updated list of acceptable plans for placement of insurance products but that he still

25  needed to see the compliance documents by January 2004.

26      60.    By January 2004, the Reish firm had completed its review and

27  prepared a draft opinion letter concluding that Defendants' VEBA Programs did not

28

CLASS ACTION COMPLAINT FOR DAMAGES

1    comply with the new regulations under § 419A(f)(6).  Shortly thereafter, the Agent

2    Defendants sent this draft opinion letter to AIG with a cover letter stating:

3            "As you are aware, we have been developing a long-term

4        alliance with AIG American General over the last 2+ years with the

5        hopes of

6                1. generating substantial business in the dynamic area of

7                qualified multiple employer welfare benefit plans and

8                2. eventually expanding the distribution channels for our plans

9                with the assistance of the Affluent and Corporate Markets Group

10               and its agents.

11           Because of our interest in a stable long-term strategic alliance

12       with your group, we wanted you and your agents to be comfortable

13       and supportive of our programs. In order to facilitate this, we decided

14       to engage a major law firm ... whose opinions were highly regarded by

15       AIG.... Consequently, because of our discussion with you and David

16       Robinson ... we decided to engage Reish Luftman Relcher & Cohen

17       ("Reish")—a firm that was already of counsel to your company ...

18           As a result of the final 419 regulations which were released in

19       2003, we felt that Reish should evaluate the structure and operations of

20       our programs in light of these regulations to ensure continued

21       compliance. We also wanted them to reaffirm that we are a plan under

22       ERISA as currently operated. Both of these items are very significant

23       in sustaining the deductibility of employer contributions to our

24       program. They are also critical to differentiating our programs from

25       the non-qualified "419" plans which claim that they do not fall under

26       the guidelines, and therefore do not have to meet such standards and

27       restrictions.[] As you can see, Reish's opinion is to the contrary ...

28

CLASS ACTION COMPLAINT FOR DAMAGES

1        We have attached herewith the initial draft letter provided by

2    Reish."

3        61.    The attached Reish law firm draft letter stated that Elliott, on behalf of

4    Sea Nine, asked Reish "to address whether the several [VEBAs] administered by

5    Sea Nine Associates conform to the requirements set forth in Treasury Regulations

6    under Internal Revenue Code" or were exempt from those regulations.  Reish first

7    concluded that "[b]ecause the Plan and Trust do not contain provisions required

8    under the new 419 Regulations, the VEBAs do not currently meet the requirements

9    of the 419 Regulations."  Reish also concluded that the VEBAs were not exempt

10    from the regulations.

11        62.    These same conclusions were reflected in a final version of this

12    opinion letter dated January 27, 2004.  Reish made several suggestions to make

13    these plans compliant, which the Defendants ultimately ignored.

14        63.    On January 30, 2004, Defendant IPS sent a letter to Mordin stating that

15    in light of the opinion letter from Reish, the Agent Defendants would amend "[o]ur

16    plan documents and some operational aspects of our program ... accordingly" and

17    that the Agent Defendants would "notify [AIG] of the changes and make available

18    the final documents resulting from their recommendations—when they become

19    available."  The letter also stated that IPS planned "on maintaining an "open book

20    approach, and making transparent to your team, any structural, operational and

21    documentation changes that Reish recommends."  In fact, the Agent Defendants

22    never followed through with these promises.  Robinson has testified in another

23    action that he warned Imhoff and Mordin that the Agent Defendants had not done

24    so.  But AIG took no further action to ensure compliance with federal tax law and

25    continued to sell Policies, including to Plaintiffs and other members of the Class.

26        64.    In summary, Defendants, including AIG, knew that their Programs

27    were noncompliant.  Yet Defendants continued to market their VEBA Programs

28    and falsely represent to Participants that (a) their Programs fully complied with

federal tax law, (b) the Programs were not Listed Transactions requiring notice to the IRS, and (c) contributions were tax-deductible.  Further, Defendant AIG continued to market and sell its Policies even after very senior executives, including Imhoff, Robinson and Mordin, knew that the VEBA Programs failed to comply with § 419A(f)(6) and related regulations.

### F.    The Ulti-Mate Connectors Plaintiffs' Participation In A VEBA Program

65.    Defendants promoted their VEBA Programs (of which there are at least nine in total) mostly to high-income professionals who own small, closely-held companies.  Plaintiffs fit that description perfectly.  Plaintiffs Billington, Brockman and Pombart are shareholders of Ulti-Mate Connector, an Orange County-based business founded in 1977 that designs and produces world-class micro and nano miniature connectors and cables and interconnect solutions for the military, space, aviation, and medical industries.

66.    In or about February 2006, Defendant Mordin telephoned Sierk (Plaintiffs' financial planner) about the possibility of Sierk recommending Defendants' VEBA Programs – and the life insurance Policies that Defendant AIG created for use in conjunction with these Programs – to certain of Sierk's clients. Mordin suggested that Sierk contact Defendant Lalat to learn more.  In this telephone call, Sierk expressed concerns about the legitimacy of VEBA plans in general, but Mordin (and later Laban, Lalat and Elliott) assured him that these plans had been thoroughly vetted by reputable counsel and, further, that the VEBA Programs had historically passed all IRS audits without change.

