LAW OFFICE OF MICHAEL J. REISER
MICHAEL J. REISER, ESQ. (SBN 133621)
LILIA BULGUCHEVA, ESQ. (SBN 291374)
961 Ygnacio Valley Road
Walnut Creek, California 94596
Telephone: (925) 256-0400
Facsimile: (925) 476-0304
reiserlaw@gmail.com
lilia.reiserlaw@gmail.com

MEADE & SCHRAG LLP
TYLER R. MEADE, ESQ. (SBN 160838)
MICHAEL L. SCHRAG, ESQ. (SBN 185832)
1816 Fifth Street
Berkeley, CA 94710
Telephone: (510) 843-3670
Facsimile: (510) 843-3679
tyler@meadeschrag.com
michael@meadeschrag.com

Attorneys for Plaintiffs and the Class
ULTI-MATE CONNECTORS, INC., BRUCE
L. BILLINGTON, THIERRY POMBART,
and STEPHEN R. BROCKMAN

### IN THE UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ULTI-MATE CONNECTORS, INC.; BRUCE L. BILLINGTON; THIERRY POMBART; and STEPHEN R. BROCKMAN, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> AMERICAN GENERAL LIFE INSURANCE COMPANY; SEA NINE ASSOCIATES, INC.; INNOVATIVE PRIVATE | Case No.  8:14-cv-01051-JLS-JPRx <br><br> FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES FOR: <br><br> 1.  RESCISSION; <br><br> 2.  VIOLATIONS OF THE RACKETEER INFLUENCED CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c); <br><br> 3.  CONSPIRACY TO VIOLATE |

-1-
FIRST AMENED CLASS ACTION COMPLAINT FOR DAMAGES

| | |
|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23 | STRATEGIES & INSURANCE SERVICES, INC.; I.P.S. PRIVATE ADVISORS; LALAT PATTANAIK; LABAN PATTANAIK; KENNETH A. ELLIOTT, individually and d.b.a. KAE, KAE CONSULTING and VISTA BARRANCA; PETER MORDIN; SOUTHERN CALIFORNIA MANUFACTURERS' AND AGRICULTURAL PRODUCERS' LEAGUE VOLUNTARY EMPLOYEES' BENEFICIARY ASSOCIATION MASTER PLAN; SOUTHERN CALIFORNIA ENTERTAINMENT AND COMMUNICATION GUILD VOLUNTARY EMPLOYEES' BENEFICIARY ASSOCIATION MASTER PLAN; SOUTHERN CALIFORNIA MEDICAL PROFESSION ASSOCIATION VOLUNTARY EMPLOYEES' BENEFICIARY ASSOCIATION MASTER PLAN; SOUTHERN CALIFORNIA RETAIL MERCHANTS' LEAGUE VOLUNTARY EMPLOYEES' BENEFICIARY ASSOCIATION MASTER PLAN; CALIFORNIA BUILDING SUPPLY, WHOLESALERS' AND CONTRACTORS' LEAGUE VOLUNTARY EMPLOYEES' BENEFICIARY ASSOCIATION MASTER PLAN; SOUTHERN CALIFORNIA CONSULTANTS' AND FINANCIAL PLANNERS' PROFESSION ASSOCIATION VOLUNTARY EMPLOYEES' BENEFICIARY ASSOCIATION MASTER PLAN and DOES 1 – 50,<br><br>        Defendants. | THE RACKETEER INFLUENCED CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d);<br><br>4.   VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW, Cal. Bus. & Prof. Code §§ 17200, *et seq.*;<br><br>5.   FALSE ADVERTISING, Cal. Bus. & Prof. Code §§ 17500, *et seq.*;<br><br>6.   FRAUD BY CONCEALMENT;<br><br>7.   FRAUD; and<br><br>8.   AIDING AND ABETTING<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs Ulti-Mate Connectors, Inc., Bruce L. Billington, Stephen R. Brockman, and Thierry Pombart (collectively referred to as "Plaintiffs"), on behalf of themselves and all other similarly situated entities and/or individuals ("Class Members"), allege the following on information and belief against Defendants

- 2 -

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

1   American General Life Insurance Company ("AIG"); Sea Nine Associates, Inc.

2   ("Sea Nine"); Innovative Private Strategies & Insurance Services, Inc.

3   ("Innovative"); I.P.S. Private Advisors ("IPS"); Laban Pattanaik ("Laban"); Lalat

4   Pattanaik ("Lalat"); Peter Mordin ("Mordin"); Kenneth A. Elliott, individual and

5   d.b.a. KAE, KAE Consulting and Vista Barranca (collectively, "Elliott"); Southern

6   California Manufacturers' And Agricultural Producers' League Voluntary

7   Employees' Beneficiary Association Master Plan; Southern California

8   Entertainment And Communication Guild Voluntary Employees' Beneficiary

9   Association Master Plan; Southern California Medical Profession Association

10   Voluntary Employees' Beneficiary Association Master Plan; Southern California

11   Retail Merchants' League Voluntary Employees' Beneficiary Association Master

12   Plan; California Building Supply, Wholesalers' And Contractors' League

13   Voluntary Employees' Beneficiary Association Master Plan; and Southern

14   California Consultants' And Financial Planners' Profession Association Voluntary

15   Employees' Beneficiary Association Master Plan and Does 1-50 (collectively and

16   with the DOES, "Defendants").

17   **INTRODUCTION**

18        1.     For well over a decade, Defendants have organized, promoted,

19   administered, and sold rights to participate in voluntary employee beneficiary

20   association plans that they touted as offering owners of small, closely-held

21   businesses a valuable insurance-oriented welfare benefit with significant tax

22   advantages.  (As used herein, the terms "VEBA plan(s)" or "plan(s)" refer to

23   voluntary employee beneficiary associations generally and the terms "VEBA

24   Program(s)" or "Program(s)" refer to the plans established, promoted and/or

25   administered by Defendants.)  An integral part of these VEBA Programs are

26   specialized whole life insurance policies that, when purchased and initially owned

27   through a VEBA Program and then later exchanged for another policy, supposedly

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

1    allowed these small business owners to make tax-deductible premium payments

2    and, at later dates, withdraw funds on a tax-free basis ("Policies" or "Policy").

3          2.      The problem is that the Internal Revenue Service ("IRS") has

4    repeatedly ruled that VEBA plans like the ones Defendants established, promoted

5    and administered do not comply with federal tax law, determinations that have been

6    consistently upheld by federal courts.  At all relevant times, Defendants were well

7    aware of the noncompliant nature of their Programs and thus that the tax advantages

8    they promoted were illusory.  By 2001, litigation involving prior versions of the

9    VEBA Programs at issue here and determinations by the IRS put Defendants on

10   notice that their Programs are an unlawful tax avoidance scheme.  Nonetheless,

11   Defendants continued to promote, administer, and sell participation rights in their

12   VEBA Programs, and further continued to market and sell the accompanying

13   Policies.

14         3.      In January 2004, tax attorneys retained by Defendants issued an

15   opinion letter advising them that their VEBA Programs did not did not comply with

16   the Tax Code and related regulations, including I.R.C. § 419A(f)(6), the relevant

17   provision of the Tax Code that supposedly permitted the tax-deductible

18   contributions and the tax-free withdrawals ("§ 419A(f)(6)").  In 2013, the U.S.

19   Department of Justice ("DOJ") filed a civil action to enjoin two of the defendants

20   (Sea Nine and Elliott) from continuing to market and sell these VEBA Programs.

21         4.      Using false and misleading marketing efforts, Defendants induced

22   many small business owners such as Plaintiffs and other Class members to

23   participate in VEBA programs ("Participants") without disclosing the following

24   material facts about the Programs:

25                a.      The IRS has deemed VEBA plans like Defendants' Programs to

26                        be suspect "Listed Transactions," or in other words, transactions

27                        that are the same or substantially similar to ones that the IRS has

28                        determined to be illegal tax avoidance schemes.  The IRS

- 4 -

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

imposes significant penalties on those who participate in Listed Transactions without disclosing that fact to the IRS.

b.    Contrary to Defendants' representations, the substantial "contributions" that Participants make to the Programs, which in reality are simply life insurance premium payments routed through the Program, were not tax-deductible as represented.

c.    Defendants' claims that Participants could withdraw funds on a tax-free basis are false.  The IRS considers the features of these Programs that supposedly allowed Participants to withdraw funds on a tax-free basis to be a deferred compensation scheme subject to taxation.

d.    With their high fees and low cash values, the Policies have few advantages once stripped of their supposed tax advantages.

5.    The Ulti-Mate Connector Plaintiffs are among the victims ensnared in this long-running scheme.  In 2006 – more than two years after tax attorneys advised Defendants that these Programs did not comply with federal tax law – Defendants reached out to Plaintiffs' financial planner to convince him to have his clients participate in their VEBA Programs.  Defendants, including a senior AIG executive, told the financial adviser that, if his clients joined one of Defendants' VEBA Programs and purchased the related Policies, their premium payments would be tax deductible and they would be allowed to withdraw funds on a tax-free basis at a later date.  When Plaintiffs' financial planner raised questions about earlier IRS actions against such plans and inquired whether they were Listed Transactions, Defendants assured him that their VEBA Programs had been vetted by counsel and complied with § 419A(f)(6) and all other provisions of applicable law.  Defendants also provided him with opinion letters from tax attorneys and an IRS determination letter to that effect, but failed to disclose that these letters did not accurately reflect the current state of the law.  Further, Defendants kept secret the

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

January 2004 opinion letter that concluded Defendants' Programs did *not* comply with § 419A(f)(6).

6.      Plaintiffs' financial adviser relayed Defendants' false and misleading claims about their VEBA Programs to Plaintiffs.  Since he had no knowledge of the January 2004 improperly withheld opinion letter, Plaintiffs financial planner was unable to warn Plaintiffs that the supposed tax advantages were illusory, or that participation in one of Defendants' Programs would likely result in an IRS audit and the imposition of penalties.  In this fashion, Defendants persuaded Plaintiffs to join one of their Programs and purchase three Policies from Defendant AIG.

7.      In late 2011 and early 2012, after Plaintiffs paid $914,696.74 in contributions to the Program they joined, which were to be used to pay the premiums on the Policies, the IRS audited Plaintiffs and issued assessments for $362,904.91 in penalties, interest, and back taxes, which Plaintiffs have paid.