67.    On June 29, 2006, an employee of Defendant IPS e-mailed Sierk's office a packet of marketing material as part of a common marketing plan used on a class-wide basis.  Attached to the e-mail were a lengthy description of VEBA plans prepared by IPS and trade association bulletins entitled "IRS Loses Major Case on

CLASS ACTION COMPLAINT FOR DAMAGES

1  Funding Welfare Benefits" and "IRS Rules that Employer May Deduct VEBA

2  Contributions Used to Purchase Life Insurance."  Also included was a document on

3  IPS stationary that prominently displays the AIG logo, and includes the following

4  representations:

5      "IPS successfully identifies, structures and implements innovative programs

6      that allow high net worth individuals to dramatically reduce their taxes and

7      enhance their overall tax efficiency.  [¶]  Our team consists of in-house

8      experienced professionals including MBAs, attorneys, and registered

9      financial consultants.  We also work closely with outside legal, actuarial and

10     accounting experts, as well as the advanced planning divisions of major

11     financial institutions….  [¶]  IPS has teamed with some of the strongest, and

12     most well-respected global financial institutions to offer clients world-class

13     … advanced planning services.  Over the past 25 years, IPS has developed

14     relationships at the highest levels of these partner organizations….  <u>Further,</u>

15     <u>IPS works with some of the largest and most reputable law firms in the</u>

16     <u>country to ensure that programs offered through IPS are structured</u>

17     <u>properly</u>….  [¶]  Our high impact programs are backed and used by

18     experienced law firms, actuarial firms, and accounting professionals.  <u>All of</u>

19     <u>the programs offered by IPS have written Determination Letters from the IRS</u>

20     <u>or written opinion by a major law firm(s)</u> [*sic.*] <u>with expertise in the area of</u>

21     <u>law opined on</u>….  [¶]  <u>Our Welfare Benefit Trust Programs can provide your</u>

22     <u>business or practice a substantial tax deduction into an IRS-qualified plan,</u>

23     <u>while providing tax-favored benefits for you and any eligible employees.</u>  A

24     few of the key benefits of adopting a WBT are: … [¶]

25     •  <u>IRS qualification (IRS Letter of Determination) assures security and tax</u>

26        <u>advantages.</u>"  (Emphasis added.)

27         68.    As part of their common marketing plan used on a class-wide basis,

28  Defendants also e-mailed (on June 29, 2006) Sierk's office copies of legal opinions

CLASS ACTION COMPLAINT FOR DAMAGES

and IRS correspondence to induce Sierk into believing that their VEBA Programs complied with § 419A(f)(6).  This included an IRS "Favorable Determination Letter" dated August 1, 1988, an October 2, 1998 IRS "no change" letter, and an extensive opinion letter from an attorney named Frederick A. Romero.  But Defendants deliberately withheld the January 27, 2004 Reish letter, which concluded that Defendants' VEBA Programs did not contain certain provisions required under the new regulations under § 419A(f)(6) and, therefore, were not compliant.  Thus, Sierk did not know that the claimed tax advantages were illusory.

69.     During a meeting at Lalat's Orange County office on or about July 6, 2006, Defendants Mordin, Laban, Lalat and Elliott explained their Programs to Sierk as follows:

a.   A small, closely held business joins one of their VEBA Programs and purchases specialized whole life insurance Policies for its owner(s) (and perhaps other employees as well).

b.   The VEBA Program is the policyholder of record for the Policy(ies) and holds it/them for the benefit of the owner(s).

c.   The business makes five annual, supposedly tax-deductible contributions to the Program, which uses those contributions to make premium payments to the Insurer.

d.   Initially, the Program is the named beneficiary under each Policy and would receive any benefits that might be paid, but the owner designates those to whom the Program would, in turn, pay the benefits.

e.   After five years, the Program: (i) allows the business to exit the Program if it encounters "adverse business conditions," a purposefully lenient contractual standard that any business can properly meet and that Plaintiffs and Class Members did meet; (ii) transfers ownership of the Policy(ies) to the owner(s); and

- 24 -

(iii) issues a 1099 to each owner based on the surrender value of their Policy.  To keep the tax liability low, the Policies were designed with low surrender values.

f.      Each owner holds their Policy in his or her name for another two years.  Then, on the first day of the eighth year, the Insurer allows the owner to exchange his or her Policy for one with a higher cash value and a lower death benefit.  The Insurer agrees in advance that the exchange can be made without penalty (*i.e.*, the surrender value would equal the amount of the premiums made).

g.      Each owner may then borrow against or even cash out of the new policy, supposedly on a tax-free basis.  Because the new policy has a higher cash value (at the cost of a correspondingly lower death benefit), the amount available to the owner to withdraw is significantly higher than under the original Policy.

70.    Based on Defendants' representations and their concealment of material information, Sierk believed that the Policies, while not advantageous to his clients on their own (because of the high fees and relatively low cash values), provided significant tax advantages when purchased through one of Defendants' Program.  Specifically, based on Defendants' representations, he believed that the five annual contributions were tax-deductible to the businesses in the year made, and that the owners could withdraw significant benefits on a tax-free basis after the exchange on the first day of the eighth year.

71.    On July 10, 2006, Defendant Lalat e-mailed Sierk that he could obtain a "VEBA Plan Design / Proposal" from IPS by filing out an IPS form entitled "Welfare Benefit Census" and faxing it to 310-388-0508, the fax number listed for IPS.  The next step, Lalat explained in this e-mail, was to fill out a "Client Confidential Information Form" and that the clients would then receive

CLASS ACTION COMPLAINT FOR DAMAGES

"customized VEBA plan documents within 3-4 business days." Notably, the end of the latter form was pre-filled out to indicate that Defendant Innovative was the agent. The e-mail explained that this form too should be faxed to 310-388-0508 when completed. Both of these forms were attached to the e-mail, as was a third form entitled "AIG / American General / Part A Life Insurance Application."

72.     Lalat's July 10, 2006 e-mail to Sierk also attached informational documents purporting to establish the legality of Defendants' VEBA Programs. One, from AIG itself and entitled "AIG Advisor Group Insurance Services Division SalesInsight," stated that the IRS had recently ruled that a company could properly deduct contributions to a VEBA program used to purchase life insurance policies. Defendant Lalat e-mailed this same document to Sierk again in November and December 2006.

73.     On August 1, 2006, Defendants e-mailed a proposal to Sierk's office. This proposal, prepared for Ulti-Mate Connectors and dated July 31, 2006, stated among other things that: (a) Defendants' VEBA Programs had the "Support of Substantial Legal Authority"; (b) "the Amount You Contribute Will Be <u>100% Tax Deductible</u>"; (c) those amounts will be "Deferred in a Safe, Creditor Proof, Tax Exempt Environment"; and (d) participation in the Program meant "Substantially Reducing Income and Estate Taxes." In reliance on Defendants false statements, material misstatements, and material omissions, Plaintiffs agreed to join the SCMAPL Program and purchase Policies for Plaintiffs Billington, Brockman, and Pombart.