8.      Using similar methods and a common marketing plan, Defendants convinced dozens of other entities and individuals to join their Programs and purchase AIG Policies as documented in the DOJ complaint and other cases filed against Defendants.  The various Programs were essentially identical, although established in the names of different associations.

9.      Defendants knew, or should have known, that their Programs did not comply with § 419A(f)(6) and other tax statutes and regulations, that the IRS would audit and impose penalties on Class Members for deducting the premium payments they paid for the Policies, and that Class Members would not be able to withdraw benefits on a tax-free basis.

10.      Defendants have violated the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §§ 1961, *et seq.* ("RICO"), as well as California's Unfair Competition and False Advertising laws, Cal. Bus. & Prof. Code §§ 17200, *et seq.* and §§ 17500, *et seq.* (collectively, "UCL").  They also committed fraud by concealment, and common law fraud.  Finally, in addition to being directly liable

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

1  and liable under agency principles, Defendant AIG is also liable for aiding and

2  abetting the other Defendants' wrongful conduct.

3      11.    In the alternative, Plaintiffs are entitled to rescind all transactions with

4  Defendants, whether Defendants' material misstatements and failure to disclose

5  material information were intentional, negligent, Cal. Ins. Code §§ 331, 359, or

6  even just the result of a simple mistake.  Cal. Civ. Code § 1691(b)(1).  In

7  conjunction with their alternative claim for rescission, Plaintiffs are entitled to

8  recoup not only their contributions/premiums and related fees, but also

9  consequential damages, including back taxes, interest and penalties, the loss of the

10  time value of their money, and future tax liabilities that they would not otherwise

11  have incurred.  Cal. Civ. Code § 1692.

12      12.    Defendant AIG had worked closely with the other Defendants on these

13  Programs since 2001 or 2002, supplied some of the most critical marketing

14  materials used to market these Programs, and sold many Policies.  At all relevant

15  times, AIG knew that Plaintiffs and members of the Class were induced by

16  Defendants' conduct to believe that purchasing these Policies through a VEBA

17  Program provided the significant tax advantages described in this Complaint.

18      13.    AIG is responsible for the wrongful conduct of its employees

19  (including Defendant Mordin and David Robinson), its designated agents

20  (including Defendants Innovative, Laban and Elliott), and those defendants who are

21  AIG's agents by operation of law (including Defendants Innovative, Laban, IPS,

22  Lalat, Sea Nine, and Elliott).  *See* Cal. Ins. Code § 1704.5.  Further Defendant AIG,

23  is responsible for the materially false and incomplete information that financial

24  advisers obtained from Defendants and innocently relayed to Plaintiffs and

25  members of the Class.  *Id.*

26                              **PLAINTIFFS**

27      14.    Plaintiff Ulti-Mate Connectors, Inc. is a California corporation with a

28  principal place of business in Orange County, California.  At Defendants' urging,

1    Ulti-Mate Connectors joined a VEBA Program established in the name of

2    Defendant Southern California Manufacturers' and Agricultural Producers' League

3    ("SCMAPL"), and thus became a "Participating Employer" in that Program

4    pursuant to an Adoption Agreement described below.

5        15.    Plaintiff Bruce L. Billington ("Billington") is a resident of Orange

6    County, California, a shareholder of Ulti-Mate Connectors, the President of that

7    company, and a "Participating Employee" in the SCMAPL VEBA Program

8    pursuant to the Adoption Agreement.  He is the named Insured of the Policy No.

9    A10225086C issued by Defendant AIG.

10       16.    Plaintiff Stephen R. Brockman ("Brockman") is a resident of Los

11   Angeles County, California, a shareholder of Ulti-Mate Connectors, the Vice-

12   President of Sales and Marketing of that company, and a "Participating Employee"

13   in the SCMAPL VEBA Program pursuant to the Adoption Agreement.  He is the

14   named Insured of the Policy No. A10225085C issued by Defendant AIG.

15       17.    Plaintiff Thierry Pombart ("Pombart") is a resident of Orange County,

16   California, a shareholder of Ulti-Mate Connectors, the Vice-President of Operations

17   of that company, and a "Participating Employee."  He is the named Insured of the

18   Policy No. A10225084C issued by Defendant AIG.

19       18.    Plaintiffs Ulti-Mate Connectors, Billington, Brockman and Pombart

20   are sometimes referred to herein as the "Ulti-Mate Connector Plaintiffs."

21   **NON-PARTY ENTITIES AND INDIVIDUALS**

22       19.    From 2007 to the present, Comerica Bank has served as the Trustee of

23   a trust established to hold the assets of Defendants' Programs and serve as the

24   Programs' "funding mechanism."  On information and belief, all of Comerica's

25   activities were directed by Defendants and Comerica did not act in the absence of

26   instructions from Defendants.

27       20.    R. Wesley Sierk, III ACI, ARM, ChFC, a principal at Pine Avenue

28   Partners, LLC, was Plaintiffs' financial planner.  As alleged more fully elsewhere,

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

Defendants communicated false and misleadingly incomplete information to Sierk who innocently relayed that false and misleadingly incomplete information to Plaintiffs.

21.     At all relevant times, Royce Imhoff ("Imhoff") held senior executive positions at Defendant AIG, including President of Independent Distribution.

22.     At all relevant times, David Robinson ("Robinson") held senior executive positions at Defendant AIG, including senior counsel to AIG and later head of advance sales in the Affluent and Corporate Markets Group.

## **DEFENDANTS**

23.     Defendant American General Life Insurance Company is a corporation organized and existing under the laws of the State of Texas, with its principal place of business in Houston, Texas, and a wholly-owned subsidiary of American International Group, Inc.  As more fully alleged elsewhere in this Complaint, AIG specifically designed the Policies to be sold in conjunction with the VEBA Programs that Defendants developed and promoted (including the SCMAPL Program) and took a leading role in marketing and selling not only the Policies, but also participation in the noncompliant VEBA Programs.

24.     On information and belief, Defendant Peter Mordin is an individual residing in Orange County, California who, at all relevant times, held senior positions with Defendant AIG, including National Marketing Director and Regional Vice President.

25.     Defendant Sea Nine Associates, Inc. is a Nevada corporation whose status with the California Secretary of State is now listed as "FTB Suspended" and, thus, lacks the capacity to defend itself in this action and is subject to entry of a default judgment.  Cal. Rev. & Tax Code § 23301.  At all relevant times, Sea Nine served as the Administrator or *de facto* Administrator for the Programs and was responsible for operating them and directing their activities.

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

26.     Defendant Kenneth Elliott, individually and d.b.a. KAE, KAE Consulting and Vista Barranca, is an individual residing in Orange County, California.  Plaintiffs are informed and believe that, at all relevant times, Elliott was an employee of Defendant Sea Nine and was solely responsible for directing all of Sea Nine's affairs.

27.     Defendants Lalat Pattanaik and Laban Pattanaik are brothers residing, on information and belief, in the State of California, County of Los Angeles.

28.     Defendant Innovative Private Strategies & Insurance Services, Inc. is a California corporation whose status with the California Secretary of State is now listed as "FTB Suspended" and, thus, lacks the capacity to defend itself in this action.  Cal. Rev. & Tax Code § 23301.  At all relevant times, Defendant Laban was the sole owner, shareholder, director and/or principal of Innovative and was solely responsible for directing all of Innovative's affairs.

29.     Defendant I.P.S. Private Advisors LLC is a California limited liability company with its principal place of business in Laguna Hills, California and, on information and belief, is equally owned and controlled by Lalat and his brother, Laban.  Defendants Innovative and Laban retained Defendant IPS to market Defendants' VEBA Programs.

30.     Defendants Sea Nine, Elliott, Innovative, Laban, IPS, and Lalat are collectively referred to herein as the "Agent Defendants."

31.     Defendant Southern California Manufacturers' And Agricultural Producers' League Voluntary Employees' Beneficiary Association Master Plan, a.k.a. Southern California Manufacturing and Producers' League (collectively, "SCMAPL") is the "sponsor" of the VEBA Program that Defendants persuaded Plaintiffs to join.

32.     Defendants Southern California Entertainment And Communication Guild Voluntary Employees' Beneficiary Association Master Plan, Southern California Medical Profession Association Voluntary Employees' Beneficiary

- 10 -

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

1  Association Master Plan, Southern California Retail Merchants' League Voluntary

2  Employees' Beneficiary Association Master Plan, California Building Supply,

3  Wholesalers' And Contractors' League Voluntary Employees' Beneficiary

4  Association Master Plan, Southern California Consultants' And Financial Planners'

5  Profession Association Voluntary Employees' Beneficiary Association Master Plan

6  (collectively and with SCMAPL, the "Plan Defendants") are sponsors of other

7  VEBA Programs that Defendants persuaded other Class Members to join.  The

8  exact legal status of the Plan Defendants is not known.

9  33.    The true names and capacities of the Defendants, DOES 1 through 50,

10  whether individual, corporate, associate or otherwise, are unknown to Plaintiffs at

11  the time of filing this Complaint and Plaintiffs, therefore, sue said Defendants by

12  such fictitious names and will ask leave of court to amend this Complaint to show

13  their true names or capacities when the same have been ascertained.  Plaintiffs are

14  informed and believe, and therefore allege, that each of the DOE Defendants is, in

15  some manner, responsible for the events and happenings herein set forth and

16  proximately caused injury and damages to Plaintiffs as herein alleged.

17  **VICARIOUS LIABILITY ALLEGATIONS**

18  34.    Plaintiffs are informed and believe, and on that basis allege, that each

19  Defendant named in this action, including each of the DOE defendants, was the

20  agent, ostensible agent, servant, aider and abettor, co-conspirator, partner, joint

21  venturer, representative and/or associate of each of the other Defendants, and was at

22  all times relevant herein acting within the course and scope of his, her or its

23  authority as agent, ostensible agent, servant, aider and abettor, co-conspirator,

24  partner, joint venturer, representative and/or associate, and with the knowledge,

25  authorization, consent, permission, and/or ratification of the other Defendants.  On

26  information and belief, all actions of each Defendant alleged herein were ratified

27  and approved by the officers and/or managing agents of each other Defendant,

28  whether DOE or otherwise.