74.     On August 6, 2006, Defendant Elliott sent Sierk an e-mail (copied on Defendants Mordin and Lalat) in which Defendants quelled Sierk's stated concern that these were Listed Transactions such that his clients would have to report their participation to the IRS. This e-mail concluded with the following statement by Defendants: "We believe that the VEBA's sponsorship of the ten or more employer plan using this deduction established that we are not a tax shelter."

CLASS ACTION COMPLAINT FOR DAMAGES

75.     On or about October 16, 2006, Defendants sent Plaintiffs a set of Master Plan Documents to sign via U.S. Mail.  The cover letter was signed by Defendant Elliott, noted that copies were sent to Defendants Laban and IPS, and included this statement: "Enclosed you will find the completed signature pages which Laban Pattanaik asked us to prepare for your review."  The enclosed documents underscored the fact that these documents were prepared by Defendants. One included the notation "© Sea Nine Associates."  Another was printed on stationary bearing the name "Sea Nine Associates", included Sea Nine's logo, and was signed by Defendant Elliott.  Plaintiffs signed where requested and thus joined the Program.

76.     AIG issued the following three "Modified Whole Life" Policies: (a) Policy No. A10225086C with Bruce Billington as the Insured and a current cash value of approximately $223,000; (b) Policy No. A10225085C with Stephen Brockman as the Insured and a current cash value of approximately $241,442; and (c) Policy No. A10225084C with Thierry Pompart as the Insured and a current cash value of approximately $92,379.18.  Sierk and IPS were among those listed on the applications for these Policies as agents entitled to receive commissions from AIG. Plaintiffs are informed and believe that, as a matter of course, all Agent Defendants received commissions from AIG on the Policies it issued.

77.     During the 2006-2011 period, Plaintiffs made the following contributions into the SCMAPL VEBA Program by mail and/or wire transfer(s): (a) $177,941.00 on or about December 12, 2006; (b) $188,264.00 on or about December 27, 2007; (c) $183,860.96 on or about December 11, 2008; (d) $183,860.96 on or about December 30, 2009; and (e) $180,769.82 on or about January 7, 2011.  The first payment was made payable to UBS F/C Capital Trust, which was the Trustee at that time.  The subsequent payments were made payable to Comerica, which became the Trustee in 2007.  The total amount of Plaintiffs' contributions to the SCMAPL Program equals $914,696.74.

CLASS ACTION COMPLAINT FOR DAMAGES

78.     Plaintiffs discovered the true nature of the VEBA Programs on or about September 8, 2011, when Plaintiffs received audit notices from the IRS, informing them that their federal tax returns had been selected for examination. Following its audit review, the IRS assessed $362,904.91 in taxes, interest and penalties for the years 2008-2009.  The following is a breakdown:

  a. Ulti-Mate Connectors – a $20,057.62 penalty pursuant to 26 U.S.C. § 6706A (failure to report a Listed Transaction);

  b. Plaintiff Billington – a $26,266.50 penalty under § 6707A, plus back taxes of $80,657.36 and interest of $6,288;

  c. Plaintiff Pombart – a $26,437.50 penalty, plus back taxes of $85,103.47, and interest of $7,690; and

  d. Plaintiff Brockman – a $25,326 penalty, plus back taxes of $77,756.46 and $7,362 in interest.

79.     Prior to September 8, 2011, Plaintiffs did not know and had no reason to know that Defendants had engaged in wrongdoing or that they had been injured by the conduct alleged in this Complaint.

80.     In addition to the IRS penalties listed above and the $914,696.74 in contributions into the VEBA Program, Plaintiffs have lost investment opportunities by putting their money in the VEBA Program, to which they now have no access, and have suffered from anxiety, emotional distress, among other damages to be proven at trial.  Further, Plaintiffs and Class Members are likely to face additional tax liabilities in the future that they would not have incurred but for Defendants' wrongdoing.

81.     Defendants knew, or should have known, that none of their VEBA Programs, including the SCMAPL Program, complied with provisions of federal tax law that supposedly provided the tax advantages that Defendants claimed. Defendants, and each of them, negligently and/or intentionally failed to disclose this information.  Despite knowledge of the noncompliant nature of their Programs,

CLASS ACTION COMPLAINT FOR DAMAGES

1   Defendants continued to make representations that the VEBA Programs were

2   compliant to Plaintiffs and other members of the Class.

3        82.    Defendant AIG, which designed its Policies to be used in conjunction

4   with these VEBA Programs and actively participated in the Agent Defendants'

5   marketing efforts, knew or should have known that its agents were marketing and

6   promoting these Programs as a tax-avoidance transaction.  However, even after

7   AIG received actual notice of the noncompliant nature of these Programs, AIG

8   knowingly and willingly continued to participate in this fraudulent scheme and

9   continued to derive profits at Plaintiffs' expense.

10       83.    Defendants engaged in the wrongful conduct alleged herein to induce

11  Plaintiffs and other Class Members to join their VEBA Programs and buy the

12  Policies, which Plaintiffs and other members of the Class would not have done had

13  they known the true facts.  Defendants knew, or should have known, that Plaintiffs

14  and Class members were ignorant of the true facts at all relevant times.

15       **G.    Defendants Used A Common Marketing Plan And The Same**
16       **Modus Operandi With Other Members Of The Class**

17       84.    Defendants used a common marketing plan and the same basic modus

18  operandi to promote their VEBA Programs and sell AIG Policies to other Class

19  Members who suffered similar damages.  *See, e.g., United States of America v.*

20  *Kenneth Elliott, et al.*, U.S. District Court, C. D. Cal. Case No. 13-CV-01582-JLS-

21  JPR, Dkt. No. 1 at ¶¶ 3-4, 16, 33-99 (alleging a common scheme);  *J & M v.*

22  *Callahan, et al.*, U.S. District Court, S.D. Ala. Case No. 07-CV-00883, Dkt. No. 1,

23  at ¶¶ 8-16, 21-28 (alleging a similar sequence of events in 2004 to 2006 in a

24  complaint filed against AIG, Lalat, IPS, and others); *Smith, et al. v. Elliott, et al.*,

25  Hawaii Circuit Court, First Circuit, Case No. 09-1-2282-10 KKS, First Amended

26  Complaint filed 2/24/2011 at ¶¶ 24-69 (alleging a similar sequence of events

27  against Innovative, IPS, Laban, Lalat, Sea Nine, Elliott).