- 11 -

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

35.    At various times prior to the marketing and sale of the Policies to Plaintiffs, AIG filed "Notices of Agency Appointment" or other similar documents with the California Department of Insurance designating Defendants Innovative, Laban, and Elliott as agents of AIG.  *See* Cal. Ins. Code § 1704.  These Defendants thereby became "life licensees" of AIG or were otherwise authorized to sell Policies on behalf of AIG.  Cal. Ins. Code §§ 32(a); 1622(a).  Further, Defendants Innovative and Laban became Master General Agents (a.k.a. "Level 7 Master General Agents") of AIG pursuant to a contract dated February 17, 2004.  Under California law, Defendant AIG is thus liable for these Agent Defendants' material misstatements to Plaintiffs and Class Members (directly and through others such as Sierk) and failure to disclose material information to Plaintiffs and members of the Class (directly and through others).

36.    Sierk and all or some of the Agent Defendants jointly presented a proposal for the Policies to Plaintiffs on behalf of Defendant AIG, jointly transmitted applications for those Policies to AIG, and/or received commission payments from AIG.  Pursuant to California Insurance Code § 1704.5, when Defendant AIG issued the Policies pursuant to the aforementioned proposal and transmittal and/or paid commissions to Sierk and all or some of the Agent Defendants, it became liable for: (a) the material falsehoods communicated by the Agent Defendants to Plaintiffs; (b) the failure of Defendants to disclose material information to Plaintiffs; (c) Sierk's innocent reconveyance of materially false information from Defendants to Plaintiffs; and (d) Sierk's innocent failure to disclose the material information that these Defendants failed to disclose to Sierk.  *See* 39 Cal. Jur. 3d Insurance Companies § 193.  More broadly, because Defendant AIG paid commissions to the Agent Defendants for *all* Policies purchased by *all* Class Members and/or naming them insureds, California Insurance Code § 1704.5 makes AIG is liable for the Agent Defendants' misconduct against *all* members of the Class.

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

37.     Because Defendant AIG knew that the Agent Defendants were marketing and selling its Policies to Plaintiffs and Class Members in conjunction with VEBA Programs, participated in a unified marketing scheme that promoted both its Policies and the Programs, and understood all of the details relating to those Programs, all of the conduct of the Agent Defendants alleged in this Complaint was within the course and scope of the agency relationship(s) between AIG and the other Defendants.

38.     Defendant AIG is also responsible for the wrongful acts and omissions of its employees Imhoff, Robinson, and Defendant Mordin under the doctrine of respondeat superior.

## JURISDICTION AND VENUE

39.     This Court has jurisdiction pursuant to 28 U.S.C. §1331 in that certain of the claims alleged herein arise under federal law, namely RICO.  This Court has supplemental jurisdiction over the state law claims.

40.     Jurisdiction in this Court is also proper pursuant to the Class Action Fairness Act.  28 U.S.C. § 1332(d).

41.     Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.  Venue is also proper under 18 U.S.C. § 1965(a) in that all Defendants either reside in the Central District of California and/or have an agent in this judicial district.

## GENERAL ALLEGATIONS

**A.     The Common Characteristics And Tax Advantages Of §
419A(f)(6) Plans**

42.     A VEBA plan that complies with § 419A(f)(6) involves the creation of a joint trust or other fund that ten or more companies join.  Those companies make tax-deductible contributions to this common trust or fund which, in turn, uses those contributions to purchase insurance contracts and other assets which provide

- 13 -

1  welfare benefits – usually and in this case only life insurance – to certain of the

2  participating companies' employees.  A trustee (often a bank or other financial

3  institution) typically takes formal ownership of the insurance policies purchased by

4  the plan and conducts the day-to-day operations.

5       43.    Ordinarily, if a company purchases a standard term life insurance

6  policy for an employee, the premium payments would be included as part of the

7  employee's gross income, and therefore taxable (to the employee).  *See* 26 C.F.R. §

8  1.61-2(d)(ii)(A).  But if the company joins a properly established multiple-

9  employer welfare benefit plan under § 419A(f)(6), its contributions to the plan are

10  deductible (to the company), and the plan may use those contributions to purchase

11  the same life insurance policy.  In other words, premiums paid in the first case are

12  not tax deductible while contributions (used to buy the exact same policy) in the

13  second case are tax deductible.  This makes a § 419A(f)(6)-compliant plan

14  attractive.

15       **B.    Defendants' VEBA Programs**

16       44.    Defendants' VEBA Programs consist of a series of "Master Plan

17  Documents" drafted by Defendants and a trust established by Defendants to hold

18  the assets of the Program and serve as the "funding mechanism."  The Master Plan

19  Documents include the following: (a) "Master Plan" and "Master Trust" documents

20  to establish the entity of ten or more employers required for a § 419A(f)(6) plan; (b)

21  "Adoption Agreements" that the small businesses targeted by Defendants would

22  sign to join the Program; and (c) "Summary Plan Descriptions" that such

23  Participating Employers could issue to their eligible employees.

24       45.    The following summary is helpful to understand Defendants' VEBA

25  Programs and the facts alleged herein:

26            a.    First, there is the "Sponsor," an association of employers in

27  whose name the VEBA Program is established.  Defendant SCMAPL was one such

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

association.  Each VEBA Program was organized, promoted, administered, and operated by Defendants, without any material involvement by the Sponsor.

        b.      Second, the small businesses persuaded to adopt one of Defendants' VEBA Program are known as the "Participating Employers" and their eligible employees who elected to participate – usually the owners of a closely held business – are referred to as "Participating Employees" (collectively, "Participants").  Plaintiff Ulti-Mate Connectors is a Participating Employer, and the individual Plaintiffs are Participating Employees.  (Three other employees of Ulti-Mate Connectors purchased regular term life insurance policies and thus are not parties to this suit.)

        c.      Third, there is the "Insurer" who issues the Policies.  In this case, the Insurer is Defendant AIG, which marketed and sold Policies to Plaintiffs and other members of the Class.

        d.      Fourth, there are the "Insureds."  In practice, these are the individuals defined above as Participating Employees – the owners of the small businesses that joined Defendants' VEBA Programs.  Plaintiffs Billington, Brockman, and Pombart are Insureds.

        e.      Fifth, each VEBA Program has a designated or *de facto* "Administrator" responsible for directing the affairs of the Program.  Defendants Sea Nine and Elliott served as the Administrator for all Programs.

        f.      Finally, there is the "Trustee" responsible for holding the assets entrusted to the Program and processing the required financial transactions as directed by Defendants (*e.g.*, receiving "contributions" or in other words premium payments from Class Members, and the payment of those premiums to the Insurer, etc.).  In 2007, Defendants Sea Nine and/or Elliott retained Comerica to serve as Trustee for its Programs.

    46.    The Master Plan Documents provided that a "Master Committee" would determine the kind of insurance policies to be purchased with the

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

1  contributions, and be responsible for all related issues, such as the payment of

2  benefits under the plan.  In reality, however, the designated or *de facto* Administer

3  (Defendants Sea Nine and Elliott) made all relevant decisions and directed all of the

4  Trustee's actions.

5     47.    The Master Plan Documents specified: (a) the eligibility requirements

6  for Participants; (b) when and how Participating Employers were to make their

7  contributions; (c) the nature of the insurance benefit to be provided by the Program,

8  which was always life insurance; and (d) the conditions under which Participating

9  Employers could terminate participation and thereby provide the Participating

10  Employees the opportunity to take personal ownership of the life insurance policies.

11     48.    According to the DOJ complaint, these Master Plan Documents are

12  "largely identical."  In 2009, Defendants prepared a new set of Master Plan

13  Documents that purportedly brought Defendants' VEBA Programs into compliance

14  with § 419A(f)(6) but (a) according to the DOJ, the 2009 versions do not remedy

15  the deficiencies, and (b) in any event, they were never implemented because no

16  Class Members, Plaintiffs included, adopted them.  In short, none of the Master

17  Plan Documents complied with § 419A(f)(6) and related regulations, and so

18  Participating Employers were not entitled to deduct their contributions as

19  represented.  To the contrary, these were Listed Transactions that Participants were

20  required to disclose to the IRS or pay a penalty.

21     **C.    Defendant AIG's Involvement In The Scheme**

22     49.    Defendant AIG sold many Policies and made tens of millions of

23  dollars in conjunction with the fraudulent scheme to market and sell VEBA

24  Programs.  Beginning in approximately 2001, AIG worked closely with the Agent

25  Defendants to deceptively promote the phantom tax benefits of Defendants' VEBA

26  Programs.  On an ongoing basis, Defendant Lalat had extensive discussions with

27  high-level executives at AIG, including Imhoff (AIG's President of the Independent

28  Distribution), Robinson (who held various senior executive positions, including

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES**

1   senior counsel to AIG and later head of advance sales in the Affluent and Corporate

2   Markets Group), and Defendant Mordin.[1]

3       50.     Defendants Lalat and Laban and their staff at IPS met regularly with

4   Defendant Mordin.  In or around August 2002 or 2003, Mordin introduced

5   Robinson to Lalat and IPS.  Thereafter, Robinson was in regular communication

6   with the Agent Defendants about the VEBA Programs.  AIG was aware that

7   Defendant Elliott was involved in the administration of the VEBA Programs and

8   directly communication with him regarding the Programs.

9       51.     Robinson and Defendant Mordin were not only aware of and never

10  objected to the Agent Defendants' marketing strategy for the VEBA Programs, but

11  also they allowed the Agent Defendants to use AIG-generated marketing materials

12  and software in this marketing.  Defendant AIG provided an advisors guide, which

13  included a section on VEBA plans.  This was probably the most significant

14  marketing piece that the Agent Defendants used.  AIG also provided the Agent

15  Defendants with numerous other marketing publications for VEBA plans.

16      52.     Defendant AIG provided marketing material to the other Defendants

17  with the knowledge and intent that the other Defendants would transmit that false

18  and misleading material to Plaintiffs and others using the U.S. Mail and/or e-mail

19  transmitted across interstate wires.  AIG knew or should have known that this

20  marketing would be used in conjunction with the fraudulent marketing of

21  Defendants' VEBA Programs and the sale of Policies through those Programs.

22  AIG knew or should have known that this marketing material was materially false

23  and/or misleading when so used.

24  ///

25  ///

26  _____

27  [1]     Lalat also had discussions with Dennis Roberts, who was President of AIG's
    Independent Agency Group; Larry O' Brien, who was a Senior Vice President and
    Chief Marketing Officer; and Rodney Martin, who was the head of AIG life
28  insurance worldwide.