28

CLASS ACTION COMPLAINT FOR DAMAGES

1
2

H.   **California Statutes Regarding Concealment and Misrepresentation in the Sale of Insurance Policies**

3
4
5
6
7
8
9
10
11

85.   Defendants had a duty to communicate to Plaintiffs and members of the Class, "in good faith, all facts within their knowledge which were … material to the contract." Cal. Ins. Code § 332. In the insurance context, "materiality" is defined "not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due, in forming his estimate of the disadvantages of the proposed contract, or in making his inquiries." Cal. Ins. Code § 334. There is no possible way that Plaintiffs or the other Class Members could have discovered the January 27, 2004 opinion letter from the Reish law firm because Defendants failed to disclose it.

12
13
14
15
16
17
18
19
20
21
22

86.   Pursuant to California Insurance Code § 331, Defendants' concealment of material information regarding the Policies, as alleged elsewhere in this Complaint, constitutes grounds for rescission whether the concealment was intentional or unintentional. Likewise, Plaintiffs and members of the California rescission class are entitled to rescind the Policies based on Defendants' material misrepresentations and/or a simple mistake of fact at the time Plaintiffs and members of the California rescission class gave their consent to the transactions with Defendants. Cal. Ins. Code § 359; Cal. Civ. Code § 1689(b)(1). Remedies for rescission are not limited to the return of the consideration they paid; California Civil Code § 1692 also allows Plaintiffs and Class Members to recover their consequential damages.

23
24

I.   **Ownership Of The Policies, Missing Premium Payments On The Pombart Policy, And The Comerica Action**

25
26
27

87.   By design, the Programs purchased the Policies and, at least initially, were the policyholders of record and the beneficiary of each. But the Programs hold all policies in trust for their beneficial owners (the individual Plaintiffs and

28

CLASS ACTION COMPLAINT FOR DAMAGES

individual Class Members) and is required to pay benefits to those designated by the Insureds to receive benefits.

88.    Beginning in late 2011, Plaintiffs notified Defendant Elliott, the Administrator of the SCMAPL Program, that they wished to terminate participation from the Program and have ownership of the Policies transferred to the individual Plaintiffs.  Elliott and Sierk exchanged several e-mails in March and April, 2013 regarding the steps required to transfer ownership of the Policies to the individual Plaintiffs.  In a series of e-mails dated March 25, March 26, April 10, April 17, and April 22, 2013, Defendant Elliott led Sierk to believe that the transfer of ownership was in process but that, per AIG policy, the copies of the Policies that Plaintiffs requested would continue to bear the name of the original owner.  On April 22, 2013, Defendant Elliott e-mailed duplicate copies of the three Policies to Sierk. Based on Elliott's representations, Sierk believed that the transfer of ownership had been completed at that time and communicated that belief to Plaintiffs.

89.    Around this time (April 2013), Plaintiffs learned that the SCMAPL Program failed to make two of the premium payments for the Pombart Policy, each of which was supposed to be for $58,334.  As a result, the Pombart Policy is now worth substantially less than promised.  E-mails from Elliott to Sierk on December 18 and 19, 2013 and January 2 and 13 and February 4, 2014 failed to explain or remedy Defendants' failure to make these payments.  Defendants have never explained why they were not made.  Nor have they refunded the $116,668 in contributions that Plaintiffs made to the SCMAPL Program to cover them.

90.    In December 2013, Plaintiffs discovered that Defendants still had not transferred ownership of the Policies to Plaintiffs.  After Sierk demanded that the two failures described above be remedied, Defendant Elliott promised in a December 19, 2013 e-mail: "This matter will be resolved as a result of the hard work in obtaining the facts as to what happened and then applying the appropriate remedy.  To the degree allowed me, I will proceed in good faith towards that goal

1  regardless of what others may do."  However, Defendants never fixed these

2  failures.

3      91.    On January 2, 2014, Defendant Elliott e-mailed Sierk that Comerica

4  had advised him that it would not process any further terminations from

5  Defendants' Programs, meaning that ownership of the Policies could not be

6  transferred to the individual Plaintiffs as promised.  That same day, Sierk contacted

7  AIG and obtained the form required to transfer ownership of the Policies and asked

8  Elliott to have Comerica sign it.  Defendant Elliott forwarded it by e-mail to

9  Comerica, but Comerica has refused to sign the form.

10     92.    Earlier this year, Comerica, the current Trustee responsible for holding

11 the assets of Defendants' VEBA Programs and receiving and paying the premium

12 payments for the Policies, filed an action in federal district court seeking

13 declaratory and injunctive relief and instructions (U.S. District Court, C.D. Cal.

14 Case No. 14-CV-00186-JLS-JPRx) ("Comerica Action").  In its complaint,

15 Comerica reports that many of the participants in the VEBA Programs have issued

16 notices of withdrawal and demanded distributions from the trust.  Comerica warns

17 that the VEBA Programs for which it is the Trustee do not have sufficient assets to

18 satisfy all of these claimants:

19     "Based on the manner in which Sea Nine has administered the VEBA

20     Programs, if the trust assets are distributed on a piecemeal, first-come,

21     first-served basis in accordance with Sea Nine's directives, the trust

22     assets may be depleted before all employers have received a

23     distribution, and/or there may be inadequate resources to make

24     premium payments to keep remaining policies in force."

25     93.    Among other things, the Comerica Action seeks: (a) a determination

26 whether these VEBA Programs are governed by the Employee Retirement Income

27 Security Act of 1974, 29 U.S.C. §§ 1001-1191c ("ERISA") because the DOJ

28 Complaint calls the applicability of ERISA into question; (b) a determination

CLASS ACTION COMPLAINT FOR DAMAGES

1    whether recent events have resulted in an involuntary termination of these VEBA

2    Programs requiring distribution of trust assets; (c) an Order enjoining distribution

3    or disposition of trust assets except as necessary to preserve those assets and pay

4    any death benefits to beneficiaries pending further directions from the Court; and

5    (d) directions from the Court as to how to fulfill its responsibilities.