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

### D.   Defendants' VEBA Programs Violate Restrictions On § 419A(f)(6) Plans

53.     There is a long history of companies misusing VEBA plans as tax avoidance schemes and the IRS has rules and regulations to prevent such abuse. For example, if a participating corporation claims a deduction for contributions actually used to distribute corporate earnings to the corporation's shareholders, the deduction will be disallowed because such contributions are not an "ordinary and necessary" business expense within the meaning of I.R.C. § 162.  Second, a company cannot deduct a contribution to a welfare benefit plan in the year made if the benefits provided constitute "deferred compensation" as defined in IRC § 404. *See* I.R.C. § 419(e)(2).  Rather, the deduction must be deferred until the employee includes the compensation in his or her gross income.  I.R.C. § 404(a)(5).

54.     Defendants represented that their VEBA Programs, including the SCMAPL Program, strictly complied with § 419A(f)(6) and all related rules and regulations.  In fact, these Programs were noncompliant, as Defendants knew.  The contributions Participating Employers made to the Programs for purchase of the Policies far exceeded the actual cost of the primary "welfare benefit" claimed to be the aim of the VEBA Program – the death benefit derived from a life insurance policy; the same death benefit could be purchased for much less money.  The amounts above the true cost of the death benefit were used to obtain the cash value portion of the Policies and, in effect, set aside those excess payments for the benefit of the owners of the companies.

55.     In other words, Defendants' VEBA Programs allowed the excess contributions to be used to pay premiums that mostly flowed through the accumulated cash values of these Policies, and then into the hands of the company owners.  Thus, Defendants' VEBA Programs did not really provide a welfare benefit for Participants, but instead were mechanisms for distributing excess profits

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES**

1  to owners and/or providing deferred compensation in a manner that attempted to

2  evade federal taxes.

3       56.    In 2013, the DOJ filed a civil action in U.S. District Court for the

4  Central District of California (Case No. 13-CV-01582-JLS-JPRx) against

5  Defendants Sea Nine and Elliott to enjoin them from continuing to market and sell

6  participation rights in Defendants' VEBA Programs because they do not comply

7  with § 419(f)(6).  As summarized in the DOJ complaint: "[T]he core purpose and

8  effect of the participation in a Sea Nine VEBA plan is to provide participants with a

9  mechanism to accumulate wealth for their personal benefit, unlawfully protecting

10  that income from federal taxation by treating it as a welfare benefit plan when it

11  was that in name only."

12       57.    The IRS has audited at least 41 taxpayers who participated in one of

13  Defendants' Programs as of August 2013, and in 36 of those audits determined the

14  taxpayer was liable back taxes and/or penalties.  The total amount collected in these

15  audits exceeds $13 million.  The IRS knows of a total 205 Participants in these

16  Programs and estimates that, when all audits are completed, its recovery of back

17  taxes and penalties could exceed $70,000,000.

18  
19       **E.    Defendants Knew, But Did Not Disclose, That Their VEBA
             Programs Were Noncompliant**

20       58.    At all relevant times, Defendants knew, or in the exercise of ordinary

21  care should have known, that their VEBA Programs were Listed Transactions and

22  an unlawful tax avoidance scheme.  For example, Defendants Sea Nine and Elliott

23  were involved in early VEBA Programs promoted in the 1990s that led to

24  determinations by the Tax Court that the Programs were an unlawful tax avoidance

25  scheme.  *See, e.g., Neonatology Assoc., P.A. v. Comm'r*, 229 F.3d 221 (3d Cir.

26  2002) (upholding one such Tax Court determination).  At least one Participant from

27  the 1990s sued Sea Nine and Elliott for RICO violations involving a pattern of

28  racketeering activity almost identical to that allege herein.  *Borah, et al. v.*

- 19 -

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES**

*Monumental Life Insurance Company, et al.,* U.S. District Court, E.D. Pa. Case No. 04-CV-03617-BMS, Dkt. No. 1 at ¶¶ 1, 16, 46-142 (RICO allegations in complaint filed July 30, 2004).  Defendants, and each of them, knew from such experience that Plaintiffs and members of the Class would not obtain the claimed tax advantages and, in fact, would be forced to pay penalties, back taxes, and interest to the IRS as a result of their participation.  Indeed, the following from the DOJ complaint applies with equal force here:

> "Significantly, the *Neonatology* case involved the participants in a Sea Nine-sponsored and promoted VEBA plan – thus evidencing the Defendants' persistent promotion of the tax scheme at issue in this case despite knowledge of its potential illegality for over 10 years."

59.     As noted in the DOJ complaint, Defendants Sea Nine and Elliott continued to use the same Master Plan Documents after 2001 knowing that these documents did not comply with § 419A(f)(6) and that the results for early Participants were disastrous.

60.     In 2000, the IRS designated transactions like the VEBA Programs that Defendants marketed and sold as Listed Transactions.  *See* IRS Notice 2000-15; *see also* IRS Notice 95-34.  A Listed Transaction is a transaction that is the same as or substantially similar to one of the types of transaction that the IRS has determined to be a tax avoidance transaction, and must therefore be reported by participants to the IRS in accordance with specified regulations.  I.R.C. § 6111(a) and (b); 26 C.F.R. § 1.6011-4.  If not reported, the IRS imposes penalties on the taxpayer.  Here, Defendants failed to disclose to Plaintiffs and Class Members that their VEBA Programs, including the SCMAPL Program, are Listed Transactions that must be disclosed to the IRS.

61.     Moreover, in 2003, the Treasury Department tightened the regulations applicable to plans that purport to be multiple-employer plans under § 419A(f)(6).  26 C.F.R. § 1.419A(f)(6)-1.  Defendant AIG (acting through Robinson and Mordin)

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

1   asked Defendants Lalat and Laban to demonstrate to AIG that their VEBA

2   Programs complied with these newly tightened regulations.  In September 2003, the

3   Agent Defendants advised AIG that they intended to "engage a major law firm to

4   thoroughly analyze numerous items associated with our plan and the impact of the

5   regulations."  In November 2003, the Agent Defendants told AIG that, on AIG's

6   recommendation, they had selected attorney Bruce Ashton of the law firm of Reish

7   Luftman Relcher & Cohen ("Reish") to conduct this review.  That same month,

8   Robinson e-mailed Lalat that AIG was placing Defendants' VEBA Programs on an

9   updated list of acceptable plans for placement of insurance products but that he still

10  needed to see the compliance documents by January 2004.

11        62.    By January 2004, the Reish firm had completed its review and

12  prepared an opinion letter concluding that Defendants' VEBA Programs did not

13  comply with the new regulations under § 419A(f)(6).  Shortly thereafter, the Agent

14  Defendants sent this opinion letter to AIG with a cover letter stating:

15        "As you are aware, we have been developing a long-term

16        alliance with AIG American General over the last 2+ years with the

17        hopes of

18              1. generating substantial business in the dynamic area of

19              qualified multiple employer welfare benefit plans and

20              2. eventually expanding the distribution channels for our plans

21              with the assistance of the Affluent and Corporate Markets Group

22              and its agents.

23        Because of our interest in a stable long-term strategic alliance

24        with your group, we wanted you and your agents to be comfortable

25        and supportive of our programs. In order to facilitate this, we decided

26        to engage a major law firm ... whose opinions were highly regarded by

27        AIG.... Consequently, because of our discussion with you and David

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

1    Robinson ... we decided to engage Reish Luftman Relcher & Cohen

2    ("Reish")—a firm that was already of counsel to your company ...

3        As a result of the final 419 regulations which were released in

4    2003, we felt that Reish should evaluate the structure and operations of

5    our programs in light of these regulations to ensure continued

6    compliance. We also wanted them to reaffirm that we are a plan under

7    ERISA as currently operated. Both of these items are very significant

8    in sustaining the deductibility of employer contributions to our

9    program. They are also critical to differentiating our programs from

10   the non-qualified "419" plans which claim that they do not fall under

11   the guidelines, and therefore do not have to meet such standards and

12   restrictions.[] As you can see, Reish's opinion is to the contrary ...

13       We have attached herewith the initial draft letter provided by

14   Reish."

15   63.     The attached Reish law firm opinion letter stated that Elliott, on behalf

16   of Sea Nine, asked Reish "to address whether the several [VEBAs] administered by

17   Sea Nine Associates conform to the requirements set forth in Treasury Regulations

18   under Internal Revenue Code" or were exempt from those regulations.  Reish first

19   concluded that "[b]ecause the Plan and Trust do not contain provisions required

20   under the new 419 Regulations, the VEBAs do not currently meet the requirements

21   of the 419 Regulations."  Reish also concluded that the VEBAs were not exempt

22   from the regulations.  Reish made several suggestions to make these plans

23   compliant, which Defendants ultimately ignored.

24   64.     On January 30, 2004, Defendant IPS sent a letter to Mordin stating that

25   in light of the opinion letter from Reish, the Agent Defendants would amend "[o]ur

26   plan documents and some operational aspects of our program ... accordingly" and

27   that the Agent Defendants would "notify [AIG] of the changes and make available

28   the final documents resulting from their recommendations—when they become

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

1   available."  The letter also stated that IPS planned "on maintaining an "open book

2   approach, and making transparent to your team, any structural, operational and

3   documentation changes that Reish recommends."  In fact, the Agent Defendants

4   never followed through with these promises.  Robinson has testified in another

5   action that he warned Imhoff and Mordin that the Agent Defendants had not done

6   so.  But AIG took no further action to ensure compliance with federal tax law and

7   continued to sell Policies, including to Plaintiffs and other members of the Class.

8       65.    In summary, Defendants, including AIG, knew that their Programs

9   were noncompliant.  Yet Defendants continued to market their VEBA Programs

10  and falsely represent to Participants that (a) their Programs fully complied with

11  federal tax law, (b) the Programs were not Listed Transactions requiring notice to

12  the IRS, and (c) contributions were tax-deductible.  Further, Defendant AIG

13  continued to collect tens of millions of dollars in premium payments from Plaintiffs

14  and Class Members, including by marketing and selling new Policies, even after

15  very senior executives, including Imhoff, Robinson and Mordin, knew that the

16  VEBA Programs failed to comply with § 419A(f)(6) and related regulations.

17

18      **F.    The Ulti-Mate Connectors Plaintiffs' Participation In A
             VEBA Program**

19

20      66.    Defendants promoted their VEBA Programs mostly to high-income

21  professionals who own small, closely-held companies.  Plaintiffs fit that description

22  perfectly.  Plaintiffs Billington, Brockman and Pombart are shareholders of Ulti-

23  Mate Connector, an Orange County-based business founded in 1977 that designs

24  and produces world-class micro and nano miniature connectors and cables and

25  interconnect solutions for the military, space, aviation, and medical industries.