6        94.    Plaintiffs are informed and believe and on that basis allege that

7    Comerica intends to obtain default judgments against the various Sponsors of

8    Defendants' VEBA Programs, including SCMAPL, and that the Comerica Action

9    will soon result in the termination of all of Defendants' VEBA Programs, including

10   the SCMAPL.

11                            **CLASS ACTION ALLEGATIONS**

12       95.    Pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil

13   Procedure, Plaintiffs seek to represent two classes that, collectively, consist of all

14   entities and individuals that, at any time during the year 2001 or later, joined one of

15   Defendants' VEBA Programs and either contributed money to that Program for the

16   purchase of one or more Policies from AIG or became an Insured under such a

17   Policy (collectively, "Class Members").  (As used herein, the term "Class" refers to

18   the two classes collectively and/or the members thereof, depending on the context.)

19   The two classes are differentiated as follows:

20           a.    California-only rescission/UCL class: For purposes of pursuing

21                 the rescission claim alleged in the First Cause of Action and the

22                 UCL claims alleged in the Fourth and Fifth Causes of Action,

23                 Plaintiffs seek to certify a California-only class consisting of

24                 Class Members residing in California ("California

25                 rescission/UCL class"); and

26           b.    Nationwide RICO/fraud-by-concealment/aiding and abetting

27                 class: For purposes of pursuing the RICO claims alleged in the

28                 Second and Third Causes of Action, the fraud by concealment

1   claim in the Sixth Cause of Action, and the alternative aiding
2   and abetting claim against AIG in the Eighth Cause of Action,
3   Plaintiffs seek to certify a nationwide class consisting of Class
4   Members residing in any state, including California
5   ("nationwide RICO/fraud-by-concealment/aiding and abetting
6   class").

7   96.   This action is properly brought against Defendants as a class action for
8   the following reasons.  On information and belief, the Class is composed of dozens
9   of entities and individuals widely disbursed geographically.  The Class (and each
10  part thereof) is so numerous that joinder of all Class Members is impracticable.
11  The Class (and each part thereof) is readily ascertainable.  There is a well-defined
12  community of interest in the questions of law and fact alleged because the rights of
13  each Class Member were infringed or violated in the same fashion based on
14  Defendants' (a) wrongful concealment of material information and/or (b) use of
15  common forms and promotional material, a common marketing plan, and uniform
16  misrepresentations of material fact and concealment of material facts.  Notice to the
17  Class can be provided through the records of Defendants, their affiliates and
18  subsidiaries, or by publication, the cost of which is properly imposed upon
19  Defendants.

20  97.   Questions of law or fact common to the Class (and each part thereof)
21  predominate over questions that may affect particular Class Members.  Some
22  common questions include:

23      a.   Whether Defendants' VEBA Programs were Listed Transactions
24           within the meaning of I.R.C. § 6111(a) and (b) and 26 C.F.R. §
25           1.6011-4 and related provisions of federal tax law;
26      b.   Whether Defendants knew or should have known that their
27           VEBA Programs were Listed Transactions;

28

- 34 -

CLASS ACTION COMPLAINT FOR DAMAGES

1            c.      Whether Defendants had a duty to disclose to Participants that

2                  their VEBA Programs were Listed Transactions;

3            d.      Whether Defendants disclosed to Participants that their VEBA

4                  Programs were Listed Transactions;

5            e.      Whether Defendants' VEBA Programs complied with §

6                  419A(f)(6) and related provisions of the Tax Code and

7                  regulations promulgated thereunder;

8            f.      Whether Defendants knew or should have known that their

9                  VEBA Programs failed to comply with § 419A(f)(6) and related

10                 provisions of federal tax law;

11           g.      Whether Defendants had a duty to disclose to Participants that

12                 their VEBA Programs failed to comply with § 419A(f)(6) and

13                 related provisions of federal tax law;

14           h.      Whether Defendants disclosed to Participants that their VEBA

15                 Programs failed to comply with § 419A(f)(6) and related

16                 provisions of federal tax law;

17           i.      Whether Defendants' common marketing plan included

18                 misstatements of material fact and/or improperly failed to

19                 disclose material facts;

20           j.      Whether there was an "enterprise" within the meaning of 18

21                 U.S.C. §§ 1961(4) and 1962(c);

22           k.      Whether Defendants conducted this enterprise on an ongoing

23                 basis, and whether Defendants did so in furtherance of a

24                 common unlawful purpose;

25           l.      Whether Defendants explicitly or tacitly agreed to function and

26                 did function as a unit;

27           m.    Whether Defendants' conduct amounted to a scheme or artifice

28                 to defraud Class Members;

- 35 -

1    n.    Whether Defendants engaged in a pattern of racketeering

2          activity;

3    o.    Whether Defendants' conduct posed or poses a threat of

4          continuing harm;

5    p.    Whether Defendants conspired to violate RICO;

6    q.    Whether Defendants violated the UCL and/or False Advertising

7          Law

8    r.    Whether Defendants violated I.R.C. § 6700 and/or 7408 as

9          alleged in the DOJ complaint;

10   s.    Whether Plaintiffs and Class Members are entitled to rescission,

11         compensatory damages, consequential damages, punitive

12         damages, restitution, disgorgement and/or other remedies

13         because of Defendants' wrongful conduct; and

14   t.    Whether Defendant AIG aided and abetting the other

15         Defendants' RICO violations and other unlawful and wrongful

16         conduct.

17   98.   Plaintiffs' claims are typical of the claims of the other members of the

18   Class in that they entered into identical or substantially similar contracts.  Plaintiffs

19   will fairly and adequately protect the interests of the Class in that they have no

20   interest antagonistic to those of the Class, and Plaintiffs have retained attorneys

21   experienced in class action and complex litigation.