26      67.    In or about February 2006, Defendant Mordin telephoned Sierk

27  (Plaintiffs' financial planner) about the possibility of Sierk recommending

28  Defendants' VEBA Programs – and the life insurance Policies that Defendant AIG

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

1   created for use in conjunction with these Programs – to certain of Sierk's clients.

2   Mordin suggested that Sierk contact Defendant Lalat to learn more.  In this

3   telephone call, Sierk expressed concerns about the legitimacy of VEBA plans in

4   general, but Mordin (and later Laban, Lalat and Elliott) assured him that these plans

5   had been thoroughly vetted by reputable counsel and, further, that the VEBA

6   Programs had historically passed all IRS audits without change.

7        68.    On June 29, 2006, an employee of Defendant IPS e-mailed Sierk's

8   office a packet of marketing materials as part of a common marketing plan used on

9   a class-wide basis.  Attached to the e-mail were a lengthy description of VEBA

10   plans prepared by IPS and trade association bulletins entitled "IRS Loses Major

11   Case on Funding Welfare Benefits" and "IRS Rules that Employer May Deduct

12   VEBA Contributions Used to Purchase Life Insurance."  Also included was a

13   document on IPS stationary that prominently displays the AIG logo, and includes

14   the following representations:

15        "IPS successfully identifies, structures and implements innovative programs

16          that allow high net worth individuals to dramatically reduce their taxes and

17          enhance their overall tax efficiency.  [¶]  Our team consists of in-house

18          experienced professionals including MBAs, attorneys, and registered

19          financial consultants.  We also work closely with outside legal, actuarial and

20          accounting experts, as well as the advanced planning divisions of major

21          financial institutions…. [¶]  IPS has teamed with some of the strongest, and

22          most well-respected global financial institutions to offer clients world-class

23          … advanced planning services.  Over the past 25 years, IPS has developed

24          relationships at the highest levels of these partner organizations…. Further,

25          IPS works with some of the largest and most reputable law firms in the

26          country to ensure that programs offered through IPS are structured

27          properly…. [¶]  Our high impact programs are backed and used by

28          experienced law firms, actuarial firms, and accounting professionals.  All of

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

the programs offered by IPS have written Determination Letters from the IRS or written opinion by a major law firm(s) [*sic.*] with expertise in the area of law opined on…. [¶]  Our Welfare Benefit Trust Programs can provide your business or practice a substantial tax deduction into an IRS-qualified plan, while providing tax-favored benefits for you and any eligible employees.  A few of the key benefits of adopting a WBT are: … [¶]

- IRS qualification (IRS Letter of Determination) assures security and tax advantages."  (Emphasis added.)

69.     As part of their common marketing plan used on a class-wide basis, Defendants also e-mailed (on June 29, 2006) Sierk's office copies of legal opinions and IRS correspondence to induce Sierk into believing that their VEBA Programs complied with § 419A(f)(6).  This included an IRS "Favorable Determination Letter" dated August 1, 1988, an October 2, 1998 IRS "no change" letter, and an extensive opinion letter from an attorney named Frederick A. Romero.  But Defendants deliberately withheld the January 27, 2004 Reish letter, which concluded that Defendants' VEBA Programs did not contain certain provisions required under the new regulations under § 419A(f)(6) and, therefore, were not compliant.  Thus, Sierk did not know that the claimed tax advantages were illusory.

70.     During a meeting at Lalat's Orange County office on or about July 6, 2006, Defendants Mordin, Laban, Lalat and Elliott provided Sirek their standard sales pitch promoting the VEBA Program:

a.     A small, closely held business joins one of their VEBA Programs and purchases specialized whole life insurance Policies for its owner(s) (and perhaps ordinary term policies for other employees as well).

b.     The VEBA Program is the policyholder of record for the Policy(ies) and holds it/them for the benefit of the owner(s).

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

c.     The business makes five annual, supposedly tax-deductible contributions to the Program, which is to use those contributions to make premium payments to the Insurer.

d.     Initially, the Program is the named beneficiary under each Policy and would receive any benefits that might be paid, but the owner designates those to whom the Program would, in turn, pay any death benefits.

e.     After five years, the Program: (i) allows the business to exit the Program if it encounters "adverse business conditions," a purposefully lenient contractual standard that any business can properly meet and that Plaintiffs and Class Members did meet; (ii) transfers ownership of the Policy(ies) to the owner(s); and (iii) issues a 1099 to each owner based on the surrender value of their Policy.  To keep the tax liability low, the Policies were designed with low surrender values.

f.     Each owner holds their Policy in his or her name for another two years.  Then, on the first day of the eighth year, the Insurer allows the owner to exchange his or her Policy for one with a higher cash value and a lower death benefit.  The Insurer agrees in advance that the exchange can be made without penalty (*i.e.*, the surrender value would equal the amount of the premiums made).

g.     Each owner may then borrow against or even cash out of the new policy, supposedly on a tax-free basis.  Because the new policy has a higher cash value (at the cost of a correspondingly lower death benefit), the amount available to the owner to withdraw is significantly higher than under the original Policy.

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

71.     Based on Defendants' representations and their concealment of material information, Sierk believed that the Policies, while not advantageous to his clients if purchased outside a VEBA Plan (because of the high fees and relatively low cash values), provided significant tax advantages when purchased through one of Defendants' Program.  Specifically, based on Defendants' representations, he believed that the five annual contributions were tax-deductible to the businesses in the year made, and that the owners could withdraw significant benefits on a tax-free basis after the exchange on the first day of the eighth year.

72.     On July 10, 2006, Defendant Lalat e-mailed Sierk that he could obtain a "VEBA Plan Design / Proposal" from IPS by filing out an IPS form entitled "Welfare Benefit Census" and faxing it to 310-388-0508, the fax number listed for IPS.  The next step, Lalat explained in this e-mail, was to fill out a "Client Confidential Information Form" and that the clients would then receive "customized VEBA plan documents within 3-4 business days."  Notably, the end of the latter form was pre-filled out to indicate that Defendant Innovative was the agent.  The e-mail explained that this form too should be faxed to 310-388-0508 when completed.  Both of these forms were attached to the e-mail, as was a third form entitled "AIG / American General / Part A Life Insurance Application."

73.     Lalat's July 10, 2006 e-mail to Sierk also attached informational documents purporting to establish the legality of Defendants' VEBA Programs. One, from AIG itself and entitled "AIG Advisor Group Insurance Services Division SalesInsight," stated that the IRS had recently ruled that a company could properly deduct contributions to a VEBA program used to purchase life insurance policies. Defendant Lalat e-mailed this same document to Sierk again in November and December 2006.  Plaintiffs are informed and believe and on that basis allege that Defendants used standardized forms and marketing materials with all Class Members.

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

74.     On August 1, 2006, Defendants e-mailed a proposal to Sierk's office. This proposal, prepared for Ulti-Mate Connectors and dated July 31, 2006, stated among other things that: (a) Defendants' VEBA Programs had the "Support of Substantial Legal Authority"; (b) "the Amount You Contribute Will Be 100% Tax Deductible"; (c) those amounts will be "Deferred in a Safe, Creditor Proof, Tax Exempt Environment"; and (d) participation in the Program meant "Substantially Reducing Income and Estate Taxes."  In reliance on Defendants false statements, material misstatements, and material omissions, Plaintiffs agreed to join the SCMAPL Program and purchase Policies for Plaintiffs Billington, Brockman, and Pombart.  Plaintiffs are informed and believe that substantially similar proposals were sent to other Class Members as part of Defendants' common scheme to fraudulently market, promote and sell VEBA Programs.

75.     On August 6, 2006, Defendant Elliott sent Sierk an e-mail (copied on Defendants Mordin and Lalat) in which Defendants quelled Sierk's stated concern that these were Listed Transactions such that his clients would have to report their participation to the IRS.  This e-mail concluded with the following statement by Defendants: "We believe that the VEBA's sponsorship of the ten or more employer plan using this deduction established that we are not a tax shelter."

76.     On or about October 16, 2006, Defendants sent Plaintiffs a set of Master Plan Documents to sign via U.S. Mail.  The cover letter was signed by Defendant Elliott, noted that copies were sent to Defendants Laban and IPS, and included this statement: "Enclosed you will find the completed signature pages which Laban Pattanaik asked us to prepare for your review."  The enclosed documents underscored the fact that these documents were prepared by Defendants. One included the notation "© Sea Nine Associates."  Another was printed on stationary bearing the name "Sea Nine Associates", included Sea Nine's logo, and was signed by Defendant Elliott.  Plaintiffs signed where requested and thus joined the Program.

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

77.     AIG issued the following three "Modified Whole Life" Policies: (a) Policy No. A10225086C with Bruce Billington as the Insured and a current cash value of approximately $223,000; (b) Policy No. A10225085C with Stephen Brockman as the Insured and a current cash value of approximately $241,442; and (c) Policy No. A10225084C with Thierry Pompart as the Insured and a current cash value of approximately $92,379.18.  Sierk and IPS were among those listed on the applications for these Policies as agents entitled to receive commissions from AIG.  Plaintiffs are informed and believe that, as a matter of course, all Agent Defendants received commissions from AIG on the Policies it issued to all members of the Class.

78.     During the 2006-2011 period, Plaintiffs made the following contributions into the SCMAPL VEBA Program by mail and/or wire transfer(s): (a) $177,941.00 on or about December 12, 2006; (b) $188,264.00 on or about December 27, 2007; (c) $183,860.96 on or about December 11, 2008; (d) $183,860.96 on or about December 30, 2009; and (e) $180,769.82 on or about January 7, 2011.  The first payment was made payable to UBS F/C Capital Trust, which was the Trustee at that time.  The subsequent payments were made payable to Comerica, which became the Trustee in 2007.  The total amount of Plaintiffs' contributions to the SCMAPL Program equals $914,696.74.