22   99.   The disposition of Plaintiffs' and Class Members' claims in a class

23   action will provide substantial benefits to both the parties and the Court.  A class

24   action is superior to other available methods for the adjudication of this

25   controversy.  This class action will promote an orderly and expeditious

26   administration and adjudication of the Class claims, be fair and efficient, and ensure

27   uniformity of decisions.

28   ///

CLASS ACTION COMPLAINT FOR DAMAGES

# FIRST CAUSE OF ACTION

## Rescission, Cal. Ins. Code §§ 331, 359; Cal. Civ. Code § 1689,

## Against All Defendants

100.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

101.   When marketing their VEBA Programs and Policies to Plaintiffs and the Class, Defendants intentionally, negligently and/or mistakenly misstated material facts.  Among other things, Defendants misrepresented that contributions to the Programs would be tax deductible to Participating Employers in the year those contributions were made, and that by following the steps set forth elsewhere in this Complaint, Participating Employees would be able to draw benefits at a later date on a tax-free basis.  When agreeing to join Defendants' VEBA Programs and purchase the Policies, Plaintiffs and members of the Class believed these things to be true.  As alleged more particularly elsewhere in this Complaint, these representations were false.

102.   As further alleged elsewhere in this Complaint, Defendants intentionally, negligently, and/or mistakenly failed to disclose material information, including but not limited to the fact that Defendants' VEBA Programs are Listed Transactions.  Nor did Defendants disclose the January 2004 opinion letter in which the Reish law firm advised Defendants that their VEBA Programs did not comply with § 419A(f)(6).  Plaintiffs and Class Members would not have joined Defendants' Programs or purchased the Policies had these facts been disclosed.  Defendants knew, or should have known, that Plaintiffs and members of the Class were ignorant of the true facts relating to the transactions at issue.

103.   As a result of Defendants' intentional, negligent and/or mistaken misstatement of material facts and/or failure to disclose material facts, and/or Plaintiffs' and Class Members' material mistake of fact at the time they consented to the transactions with Defendants, Plaintiffs and the California rescission class are

- 37 -

1   entitled to rescind: (a) their agreement to join the VEBA Programs; and (b) the

2   Policies through the Programs.

3       104.   Service of this Complaint and related pleadings on Defendants

4   constitutes notice of rescission of all agreements entered into between Plaintiffs and

5   the California rescission class on the one hand, and Defendants on the other,

6   including the Adoption Agreements and the Policies.

7       105.   Pursuant to California Civil Code § 1692, Plaintiffs and members of

8   the California rescission class are also entitled to recover the consequential

9   damages they sustained as a direct and proximate result of Defendants' intentional

10  misconduct and/or negligent conduct in an amount to be determined at trial in

11  excess of the jurisdictional threshold of this Court.

12              **SECOND CAUSE OF ACTION**

13              **RICO, 18 U.S.C. § 1962(c),**

14              **Against All Defendants**

15      106.   Plaintiffs incorporate by reference the allegations contained in the

16  preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

17      107.   At all relevant times, there existed an "enterprise" within the meaning

18  of 18 U.S.C. §§ 1961(4) and 1962(c) that consisted of multiple distinct entities

19  and/or individuals associated in fact, including Defendants AIG, Innovative, IPS,

20  Sea Nine, Lalat, Laban, Elliott and/or the VEBA Programs themselves.  Defendants

21  are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c) and distinct

22  from the "enterprise" they formed and operated to perpetrate the fraud alleged in

23  this Complaint.

24      108.   As more fully alleged elsewhere in this Complaint, Defendants have

25  conducted this enterprise on an ongoing basis since 2001 or 2002, if not earlier.

26  Through the conduct of this enterprise, Defendants have used the fraudulent means

27  alleged herein to convince at least 205 entities and/or individuals to participate in

28

CLASS ACTION COMPLAINT FOR DAMAGES

1    their VEBA Programs and purchase Policies through those Programs.  Defendants

2    reinvested the proceeds of this scheme to defraud in the continuing enterprise.

3        109.   Each Defendant participated in the conduct of this enterprise in

4    furtherance of a common purpose that all Defendants agreed upon – the sale of

5    participation rights in Defendants' VEBA Programs and the sale of Policies through

6    material misstatements and material omissions, and the reinvestment of the

7    proceeds of that misconduct in the continuing enterprise.

8        110.   Through explicit and/or tacit agreements, Defendants agreed to

9    function and did function as a unit and according to specified roles.  Specifically,

10   Defendant AIG agreed with the other Defendants to sell Policies through the

11   Programs, provide marketing material for both the Programs and the Policies, and

12   to help market the Programs and Policies through its employees.  Among other

13   things, Defendants Innovative, Lalat, IPS, and Laban agreed with the other

14   Defendants to take the leading role in marketing and promoting the Programs and

15   Policies.  Defendants Elliott and Sea Nine agreed with the other Defendants to

16   assist in marketing the Programs and Policies and serve as the Administrator for the

17   Programs.

18       111.   The conduct alleged in this Complaint was part of a scheme that

19   Defendants formulated to defraud Plaintiffs and members of the nationwide RICO

20   class.  Defendants perpetrated this scheme with the specific intent to deceive and/or

21   defraud Plaintiffs and members of the nationwide RICO class, and Defendants did

22   deceive and/or defraud Plaintiffs and the members of that class.

23       112.   Defendants committed a continuous series of predicate acts of mail

24   and wire fraud (18 U.S.C. §§ 1341 and 1343) alleged in paragraphs 66-68, 71-75,

25   77 and 88-91 of this Complaint in furtherance of this scheme.  Among these

26   predicate acts is the telephone call alleged in paragraph 66 in which Defendant

27   Mordin, a senior executive of Defendant AIG, *inter alia*, urged Sierk to recommend

28   that his clients sign up for Defendants' VEBA Programs and purchase Policies

CLASS ACTION COMPLAINT FOR DAMAGES

through those Programs.  Plaintiffs are informed and believe and on that basis allege that Defendants made similar use of the U.S. Mail and interstate wires to perpetrate fraud against all 205 Participants identified in the DOJ complaint.  In addition, Defendants stole, embezzled and/or misappropriated $116,668 in contributions that Plaintiffs made to the SCMAPL Program to cover premium payments for the Pombart Policy, which conduct qualifies as another predicate act within the meaning of the RICO statute.