79.     Plaintiffs discovered the true nature of the VEBA Programs on or about September 8, 2011, when Plaintiffs received audit notices from the IRS, informing them that their federal tax returns had been selected for examination.  Following its audit review, the IRS assessed $362,904.91 in taxes, interest and penalties for the years 2008-2009.  The following is a breakdown:

        a.     Ulti-Mate Connectors – a $20,057.62 penalty pursuant to 26 U.S.C. § 6706A (failure to report a Listed Transaction);

        b.     Plaintiff Billington – a $26,266.50 penalty under § 6707A, plus back taxes of $80,657.36 and interest of $6,288;

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

c.    Plaintiff Pombart – a $26,437.50 penalty, plus back taxes of $85,103.47, and interest of $7,690; and

d.    Plaintiff Brockman – a $25,326 penalty, plus back taxes of $77,756.46 and $7,362 in interest.

80.    Prior to September 8, 2011, Plaintiffs did not know and had no reason to know that Defendants had engaged in wrongdoing or that they had been injured by the conduct alleged in this Complaint.

81.    In addition to the IRS penalties listed above and the $914,696.74 in contributions into the VEBA Program, Plaintiffs have lost investment opportunities by putting their money in the VEBA Program, to which they now have no access, and have suffered from anxiety, emotional distress, among other damages to be proven at trial.  Further, Plaintiffs and Class Members are likely to face additional tax liabilities in the future that they would not have incurred but for Defendants' wrongdoing.

82.    Defendants knew, or should have known, that none of their VEBA Programs, including the SCMAPL Program, complied with provisions of federal tax law that supposedly provided the tax advantages that Defendants claimed. Defendants, and each of them, negligently and/or intentionally failed to disclose this information.  Despite knowledge of the noncompliant nature of their Programs, Defendants continued to make representations that the VEBA Programs were compliant to Plaintiffs and other members of the Class.

83.    Defendant AIG, which designed its Policies to be used in conjunction with these VEBA Programs and actively participated in the Agent Defendants' marketing efforts, knew or should have known that its agents were marketing and promoting these Programs as a tax-avoidance transaction.  However, even after AIG received actual notice of the noncompliant nature of these Programs, AIG knowingly and willingly continued to participate in this fraudulent scheme and continued to derive profits at Plaintiffs' expense.

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

84.     Defendants engaged in the wrongful conduct alleged herein to induce Plaintiffs and other Class Members to join their VEBA Programs and buy the Policies, which Plaintiffs and other members of the Class would not have done had they known the true facts.  Defendants knew, or should have known, that Plaintiffs and Class Members were ignorant of the true facts at all relevant times.

## G.     Defendants Used A Common Marketing Plan And The Same Modus Operandi With Other Members Of The Class

85.     Defendants used a common marketing plan and the same basic modus operandi to promote their VEBA Programs and sell AIG Policies to other Class Members who suffered similar damages.  *See, e.g., United States of America v. Kenneth Elliott, et al.*, U.S. District Court, C. D. Cal. Case No. 13-CV-01582-JLS-JPR, Dkt. No. 1 at ¶¶ 3-4, 16, 33-99 (alleging a common scheme); *J & M v. Callahan, et al.*, U.S. District Court, S.D. Ala. Case No. 07-CV-00883, Dkt. No. 1, at ¶¶ 8-16, 21-28 (alleging a similar sequence of events in 2004 to 2006 in a complaint filed against AIG, Lalat, IPS, and others); *Smith, et al. v. Elliott, et al.*, Hawaii Circuit Court, First Circuit, Case No. 09-1-2282-10 KKS, First Amended Complaint filed 2/24/2011 at ¶¶ 24-69 (alleging a similar sequence of events against Innovative, IPS, Laban, Lalat, Sea Nine, Elliott).

## H.     California Statutes Regarding Concealment and Misrepresentation in the Sale of Insurance Policies

86.     Defendants had a duty to communicate to Plaintiffs and members of the Class, "in good faith, all facts within their knowledge which were … material to the contract."  Cal. Ins. Code § 332.  In the insurance context, "materiality" is defined "not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due, in forming his estimate of the disadvantages of the proposed contract, or in making his inquiries."  Cal. Ins. Code § 334.  There is no possible way that Plaintiffs or the other Class Members

1    could have discovered the January 27, 2004 opinion letter from the Reish law firm

2    because Defendants failed to disclose it.

3        87.     Pursuant to California Insurance Code § 331, Defendants' concealment

4    of material information regarding the Policies, as alleged elsewhere in this

5    Complaint, constitutes grounds for rescission whether the concealment was

6    intentional or unintentional.  Thus, Plaintiffs are entitled to rescind the Policies

7    based on Defendants' material misrepresentations and/or a simple mistake of fact at

8    the time Plaintiffs gave their consent to the transactions with Defendants.  Cal. Ins.

9    Code § 359; Cal. Civ. Code § 1689(b)(1).  Remedies for rescission are not limited

10    to the return of the consideration they paid; California Civil Code § 1692 also

11    allows Plaintiffs to recover their consequential damages.

12

13        **I.**       **Ownership Of The Policies, Missing Premium Payments On The Pombart Policy, And The Comerica Action**

14        88.     By design, the Programs purchased the Policies and, at least initially,

15    were the policyholders of record and the beneficiary of each.  But the Programs

16    hold all policies in trust for their beneficial owners (the individual Plaintiffs and

17    individual Class Members) and is required to pay benefits to those designated by

18    the Insureds to receive benefits.

19        89.     Beginning in late 2011, Plaintiffs notified Defendant Elliott, the

20    Administrator of the SCMAPL Program, that they wished to terminate participation

21    from the Program and have ownership of the Policies transferred to the individual

22    Plaintiffs.  Elliott and Sierk exchanged several e-mails in March and April, 2013

23    regarding the steps required to transfer ownership of the Policies to the individual

24    Plaintiffs.  In a series of e-mails dated March 25, March 26, April 10, April 17, and

25    April 22, 2013, Defendant Elliott led Sierk to believe that the transfer of ownership

26    was in process but that, per AIG policy, the copies of the Policies that Plaintiffs

27    requested would continue to bear the name of the original owner.  On April 22,

28    2013, Defendant Elliott e-mailed duplicate copies of the three Policies to Sierk.

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES**

1   Based on Elliott's representations, Sierk believed that the transfer of ownership had

2   been completed at that time and communicated that belief to Plaintiffs.

3     90. Around this time (April 2013), Plaintiffs learned that the SCMAPL

4   Program failed to make two of the premium payments for the Pombart Policy, each

5   of which was supposed to be for $58,334.  As a result, the Pombart Policy is now

6   worth substantially less than promised.  E-mails from Elliott to Sierk on December

7   18 and 19, 2013 and January 2 and 13 and February 4, 2014 failed to explain or

8   remedy Defendants' failure to make these payments.  Defendants have never

9   explained why they were not made.  Nor have they refunded the $116,668 in

10   contributions that Plaintiffs made to the SCMAPL Program to cover them.

11     91. In December 2013, Plaintiffs discovered that Defendants still had not

12   transferred ownership of the Policies to Plaintiffs.  After Sierk demanded that the

13   two failures described above be remedied, Defendant Elliott promised in a

14   December 19, 2013 e-mail: "This matter will be resolved as a result of the hard

15   work in obtaining the facts as to what happened and then applying the appropriate

16   remedy.  To the degree allowed me, I will proceed in good faith towards that goal

17   regardless of what others may do."  However, Defendants never fixed these

18   failures.

19     92. On January 2, 2014, Defendant Elliott e-mailed Sierk that Comerica

20   had advised him that it would not process any further terminations from

21   Defendants' Programs, meaning that ownership of the Policies could not be

22   transferred to the individual Plaintiffs as promised.  That same day, Sierk contacted

23   AIG and obtained the form required to transfer ownership of the Policies and asked

24   Elliott to have Comerica sign it.  Defendant Elliott forwarded it by e-mail to

25   Comerica, but Comerica has refused to sign the form.

26     93. Earlier this year, Comerica, the current Trustee responsible for holding

27   the assets of Defendants' VEBA Programs and receiving and paying the premium

28   payments for the Policies, filed an action in federal district court seeking

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

declaratory and injunctive relief and instructions (U.S. District Court, C.D. Cal. Case No. 14-CV-00186-JLS-JPRx) ("Comerica Action").  In its complaint, Comerica reports that many of the participants in the VEBA Programs have issued notices of withdrawal and demanded distributions from the trust.  Comerica warns that the VEBA Programs for which it is the Trustee do not have sufficient assets to satisfy all of these claimants:

> "Based on the manner in which Sea Nine has administered the VEBA Programs, if the trust assets are distributed on a piecemeal, first-come, first-served basis in accordance with Sea Nine's directives, the trust assets may be depleted before all employers have received a distribution, and/or there may be inadequate resources to make premium payments to keep remaining policies in force."

94.     Among other things, the Comerica Action seeks: (a) a determination whether these VEBA Programs are governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1191c ("ERISA") because the DOJ Complaint calls the applicability of ERISA into question; (b) a determination whether recent events have resulted in an involuntary termination of these VEBA Programs requiring distribution of trust assets; (c) an Order enjoining distribution or disposition of trust assets except as necessary to preserve those assets and pay any death benefits to beneficiaries pending further directions from the Court; and (d) directions from the Court as to how to fulfill its responsibilities.

95.     Plaintiffs are informed and believe and on that basis allege that Comerica intends to obtain default judgments against the various Sponsors of Defendants' VEBA Programs, including SCMAPL, and that the Comerica Action will soon result in the termination of all of Defendants' VEBA Programs, including the SCMAPL.

///

///

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

**CLASS ACTION ALLEGATIONS**

96.     Pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs seek to represent two classes.

(1)  With respect to the Second, Third, Sixth, and Eighth causes of action, Plaintiffs seek to certify a class consisting of all entities and individuals residing in or with a principal place of business in the Unites States that, at any time from January 1, 2001 to the present, joined one of Defendants' VEBA Programs and either contributed money to that Program for the purchase of one or more life insurance Policies issued by AIG or became an Insured under such a VEBA Policy issued by AIG (the "Nationwide Class").