113.   The predicate acts alleged in this Complaint constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).  Defendants' conduct, including the predicate acts and pattern of racketeering activity, amount to and/or pose a threat of continued criminal conduct.

114.   As a direct and proximate result of Defendants' wrongdoing conduct, Defendants caused harm and/or injury to the individual Plaintiffs' business (in the form of the § 6707A penalty paid by Ulti-Mate Connectors and otherwise), the businesses of individual members of the nationwide RICO class, and to the property of all and members of the nationwide RICO class, including Plaintiffs. Under the provisions of RICO, Plaintiffs and members of the nationwide RICO class are entitled to recover treble damages, costs of suit and attorneys' fees.

### **THIRD CAUSE OF ACTION**

**RICO, 18 U.S.C. § 1962(d),**

**Against All Defendants**

115.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

116.   In violation of 18 U.S.C. 1962(d), Defendants, and each of them, by their words and/or actions, objectively manifested an agreement to participate, directly and/or indirectly, in the scheme to defraud and the RICO enterprise alleged in this Complaint and thereby conspired with one another to commit the conduct alleged in this Complaint.

CLASS ACTION COMPLAINT FOR DAMAGES

117.   Defendants, and each of them, by their words and/or actions, objectively manifested an agreement on the common purpose of this enterprise, *i.e.*, the sale of participation rights in their VEBA Programs, the sale of Policies through fraudulent means and/or a pattern of racketeering activity, and the reinvestment of the proceeds of that misconduct in their common enterprise.

118.   Further, Defendants, and each of them, by their words and/or actions, objectively manifested an agreement to perpetrate this scheme through predicate acts amounting to a pattern of racketeering activity.  Defendants, and each of them, agreed to commit predicate crimes, aid and abet the commission of predicate crimes by other members of the enterprise, and/or that some members of the enterprise would commit the predicate acts for the benefit of all members and/or the enterprise.

119.   As a direct and proximate result of Defendants' wrongful conduct, Defendants caused harm and/or injury to the individual Plaintiffs' business (in the form of the § 6707A penalty paid by Ulti-Mate Connectors and otherwise), the businesses of individual members of the nationwide RICO class, and to the property of all and members of the nationwide RICO class, including Plaintiffs. Plaintiffs and members of the nationwide RICO class are entitled to recover treble damages, costs of suit and attorneys' fees.

## FOURTH CAUSE OF ACTION

**California's Unfair Competition Law, Bus. & Prof. Code §§ 17200, *et seq.***

**Against All Defendants**

120.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

121.   The UCL prohibits anything that constitutes an unfair, unlawful or deceptive business practice.  Cal. Bus. & Prof. Code § 17200.  The UCL authorizes a private right of action by anyone who has suffered injury in fact and allows recovery of amounts which may be necessary to restore to any person in interest

- 41 -

1   any money or property which may have been acquired by means of any practice

2   that violates the UCL.  Cal. Bus. & Prof. Code § 17203.

3       122.   The "unlawful prong" of the UCL "borrows" violations of other laws

4   and treats them as unlawful practices independently actionable under the UCL.

5   Here, as alleged in the DOJ complaint, Defendants have violated:

6              a.   I.R.C. § 6700 which, *inter alia*, makes it unlawful for any

7                   person to (a) organize or assist in the organization of an entity,

8                   plan or arrangement, or participate in the sale of an interest

9                   therein, and (b) knowingly make or cause to be made a false or

10                  fraudulent statement as to the allowability of a deduction, the

11                  excludability of any income or the securing of another tax

12                  benefit because of his/her/its participation in the entity, plan or

13                  arrangement.

14             b.   I.R.C. §6701 which, *inter alia*, makes it unlawful for any person

15                  to aid or assist in the preparation or presentation of a federal tax

16                  return, or other document, knowing that it would result in an

17                  understatement of another's tax liability.

18      123.   In addition, Defendants' conduct violated the deceptive/fraudulent

19  prong of the UCL in that Defendants' common marketing plan, which misstated

20  material facts and failed to disclose material facts, was deceptive and likely to

21  deceive Plaintiffs and members of the California UCL class who were uniformly

22  misled about the true nature of Defendants VEBA Programs, the Policies, and the

23  tax consequences relating thereto.

24      124.   Defendants' practices also violated the UCL's "unfair" prong in that

25  they offended established federal tax policy.  Defendants' practices were also unfair

26  because the harm caused to Plaintiffs and members of the California UCL class

27  greatly outweighs any benefits associated with these practices.

28

CLASS ACTION COMPLAINT FOR DAMAGES

125.   Had Plaintiffs and the Class been aware of the material information that Defendants failed to disclose and the material misstatements of fact, they never would have agreed to join the SCMAPL VEBA Program or purchase policies through those Programs.  Thus, as a result of Defendants' unlawful practices alleged above, Plaintiffs have suffered injury in fact and lost money or property and are thus entitled to be class representatives in this class action seeking restitution for themselves and all members of the California UCL class.

126.   Defendants have derived substantial revenues from their wrongful and deceptive acts.  Plaintiffs and members of the California UCL class have been deprived of property to which they are entitled and/or in which they have a vested interest by means of Defendants' unlawful, fraudulent and unfair business practices. Pursuant to Bus. & Prof. Code § 17203, Plaintiffs and members of the California UCL class are entitled to an order requiring Defendants to restore to Plaintiffs and members of that class all the money or property which Defendants may have acquired by means of such unfair competition.

## FIFTH CAUSE OF ACTION

**California's False Advertising Law, Bus. & Prof. Code §§ 17500,** *et seq.*

**Against All Defendants**

127.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

128.   Defendants, and each of them, intended to supply services in conjunction with their VEBA Programs and/or dispose of personal property.

129.   Defendants, and each of them, publicly disseminated advertising regarding their Programs and Policies that contained statements that were untrue and/or misleading.  Defendants, and each of them, knew or in the exercise of reasonable care should have known, that this advertising falsely described their VEBA Programs, their Policies, and the tax consequences relating thereto.