(2)  With respect to the Fourth and Fifth Causes of action, Plaintiffs seek to certify a class consisting of all entities and individuals residing in or with a principal place of business in California that, at any time from January 1, 2001 to the present, joined one of Defendants' VEBA Programs and either contributed money to that Program for the purchase of one or more life insurance Policies issued by AIG or became an Insured under such a VEBA Policy issued by AIG (the "California Class").[2]

97.     As used herein, the term "Class" refers to the two classes collectively and/or the members thereof, depending on the context.

98.     This action is properly brought against Defendants as a class action for the following reasons.  On information and belief, the Class is composed of dozens of entities and individuals widely disbursed geographically.  The Class (and each part thereof) is so numerous that joinder of all Class Members is impracticable. The Class (and each part thereof) is readily ascertainable.  There is a well-defined community of interest in the questions of law and fact alleged because the rights of each Class Member were infringed or violated in the same fashion based on

---

[2]     California residents are members of both the Nationwide Class and the California Class.  Plaintiffs are not pursuing the First and Seventh Causes of Action on a class-wide basis.

- 35 -

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

Defendants' (a) wrongful concealment of material information and/or (b) use of common forms and promotional material, a common marketing plan, and uniform misrepresentations of material fact and concealment of material facts.  Notice to the Class can be provided through the records of Defendants, their affiliates and subsidiaries, or by publication, the cost of which is properly imposed upon Defendants.

99.    Questions of law or fact common to the Class (and each part thereof) predominate over questions that may affect particular Class Members.  Some common questions include:

a.    Whether Defendants' VEBA Programs were Listed Transactions within the meaning of I.R.C. § 6111(a) and (b) and 26 C.F.R. § 1.6011-4 and related provisions of federal tax law;

b.    Whether Defendants knew or should have known that their VEBA Programs were Listed Transactions;

c.    Whether Defendants had a duty to disclose to Participants that their VEBA Programs were Listed Transactions;

d.    Whether Defendants disclosed to Participants that their VEBA Programs were Listed Transactions;

e.    Whether Defendants' VEBA Programs complied with § 419A(f)(6) and related provisions of the Tax Code and regulations promulgated thereunder;

f.    Whether Defendants knew or should have known that their VEBA Programs failed to comply with § 419A(f)(6) and related provisions of federal tax law;

g.    Whether Defendants had a duty to disclose to Participants that their VEBA Programs failed to comply with § 419A(f)(6) and related provisions of federal tax law;

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

h.  Whether Defendants disclosed to Participants that their VEBA Programs failed to comply with § 419A(f)(6) and related provisions of federal tax law;

i.  Whether Defendants' common marketing plan included misstatements of material fact and/or improperly failed to disclose material facts;

j.  Whether there was an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c);

k.  Whether Defendants conducted this enterprise on an ongoing basis, and whether Defendants did so in furtherance of a common unlawful purpose;

l.  Whether Defendants explicitly or tacitly agreed to function and did function as a unit;

m.  Whether Defendants' conduct amounted to a scheme or artifice to defraud Class Members;

n.  Whether Defendants engaged in a pattern of racketeering activity;

o.  Whether Defendants' conduct posed or poses a threat of continuing harm;

p.  Whether Defendants conspired to violate RICO;

q.  Whether Defendants violated the UCL and/or False Advertising Law

r.  Whether Defendants violated I.R.C. § 6700 and/or 7408 as alleged in the DOJ complaint;

s.  Whether Plaintiffs and Class Members are entitled to compensatory damages, consequential damages, punitive damages, restitution, disgorgement and/or other remedies because of Defendants' wrongful conduct; and

- 37 -

**FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES**

t. Whether Defendant AIG aided and abetting the other

Defendants' RICO violations and other unlawful and wrongful

conduct.

100. Plaintiffs' claims are typical of the claims of the other members of the Class in that they entered into identical or substantially similar contracts.  Plaintiffs will fairly and adequately protect the interests of the Class in that they have no interest antagonistic to those of the Class, and Plaintiffs have retained attorneys experienced in class action and complex litigation.

101. The disposition of Plaintiffs' and Class Members' claims in a class action will provide substantial benefits to both the parties and the Court.  A class action is superior to other available methods for the adjudication of this controversy.  This class action will promote an orderly and expeditious administration and adjudication of the Class claims, be fair and efficient, and ensure uniformity of decisions.

## **FIRST CAUSE OF ACTION**

### **Rescission, Cal. Ins. Code §§ 331, 359; Cal. Civ. Code § 1689,**

### **Against All Defendants**

102. Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

103. When marketing their VEBA Programs and Policies to Plaintiffs, Defendants intentionally, negligently and/or mistakenly misstated material facts. Among other things, Defendants misrepresented that contributions to the Programs would be tax deductible to Participating Employers in the year those contributions were made, and that by following the steps set forth elsewhere in this Complaint, Participating Employees would be able to draw benefits at a later date on a tax-free basis.  When agreeing to join Defendants' VEBA Programs and purchase the Policies, Plaintiffs believed these things to be true.  As alleged more particularly elsewhere in this Complaint, these representations were false.

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

104.   As further alleged elsewhere in this Complaint, Defendants intentionally, negligently, and/or mistakenly failed to disclose material information, including but not limited to the fact that Defendants' VEBA Programs are Listed Transactions.  Nor did Defendants disclose the January 2004 opinion letter in which the Reish law firm advised Defendants that their VEBA Programs did not comply with § 419A(f)(6).  Plaintiffs would not have joined Defendants' Programs or purchased the Policies had these facts been disclosed.  Defendants knew, or should have known, that Plaintiffs were ignorant of the true facts relating to the transactions at issue.

105.   As a result of Defendants' intentional, negligent and/or mistaken misstatement of material facts and/or failure to disclose material facts, and/or Plaintiffs' material mistake of fact at the time they consented to the transactions with Defendants, Plaintiffs are entitled to rescind: (a) their agreement to join the VEBA Programs; and (b) the Policies through the Programs.

106.   Service of this Complaint and related pleadings on Defendants constitutes notice of rescission of all agreements entered into between Plaintiffs and Defendants, including the Adoption Agreements and the Policies.

107.   Pursuant to California Civil Code § 1692, Plaintiffs are also entitled to recover the consequential damages they sustained as a direct and proximate result of Defendants' intentional misconduct and/or negligent conduct in an amount to be determined at trial in excess of the jurisdictional threshold of this Court.

## SECOND CAUSE OF ACTION

### RICO, 18 U.S.C. § 1962(c),

### Against All Defendants

108.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

109.   At all relevant times, there existed an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) that consisted of multiple distinct entities

- 39 -

and/or individuals associated in fact, including Defendants AIG, Innovative, IPS, Sea Nine, Lalat, Laban, Elliott and/or the VEBA Programs themselves.  Defendants are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c) and distinct from the "enterprise" they formed and operated to perpetrate the fraud alleged in this Complaint.

110.   As more fully alleged elsewhere in this Complaint, Defendants have conducted this enterprise on an ongoing basis since 2001 or 2002, if not earlier. Through the conduct of this enterprise, Defendants have used the fraudulent means alleged herein to convince at least 205 entities and/or individuals to participate in their VEBA Programs and purchase Policies through those Programs.  Defendants reinvested the proceeds of this scheme to defraud in the continuing enterprise.

111.   Each Defendant participated in the conduct of this enterprise in furtherance of a common purpose that all Defendants agreed upon – the sale of participation rights in Defendants' VEBA Programs and the sale of Policies through material misstatements and material omissions, and the reinvestment of the proceeds of that misconduct in the continuing enterprise.

112.   Through explicit and/or tacit agreements, Defendants agreed to function and did function as a unit and according to specified roles.  Specifically, Defendant AIG agreed with the other Defendants to sell Policies through the Programs, provide marketing material for both the Programs and the Policies, and to help market the Programs and Policies through its employees.  Among other things, Defendants Innovative, Lalat, IPS, and Laban agreed with the other Defendants to take the leading role in marketing and promoting the Programs and Policies.  Defendants Elliott and Sea Nine agreed with the other Defendants to assist in marketing the Programs and Policies and serve as the Administrator for the Programs.

113.   The conduct alleged in this Complaint was part of a scheme that Defendants formulated to defraud Plaintiffs and members of the Nationwide Class.

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

Defendants perpetrated this scheme with the specific intent to deceive and/or defraud Plaintiffs and members of the Nationwide Class, and Defendants did deceive and/or defraud Plaintiffs and the members of that class.

114.   Defendants committed a continuous series of predicate acts of mail and wire fraud (18 U.S.C. §§ 1341 and 1343) alleged in paragraphs 67-69, 72-76, 78 and 89-92 of this Complaint in furtherance of this scheme.  Among these predicate acts is the telephone call alleged in paragraph 67 in which Defendant Mordin, a senior executive of Defendant AIG, *inter alia*, urged Sierk to recommend that his clients sign up for Defendants' VEBA Programs and purchase Policies through those Programs.  Plaintiffs are informed and believe and on that basis allege that Defendants made similar use of the U.S. Mail and interstate wires to perpetrate fraud against all 205 Participants identified in the DOJ complaint.  In addition, Defendants stole, embezzled and/or misappropriated $116,668 in contributions that Plaintiffs made to the SCMAPL Program to cover premium payments for the Pombart Policy, which conduct qualifies as another predicate act within the meaning of the RICO statute.

115.   The predicate acts alleged in this Complaint constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).  Defendants' conduct, including the predicate acts and pattern of racketeering activity, amount to and/or pose a threat of continued criminal conduct.

116.   As a direct and proximate result of Defendants' wrongdoing conduct, Defendants caused harm and/or injury to the individual Plaintiffs' business (in the form of the § 6707A penalty paid by Ulti-Mate Connectors and otherwise), the businesses of individual members of the Nationwide Class, and to the property of all and members of the Nationwide Class, including Plaintiffs.  Under the provisions of RICO, Plaintiffs and members of the Nationwide Class are entitled to recover treble damages, costs of suit and attorneys' fees.

///

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

**THIRD CAUSE OF ACTION**

**RICO, 18 U.S.C. § 1962(d),**

**Against All Defendants**

117.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

118.   In violation of 18 U.S.C. 1962(d), Defendants, and each of them, by their words and/or actions, objectively manifested an agreement to participate, directly and/or indirectly, in the scheme to defraud and the RICO enterprise alleged in this Complaint and thereby conspired with one another to commit the conduct alleged in this Complaint.