CLASS ACTION COMPLAINT FOR DAMAGES

130.   Defendants have derived substantial revenues from their false advertising.  Plaintiffs and members of the California UCL class have been deprived of property to which they are entitled and/or in which they have a vested interest by means of Defendants' violations of California's False Advertising Law. Plaintiffs and members of the California UCL class are entitled to an order requiring Defendants to restore to Plaintiffs and members of that class all the money or property which Defendants may have acquired by means of such false advertising.

## SIXTH CAUSE OF ACTION

### Fraud by Concealment

### Against All Defendants

131.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

132.   Defendants, and each of them, failed to disclose material facts to Plaintiffs and members of the nationwide fraud-by-concealment class, including that: (a) participants in prior versions of Defendants' VEBA Programs were audited by the IRS, had their deductions disallowed and were forced to pay penalties, back taxes and interest; (b) that Defendants' VEBA Programs were Listed Transactions that had to be disclosed to the IRS because they were the same or substantially similar to transactions determined to be unlawful tax avoidance schemes; and (c) Defendants own lawyers advised them in writing that the Programs did not comply with §419A(f)(6).  Defendants concealed this material information with the intent to induce Plaintiffs and members of the nationwide fraud-by-concealment class to join their Programs, purchase Policies, and make substantial payments to Defendants.

133.   Defendants, and each of them engaged in, adopted and/or ratified the misconduct alleged in this Complaint with the intent to deceive Plaintiffs and members of the nationwide fraud-by-concealment class and with the knowledge

that Plaintiffs and members of the nationwide fraud-by-concealment class would be deceived.  At all relevant times, Defendants expected that Plaintiffs and members of the nationwide fraud-by-concealment class would rely, and knew that Plaintiffs and members of the nationwide fraud-by-concealment class did rely, upon the material omissions alleged herein.

134.   Plaintiffs and members of the nationwide fraud-by-concealment class reasonably relied on Defendants' failure to disclose material facts in agreeing to participate in Defendants' Programs, in agreeing to purchase the Policies, and in making the payments to Defendants.  Plaintiffs and members of the nationwide fraud-by-concealment class would not have entered into the Adoption Agreement, purchased the Policies, or made substantial payments to Defendants had they known the true facts.

135.   As a direct and proximate result of Defendants' misconduct and deception, Plaintiffs and members of the nationwide fraud-by-concealment class have been damaged in a sum in excess of the jurisdictional threshold of this Court, and in additional amounts to be determined at time of trial, including interest and costs.  Defendants' conduct was wanton, despicable, malicious and done with a conscious disregard of Plaintiffs' rights and with the intent to defraud and harm Plaintiffs, entitling them to exemplary and punitive damages.

## SEVENTH CAUSE OF ACTION

### Common Law Fraud

### Against All Defendants

136.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

137.   Defendants, and each of them, made various misrepresentations of material fact to Plaintiffs as alleged above, and did so with the intent to induce Plaintiffs to join the SCMAPL VEBA Program, purchase Policies, and make substantial payments to Defendants.

- 45 -

138.   Defendants, and each of them engaged in, adopted and/or ratified the misconduct alleged in this Complaint with the intent to deceive Plaintiffs and with the knowledge that Plaintiffs would be deceived.  At all relevant times, Defendants expected that Plaintiffs would rely, and knew that Plaintiffs did rely, upon the material misrepresentations alleged herein.

139.   Plaintiffs reasonably relied on Defendants' misrepresentations of material facts in agreeing to participate in the SCMAPL Program, purchase the Policies, and make the payments to Defendants between 2006 and 2011.  Plaintiffs would not have entered into the Adoption Agreement, purchased the Policies, or made substantial payments to Defendants had they known the true facts.

140.   As a direct and proximate result of Defendants' misconduct and deception, Plaintiffs have been damaged in a sum in excess of the jurisdictional threshold of this Court, and in additional amounts to be determined at time of trial, including interest and costs.  Defendants' conduct was wanton, despicable, malicious and done with a conscious disregard of Plaintiffs' rights and with the intent to defraud and harm Plaintiffs, entitling them to exemplary and punitive damages.

## EIGHTH CAUSE OF ACTION

### Aiding and Abetting

### Against Defendant AIG

141.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

142.   At all relevant times, Defendant AIG knew that the conduct of the Agent Defendants, and each of them, constituted violations of RICO and/or a breach of legal duties owed to Plaintiffs and members of the nationwide aiding and abetting class.

143.   Defendant AIG nonetheless acted in concert with the Agent Defendants pursuant to a common design, gave substantial assistance or

1   encouragement to the Agent Defendants' wrongful or unlawful conduct, and/or

2   gave substantial assistance to the Agent Defendants in accomplishing a tortious

3   result.

4        144.   Defendant AIG's own conduct, separately considered, constituted a

5   breach of duty to Plaintiffs and members of the nationwide aiding and abetting

6   class.

7        145.   As a proximate and direct result of AIG's aiding and abetting the

8   Agent Defendants, Plaintiffs and members of the nationwide aiding and abetting

9   class were damaged as alleged above and in an amount to be determined at trial.

10   **PRAYER FOR RELIEF**

11        WHEREFORE, Plaintiffs pray judgment against the Defendants, and each of

12   them, as follows:

13       1.    For special damages according to proof;

14       2.    For general damages according to proof;

15       3.    For attorneys' fees and costs according to proof;

16       4.    For restitution of all monies paid to the Defendants according to proof;

17       5.    For punitive and/or exemplary damages according to proof;

18       6.    For pre-judgment and post-judgment interest;

19       7.    For such other and further relief as the court may deem proper.

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

CLASS ACTION COMPLAINT FOR DAMAGES

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  July 9, 2014                    LAW OFFICE OF MICHAEL J. REISER

                                        MEADE & SCHRAG LLP
                                        TYLER R. MEADE, ESQ.
                                        MICHAEL L. SCHRAG, ESQ.


                                        By:  /s/ TYLER MEADE
                                            TYLER MEADE
                                            Attorneys for Plaintiffs and the Class

CLASS ACTION COMPLAINT FOR DAMAGES