119.   Defendants, and each of them, by their words and/or actions, objectively manifested an agreement on the common purpose of this enterprise, *i.e.*, the sale of participation rights in their VEBA Programs, the sale of Policies through fraudulent means and/or a pattern of racketeering activity, and the reinvestment of the proceeds of that misconduct in their common enterprise.

120.   Further, Defendants, and each of them, by their words and/or actions, objectively manifested an agreement to perpetrate this scheme through predicate acts amounting to a pattern of racketeering activity.  Defendants, and each of them, agreed to commit predicate crimes, aid and abet the commission of predicate crimes by other members of the enterprise, and/or that some members of the enterprise would commit the predicate acts for the benefit of all members and/or the enterprise.

121.   As a direct and proximate result of Defendants' wrongful conduct, Defendants caused harm and/or injury to the individual Plaintiffs' business (in the form of the § 6707A penalty paid by Ulti-Mate Connectors and otherwise), the businesses of individual members of the Nationwide Class, and to the property of all and members of the Nationwide Class, including Plaintiffs.  Plaintiffs and

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

1  members of the Nationwide Class are entitled to recover treble damages, costs of

2  suit and attorneys' fees.

3  **FOURTH CAUSE OF ACTION**

4  **California's Unfair Competition Law, Bus. & Prof. Code §§ 17200, *et seq.***

5  **Against All Defendants**

6      122.  Plaintiffs incorporate by reference the allegations contained in the

7  preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

8      123.  The UCL prohibits anything that constitutes an unfair, unlawful or

9  deceptive business practice.  Cal. Bus. & Prof. Code § 17200.  The UCL authorizes

10  a private right of action by anyone who has suffered injury in fact and allows

11  recovery of amounts which may be necessary to restore to any person in interest

12  any money or property which may have been acquired by means of any practice

13  that violates the UCL.  Cal. Bus. & Prof. Code § 17203.

14      124.  The "unlawful prong" of the UCL "borrows" violations of other laws

15  and treats them as unlawful practices independently actionable under the UCL.

16  Here, as alleged in the DOJ complaint, Defendants have violated:

17          a.  I.R.C. § 6700 which, *inter alia*, makes it unlawful for any

18              person to (a) organize or assist in the organization of an entity,

19              plan or arrangement, or participate in the sale of an interest

20              therein, and (b) knowingly make or cause to be made a false or

21              fraudulent statement as to the allowability of a deduction, the

22              excludability of any income or the securing of another tax

23              benefit because of his/her/its participation in the entity, plan or

24              arrangement.

25          b.  I.R.C. §6701 which, *inter alia*, makes it unlawful for any person

26              to aid or assist in the preparation or presentation of a federal tax

27              return, or other document, knowing that it would result in an

28              understatement of another's tax liability.

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

125.   In addition, Defendants' conduct violated the deceptive/fraudulent prong of the UCL in that Defendants' common marketing plan, which misstated material facts and failed to disclose material facts, was deceptive and likely to deceive Plaintiffs and members of the California Class who were uniformly misled about the true nature of Defendants VEBA Programs, the Policies, and the tax consequences relating thereto.

126.   Defendants' practices also violated the UCL's "unfair" prong in that they offended established federal tax policy.  Defendants' practices were also unfair because the harm caused to Plaintiffs and members of the California Class greatly outweighs any benefits associated with these practices.

127.   Had Plaintiffs and the members of the California Class been aware of the material information that Defendants failed to disclose and the material misstatements of fact, they never would have agreed to join the SCMAPL VEBA Program or purchase policies through those Programs.  Thus, as a result of Defendants' unlawful practices alleged above, Plaintiffs have suffered injury in fact and lost money or property and are thus entitled to be class representatives in this class action seeking restitution for themselves and all members of the California Class.

128.   Defendants have derived substantial revenues from their wrongful and deceptive acts.  Plaintiffs and members of the California  Class have been deprived of property to which they are entitled and/or in which they have a vested interest by means of Defendants' unlawful, fraudulent and unfair business practices.  Pursuant to Bus. & Prof. Code § 17203, Plaintiffs and members of the California Class are entitled to an order requiring Defendants to restore to Plaintiffs and members of that class all the money or property which Defendants may have acquired by means of such unfair competition.

///

///

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

**FIFTH CAUSE OF ACTION**

**California's False Advertising Law, Bus. & Prof. Code §§ 17500, *et seq*.**

**Against All Defendants**

129.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

130.   Defendants, and each of them, intended to supply services in conjunction with their VEBA Programs and/or dispose of personal property.

131.   Defendants, and each of them, publicly disseminated advertising regarding their Programs and Policies that contained statements that were untrue and/or misleading.  Defendants, and each of them, knew or in the exercise of reasonable care should have known, that this advertising falsely described their VEBA Programs, their Policies, and the tax consequences relating thereto.

132.   Defendants have derived substantial revenues from their false advertising.  Plaintiffs and members of the California Class have been deprived of property to which they are entitled and/or in which they have a vested interest by means of Defendants' violations of California's False Advertising Law.  Plaintiffs and members of the California Class are entitled to an order requiring Defendants to restore to Plaintiffs and members of that class all the money or property which Defendants may have acquired by means of such false advertising.

**SIXTH CAUSE OF ACTION**

**Fraud by Concealment**

**Against All Defendants**

133.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

134.   Defendants, and each of them, failed to disclose material facts to Plaintiffs and members of the Nationwide Class, including that: (a) participants in prior versions of Defendants' VEBA Programs were audited by the IRS, had their deductions disallowed and were forced to pay penalties, back taxes and interest; (b)

- 45 -

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

that Defendants' VEBA Programs were Listed Transactions that had to be disclosed to the IRS because they were the same or substantially similar to transactions determined to be unlawful tax avoidance schemes; and (c) Defendants own lawyers advised them in writing that the Programs did not comply with §419A(f)(6). Defendants concealed this material information with the intent to induce Plaintiffs and members of the Nationwide Class to join their Programs, purchase Policies, and make substantial payments to Defendants.

135.   Defendants, and each of them engaged in, adopted and/or ratified the misconduct alleged in this Complaint with the intent to deceive Plaintiffs and members of the Nationwide Class and with the knowledge that Plaintiffs and members of the Nationwide Class would be deceived.  At all relevant times, Defendants expected that Plaintiffs and members of the Nationwide Class would rely, and knew that Plaintiffs and members of the Nationwide Class did rely, upon the material omissions alleged herein.

136.   Plaintiffs and members of the Nationwide Class reasonably relied on Defendants' failure to disclose material facts in agreeing to participate in Defendants' Programs, in agreeing to purchase the Policies, and in making the payments to Defendants.  Plaintiffs and members of the Nationwide Class would not have entered into the Adoption Agreement, purchased the Policies, or made substantial payments to Defendants had they known the true facts.

137.   As a direct and proximate result of Defendants' misconduct and deception, Plaintiffs and members of the Nationwide Class have been damaged in a sum in excess of the jurisdictional threshold of this Court, and in additional amounts to be determined at time of trial, including interest and costs.  Defendants' conduct was wanton, despicable, malicious and done with a conscious disregard of Plaintiffs' rights and with the intent to defraud and harm Plaintiffs, entitling them and other Class Members to exemplary and punitive damages.

///

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

# SEVENTH CAUSE OF ACTION

## Common Law Fraud

## Against All Defendants

138.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

139.   Defendants, and each of them, made various misrepresentations of material fact to Plaintiffs as alleged above, and did so with the intent to induce Plaintiffs to join the SCMAPL VEBA Program, purchase Policies, and make substantial payments to Defendants.

140.   Defendants, and each of them engaged in, adopted and/or ratified the misconduct alleged in this Complaint with the intent to deceive Plaintiffs and with the knowledge that Plaintiffs would be deceived.  At all relevant times, Defendants expected that Plaintiffs would rely, and knew that Plaintiffs did rely, upon the material misrepresentations alleged herein.

141.   Plaintiffs reasonably relied on Defendants' misrepresentations of material facts in agreeing to participate in the SCMAPL Program, purchase the Policies, and make the payments to Defendants between 2006 and 2011.  Plaintiffs would not have entered into the Adoption Agreement, purchased the Policies, or made substantial payments to Defendants had they known the true facts.

142.   As a direct and proximate result of Defendants' misconduct and deception, Plaintiffs have been damaged in a sum in excess of the jurisdictional threshold of this Court, and in additional amounts to be determined at time of trial, including interest and costs.  Defendants' conduct was wanton, despicable, malicious and done with a conscious disregard of Plaintiffs' rights and with the intent to defraud and harm Plaintiffs, entitling them to exemplary and punitive damages.

///

///

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

## **EIGHTH CAUSE OF ACTION**

### **Aiding and Abetting**

### **Against Defendant AIG**

143.   Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

144.   At all relevant times, Defendant AIG knew that the conduct of the Agent Defendants, and each of them, constituted violations of RICO and/or a breach of legal duties owed to Plaintiffs and members of the Nationwide Class. Defendant AIG nonetheless acted in concert with the Agent Defendants pursuant to a common design, gave substantial assistance or encouragement to the Agent Defendants' wrongful or unlawful conduct, and/or gave substantial assistance to the Agent Defendants in accomplishing a tortious result.

145.   Defendant AIG's own conduct, separately considered, constituted a breach of duty to Plaintiffs and members of the Nationwide Class. As a proximate and direct result of AIG's aiding and abetting the Agent Defendants, Plaintiffs and members of the Nationwide Class were damaged as alleged above and in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray judgment against the Defendants, and each of them, as follows:

1.     For special damages according to proof;

2.     For general damages according to proof;

3.     For attorneys' fees and costs according to proof;

4.     For restitution of all monies paid to the Defendants according to proof;

5.     For punitive and/or exemplary damages according to proof;

6.     For pre-judgment and post-judgment interest;

7.     For such other and further relief as the court may deem proper.

///

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES

1

**<u>JURY DEMAND</u>**

2

Plaintiffs demand a trial by jury on all issues so triable.

3

Dated:  August 4, 2014               LAW OFFICE OF MICHAEL J. REISER

4

5               MEADE & SCHRAG LLP
                TYLER R. MEADE, ESQ.
6               MICHAEL L. SCHRAG, ESQ.

7

8               By:  /s/ TYLER MEADE
                     TYLER MEADE
9                    Attorneys for Plaintiffs and the Class

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT FOR DAMAGES