1 Jodi K. Swick No. 228634
**EDISON, McDOWELL & HETHERINGTON LLP**
2 1 Kaiser Plaza, Suite 1010
Oakland, CA 94612
3 Telephone:  510.628.2145
Facsimile:   510.628.2146
4 Email:   jodi.swick@emhllp.com

5 Cecilia E. Rendon, No. 228604
**BRIGHT AND BROWN**
6 **ATTORNEYS AT LAW**
550 North Brand Blvd., Suite 2100
7 Glendale, California 91203
Telephone:  (818) 243-2121
8 Facsimile:    (818) 243-3225
Email:  crendon@brightandbrown.com

9
Attorneys for Defendants
10 AMERICAN GENERAL LIFE INSURANCE CO. AND
PETER MORDIN

11
## UNITED STATES DISTRICT COURT
12
## CENTRAL DISTRICT OF CALIFORNIA
13
## SOUTHERN DIVISION
14

15
16 ULTI-MATE CONNECTORS, Inc.;
BRUCE L. BILLINGTON; THIERRY
17 POMBART; and STEPHEN R.
BROCKMAN, on behalf of themselves
18 and all others similarly situated

19            Plaintiff,

20       v.

21
AMERICAN GENERAL LIFE
22 INSURANCE COMPANY; SEA NINE
ASSOCIATES, INC.; INNOVATIVE
23 PRIVATE STRATEGIES &
INSURANCE SERVICES, INC.; I.P.S.
24 PRIVATE ADVISORS; LALAT
PATTANAIK; LALAT PATTANAIK;
25 LABAN PATTANAIK; KENNETH A.
ELLIOT, individually and d.b.a. KAE,
26 KAE CONSULTING and VISTA
BARRANCA; PETER MORDIN;
27 SOUTHERN CALIFORNIA
28

Case No. 8:14-cv-01051-JLS-JPR

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANTS AMERICAN
GENERAL LIFE INSURANCE
COMPANY AND PETER
MORDIN'S MOTION TO DISMISS
PLAINTIFFS' FIRST AMENDED
COMPLAINT PURSUANT TO
F.R.Civ.P. 12(b)(1) and (6)**

Date:   October 3, 2014
Time:   2:30 p.m.
Dept:   10A

1    MANUFACTURERS' AND
     AGRICULTURAL PRODUCERS'
2    LEAGUE VOLUNTARY
     EMPLOYEES' BENEFICIARY
3    ASSOCIATION MASTER PLAN;
     SOUTHERN CALIFORNIA
4    ENTERTAINMENT AND
     COMMUNICATION GUILD
5    VOLUNTARY EMPLOYEES'
     BENEFICIARY ASSOCIATION
6    MASTER PLAN; SOUTHERN
     CALIFORNIA MEDICAL
7    PROFESSION ASSOCIATION
     VOLUNTARY EMPLOYEES'
8    BENEFICIARY ASSOCATION
     MASTER PLAN; SOUTHERN
9    CAIFORNIA RETAIL MERCHANTS'
     LEAGUE VOLUNTARY
10   EMPLOYEES' BENEFICIARY
     ASSOCIATION MASTER PLAN;
11   CALIFORNIA BUILDING SUPPLY
     WHOLESALERS' AND
12   CONTRACTORS' LEAGUE
     VOLUNTARY EMPLOYEES'
13   BENEFICIARY ASSOCATION
     MASTER PLAN; SOUTHERN
14   CALIFORNIA CONSULTANTS'
     AND FINANCIAL PLANNERS'
15   PROFESSION ASSOCIATION
     VOLUNTARY EMPLOYEES'
16   BENEFICIARY ASSOCAITON
     MASTER PLAN; and DOES 1-50,
17
18                Defendants.
19

1

## TABLE OF CONTENTS

2

3

I.  INTRODUCTION ...................................................................................... 1

II. FACTUAL BACKGROUND ...................................................................... 2

    A.  The tax laws allow for VEBAs subject to restrictions. ...................... 2

    B.  VEBAs are not permitted to be used as tax avoidance schemes. .......... 3

    C.  Plaintiffs' financial planner expressed concerns about the
        VEBAs. ....................................................................................... 4

    D.  Sierk recommends the VEBA programs to Plaintiffs. ...................... 4

    E.  The VEBA programs were allegedly created through form
        documents utilized with the entire putative class. ........................... 5

    F.  Plaintiffs participate in the SCMAPLE VEBA for five years
        before "discovering" the plan was not tax compliant. ...................... 7

III. STANDARD OF REVIEW ........................................................................ 8

IV. ARGUMENT ........................................................................................... 9

    A.  Plaintiffs' claims are time-barred. ................................................. 9

        i.   Plaintiffs' claims accrued in 2006 with their suspicions of
             the VEBAs. ........................................................................ 9

        ii.  Plaintiffs' received documents in 2006 contradicting the
             alleged representations ......................................................... 12

    B.  Plaintiffs' RICO claims fail. ......................................................... 13

        i.   The enterprise is not distinct from Defendants. ...................... 13

        ii.  Plaintiffs fail to plead an enterprise with decision-making
             structure. ............................................................................ 15

        iii. The enterprise is not separate from its activities. ................... 16

        iv.  Plaintiffs fail to plead predicate acts. ................................... 17

        v.   Plaintiffs do not plead their RICO claims with specificity. ....... 18

        vi.  Plaintiffs do not plead a RICO claim against Mordin. ............. 19

        vii. Plaintiffs' RICO conspiracy claim fails. ................................. 20

    C.  Plaintiffs' UCL claim fails; the UCL cannot be applied
        extraterritorially. ....................................................................... 20

    D.  Plaintiffs' fraud and RICO claims fail for lack of justifiable
        reliance. .................................................................................... 22

    E.  Plaintiffs' aiding and abetting claim fails. .................................... 23

    F.  Individual Plaintiffs lack standing for RICO, fraud, and
        rescission claims. ....................................................................... 24

V.  CONCLUSION ........................................................................................ 25

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## Cases

*Agency Holding Corp v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143 (1987)..............9

*Alan Neuman Prods., Inc. v. Albright*, 862 F.2d 1388 (9th Cir.1989) .....................18

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)..........................................................8, 23, 24

*Bayview Hunters Point Community Advocates v. Metropolitan Transp. Com'n*,
   366 F.3d 692 (9th Cir. 2004)...........................................................................17

*Boyle v. United States*, 556 U.S. 938 (2009) ............................................................15

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) .......................17, 23, 24

*Cetel v. Kirwan Financial Group, Inc.*, 460 F.3d 494 (3d Cir. 2006)...........10, 11, 12

*Chagby v. Target Corp.*, 358 F. App'x 805 (9th Cir. 2009).....................................14

*Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229 (S.D.N.Y. 2011)  ...................17

*Edwards v. Marin Park, Inc.*, 356 F.3d 1058 (9th Cir. 2004) ............................18, 19

*Fontenberry v. MV Transp., Inc.*, 984 F. Supp. 2d 1062 (E.D. Cal. 2013).........21, 22

*Fox v. Ethicon Endo-Surgery, Inc.*, 110 P.3d 914 (Cal. 2005)................................11

*Gabriel Technologies Corp. v. Qualcomm Inc.*,
   No. 08-1992, 2009 WL 3326631 (S.D. Cal. Sept. 3, 2009)...........................22

*Gen. Bedding Corp. v. Echevarria*, 947 F.2d 1395 (9th Cir.1991) ..........................11

*Grisham v. Philip Morris, Inc.,* 670 F. Supp. 2d 1014 (C.D. Cal. 2009)...................9

*Gustafson v. BAC Home Loans Servicing, LP*,
   No. 11-915, 2012 WL 7071469 (C.D. Cal. Dec. 20, 2012) ...........................20

*Hill v. Opus Corp.*, 841 F. Supp. 2d 1070 (C.D. Cal. 2011) ....................................23

*Howard v. Am. Online Inc.*, 208 F.3d 741 (9th Cir. 2000).......................................20

*Ice Cream Distributors of Evansville, LLC v. Dreyer's Grand Ice Cream, Inc.*,
   No. 09-5815, 2010 WL 3619884 (N.D. Cal. Sept. 10, 2010)
   *aff'd*, 487 F. App'x 362 (9th Cir. 2012) .......................................................14

*In re Countrywide Fin. Corp. Mortgage Mktg. & Sales Practices Litig.*,
   601 F. Supp. 2d 1201 (S.D. Cal. 2009)....................................................14, 23

*In re Toyota Motor Corp.*, 785 F. Supp. 2d 883 (C.D. Cal. 2011)...............15, 21, 22

*J & M Associates, Inc. v. Callahan*, 753 F. Supp. 2d 1183 (S.D. Ala. 2010).........6, 7

iv

Case No. 8:14-cv-01051–JLS–JPR
American General & Peter Mordin's 12(b)(1) and (6) Memorandum of Points and Authorities ISO Motion to Dismiss

*Kearney v. Foley & Lardner,*
No. 05-2112, 2011 WL 1119047 (S.D. Cal. Mar. 28, 2011) ................... 18, 19

*Kline v. Turner*, 87 Cal. App. 4th 1369 (2001) ...................................... 9, 10

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001) .......................... 6

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,*
416 F.3d 940 (9th Cir. 2005)................................................................ 8, 9

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.,*
431 F.3d 353 (9th Cir. 2005)................................................................. 14

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................... 8

*Mathews v. Kidder, Peabody & Co., Inc.*, 260 F.3d 239 (3d Cir. 2001).......10, 11, 12

*Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163 (9th Cir. 2002) .................... 24

*Miller v. Yokohama Tire Corp.*, 358 F.3d 616 (9th Cir. 2004) ................. 17

*Moran v. Bromma*, No. 13-00487, 2014 WL 348952 (E.D. Cal. Jan. 31, 2014) ...... 14

*Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001)........................................ 8

*Negrete v. Allianz Life Ins. Co. of N. Am.,*
926 F. Supp. 2d 1143 (C.D. Cal. 2013)................................. 13, 15, 24

*Norwest Mortg., Inc. v. Superior Court*, 72 Cal. App. 4th 214 (1999) .................... 21

*Ortega v. Natural Balance Inc.,*
No. 13-05942, 2013 WL 6596792 (C.D. Cal. Dec. 16, 2013) ....................... 11

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ............................ 21

*River City Markets, Inc. v. Fleming Foods W., Inc.,*
960 F.2d 1458 (9th Cir. 1992)................................................... 13, 14

*Rotella v. Wood*, 528 U.S. 549 (2000)....................................................... 9

*Smith v. SunTrust Mortgage Inc.,*
No. 13-0739, 2013 WL 5305651 (C.D. Cal. Sept. 16, 2013) ....................... 21

*Soranno's Gasco, Inc. v. Morgan,* 874 F.2d 1310 (9th Cir.1989) ................. 24, 25

*Sosa v. DIRECTV, Inc.*, 437 F.3d 923 (9th Cir. 2006) ............................ 17

*Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191(2011)........................20, 21, 22

*Tidenberg v. Bidz.com, Inc.*
No. 08-5553, 2009 WL 605249 (C.D. Cal. Mar. 4, 2009)........................... 22

*United States of America v. Kenneth Elliott, et al.,*
No. 13-01582 (C.D. Cal Oct. 9, 2013) .................................................. 6

*United States v. Andrews*, 681 F.3d 509 (3d Cir. 2012)...............................................17

*United States v. Turkette*, 452 U.S. 576 (1981)........................................................16

*Urenia v. Pub. Storage*,
    No. 13-01934, 2014 WL 2154109 (C.D. Cal. May 22, 2014) ......................23

*Wilson v. Household Fin. Corp.*,
    No. 12-1413, 2013 WL 1310589 (E.D. Cal. Mar. 28, 2013) ..........................10

*Wisdom v. Centerville Fire Dist., Inc.*, 391 F. App'x 580 (9th Cir. 2010) .........24, 25

*Young v. Crofts*, 64 Fed. App'x. 24 (9th Cir. 2003) ..................................................8

*Zavala v. Wal-Mart Stores, Inc.*, 393 F. Supp. 2d 295 (D.N.J. 2005)......................18

## Statutes

18 U.S.C. § 1343...........................................................................................................17

18 U.S.C. § 1341...........................................................................................................17

26 U.S.C. § 419A(f)(6) ...............................................................................................2, 3

Cal. Bus. & Prof. Code § 17208 ..................................................................................9

Cal. Code Civ. Proc. § 338(h)......................................................................................9

Cal. Code Civ. Proc. § 1689(h)...................................................................................25

Cal. Ins. Code § 331 ....................................................................................................25

Cal. Ins. Code § 359 ....................................................................................................25

## I.   INTRODUCTION

This putative class action is nothing more than a case of buyer's remorse.  In 2006, Ulti-Mate Connectors, Inc. ("Ulti-Mate") adopted an employee welfare benefit plan solely to avoid taxes.  Ulti-Mate and its shareholders ("Plaintiffs") adopted the welfare benefit plan with their eyes wide open, knowing the IRS had already taken action against similar plans, suspicious of whether the proposed plan was tax compliant, and holding written documentation that conflicted with alleged misrepresentations as to the plan's benefits.  Ulti-Mate's voluntary participation did not go as planned and instead resulted in an IRS audit and an assessment of taxes, penalties, and interest years later.  Even assuming for argument that misrepresentations were made, any claims arising out of them accrued in 2006 in the face of Plaintiffs' suspicions and conflicting information, and are now time-barred.

Plaintiffs also improperly seek to characterize a consumer fraud case as a RICO action.  By alleging that a dozen other Defendants were agents of American General, Plaintiffs fail to allege an enterprise with the requisite structure and distinctiveness from the Defendant group.  Further, Plaintiffs do not allege an enterprise separate from the alleged racketeering activity.  Additionally, the predicate criminal acts of mail and wire fraud are based on non-actionable opinions rather than misrepresentations of fact.  In addition, Plaintiffs' allegations lack the specificity required by Rule 9(b).  As to former American General employee Peter Mordin, Plaintiffs allege no specific conduct demonstrating he violated RICO.

Plaintiffs' other claims likewise fail.  Their UCL claim must be dismissed because the statute does not have extraterritorial reach, and here American General's alleged misconduct occurred outside California.  For the same reasons their claims are time-barred, Plaintiffs' common law fraud and RICO claims fail for want of reliance on the misrepresentations, which was legally unjustified in the face of Plaintiffs' suspicions and the conflicting information they held.  Their aiding and abetting claim is only asserted as to the underlying RICO violations, but no such

liability exists under RICO.  Plaintiffs' rescission claim also fails, as no Plaintiff entered into a contractual relationship with either Mordin or American General.  And finally, the individual Plaintiffs lack standing to bring their fraud and RICO claims since it was their company, Ulti-Mate, that contributed funds to the welfare benefit plan and suffered the alleged losses; any harm to the shareholders was derivative of their ownership interest.  All of Plaintiffs' claims in its First Amended Complaint (the "FAC") [Dkt. 12] should be dismissed.

## II.    FACTUAL BACKGROUND

Plaintiffs Bruce Billington, Thierry Pombart and Stephen Brockman are shareholders of Plaintiff Ulti-Mate, a closely held company.  FAC ¶ 66.  This suit arises out of Ulti-Mate's decision to participate in a voluntary employees' beneficiary association, or "VEBA," established in the name of Defendant Southern California Manufacturers' and Agricultural Producers' League ("SCMAPL").  *Id.* ¶ 14.

### A. The tax laws allow for VEBAs subject to restrictions.

Section 501(c)(9) of the Internal Revenue Code exempts from taxation "voluntary employees' beneficiary associations providing for the payment of life, sick, accident, or other benefits to the members of such association or their dependents or designated beneficiaries, if no part of the net earnings of such association inures (other than through such payments) to the benefit of any private shareholder or individual."  Contributions to VEBAs are deductible if they comply with 26 U.S.C. § 419A(f)(6).  "A VEBA plan that complies with § 419A(f)(6) involves the creation of a joint trust or other fund that ten or more companies join."  FAC ¶ 42.  Participating companies make tax-deductible contributions to the trust, and the trust purchases assets to provide benefits to participating employees.  *Id.*

Plaintiffs allege that Defendant Sea Nine Associates, Inc., at the direction of its employee Kenneth Elliott, operated the affairs of various VEBA programs.  *Id.* ¶¶ 25-26, 42, 45.  Each separate program had a "sponsor" in whose name the program was established.  *Id.* ¶ 45.  The businesses that adopt a VEBA program are known as

1  "participating employers" and the individual employees that elect to participate in a

2  plan are "participating employees." *Id.* ¶ 45.  A trustee is responsible for holding

3  each program's assets and administering the plan. *Id.*  Defendant Innovative Private

4  Strategies & Insurance Services, Inc. ("Innovative"), owned by Defendant Laban

5  Pattanaik, retained Defendant I.P.S. Private Advisors LLC ("IPS"), owned by Laban

6  and his brother Lalat Pattanaik, to market the VEBA programs to small businesses.

7  *Id.* ¶¶ 28-29, 45.  American General allegedly "participated in the Agent Defendants'

8  marketing efforts" and "knew or should have known that its agents were marketing

9  and promoting these Programs as a tax-avoidance transaction." *Id.* ¶ 83.

10  ### B. VEBAs are not permitted to be used as tax avoidance schemes.

11  Plaintiffs allege a "long history of companies misusing VEBA plans as tax

12  avoidance schemes," and that the IRS implemented "rules and regulations to prevent

13  such abuse."  FAC ¶ 53.  In particular, participating companies are prohibited from

14  claiming "deduction[s] for contributions actually used to distribute corporate earnings

15  to" shareholders and from deducting "a contribution to a welfare benefit plan in the

16  year made if the benefits provided constitute 'deferred compensation[.]'" *Id.*  The

17  VEBA programs at issue were purportedly presented to Plaintiffs (through their

18  agent) as compliant with § 419A(f)(6), but were allegedly non-compliant because the

19  contributions made by the participating employers, which were used to purchase life

20  insurance policies, exceeded the cost of the death benefit derived from the insurance

21  policies. *Id.* ¶ 54.  Plaintiffs claim that the excess contributions were "used to obtain

22  the cash value portion of the Policies … for the benefit of the owners of the

23  companies." *Id.*

24  Plaintiffs describe the VEBA programs as "mechanisms for distributing excess

25  profits to owners and/or providing deferred compensation in a manner that attempted

26  to evade federal taxes." *Id.* ¶ 55.  In 2003, the Treasury Department issued

27  regulations applicable to § 419A(f)(6) multiple-employer plans, and American

28  General requested that Lalat and Laban demonstrate that their VEBA programs were

compliant.  *Id.* ¶ 61.  Plaintiffs claim that "Defendants" sought an opinion letter from the Reish law firm, which concluded in January 2004 that the VEBA Programs were not compliant, and, therefore, that "Defendants knew, or in the exercise of ordinary care should have known, that their VEBA Programs were Listed Transactions and an unlawful tax avoidance scheme" when marketing them in 2006.  *Id.* ¶¶ 58, 62.  IPS advised American General, however, that it would revise its plan documents and operational aspects of the program to bring it into compliance.  *Id.* ¶ 64.

### C. Plaintiffs' financial planner expressed concerns about the VEBAs.

Defendant Peter Mordin, an American General employee, allegedly contacted financial planner R. Wesley Sierk in February 2006 about the possibility of him "recommending Defendants' VEBA Programs – and the life insurance Policies that Defendant [American General allegedly] created for use in conjunction with these Programs – to certain of Sierk's clients."  *Id.* ¶¶ 20, 67.  Sierk, who is not named as a plaintiff or defendant, "expressed concerns about the legitimacy of VEBA plans in general."  *Id.* ¶ 67.  Sierk was concerned by "earlier IRS actions against such plans" and "inquired whether they were Listed Transactions."  *Id.* ¶ 5.  Mordin allegedly assured him that the plans were "vetted by reputable counsel" and "had historically passed all IRS audits without change."  *Id.* ¶ 67.  IPS followed up in June 2006 with marketing materials describing the plans and representing them to either have a written determination letter from the IRS or an opinion from a law firm.  *Id.* ¶ 68.

### D. Sierk recommends the VEBA programs to Plaintiffs.

Plaintiffs claim that on July 6, 2006, Laban, Lalat, Mordin, and Elliott met with Sierk and provided him "their standard sales pitch promoting the VEBA Program."  *Id.* ¶ 70.  Based on these representations, Sierk "believed that the five annual contributions were tax-deductible *to the businesses* in the year made, and that the owners could withdraw significant benefits on a tax-free basis after the exchange on the first day of the eighth year."  *Id.* ¶ 71 (emphasis added).  Four days later, Lalat provided Sierk with forms to complete, including an American General life insurance

application.  *Id*. ¶ 72.  On August 1, Sierk received a proposal specific to Ulti-Mate representing that the VEBA Programs "had the 'Support of Substantial Legal Authority'" that the contributions would be 100% tax deductible, that they would allow for deferred income, and that they would substantially reduce income and estate taxes.  *Id*. ¶ 74.

On August 6, 2006, Elliott sent Sierk another e-mail to "quell" Sierk's continued concerns that "these were Listed Transactions such that his clients would have to report their participation to the IRS."  *Id*. ¶ 75.  The e-mail concluded: "We *believe* that the VEBA's sponsorship of the ten or more employer plan using this deduction established that we are not a tax shelter."  *Id*. (emphasis added).  Plaintiffs claim they joined the SCMAPL Program in reliance on this information.  *Id*. ¶ 74.

## E. The VEBA programs were allegedly created through form documents utilized with the entire putative class.

On October 16, 2006, Plaintiffs were provided a set of Master Plan Documents to sign, including (1) the Master Plan and Master Trust documents "to establish the entity of ten or more employers required for a § 419A(f)(6) plan"; (2) an "Adoption Agreement" by which each small business would adopt and join the program; and (3) "Summary Plan Descriptions" that could be distributed to eligible employees.  *Id*. ¶ 44.  Plaintiffs allege that the Master Plan Documents used by the Sea Nine VEBAs are "largely identical" and do not comply with § 419A(f)(6) and its regulations.  *Id.* ¶ 48; *see also id.* ¶ 73 ("Defendants used standardized forms and marketing materials with all Class Members") and ¶ 98 (alleging the "use of common forms and promotional material").  The alleged "common marketing plan used on a class-wide basis" in all the VEBA programs included an August 1, 1988 IRS Favorable Determination Letter, an October 2, 1998 IRS "no change" letter, and a legal opinion from attorney Frederick Romero.  *Id*. ¶ 69.  Plaintiffs allege that Defendants used the same "common marketing plan and the same basic modus operandi to promote their VEBA programs" with other class members as shown in other pending lawsuits,

including *United States of America v. Kenneth Elliott, et al.*, No. 13-01582-JLS-JPR in the United States District Court for the Central District of California, and *J & M v. Callahan, et al.*, No. 07-00883 in the United States District Court for the Southern District of Alabama.  FAC ¶ 85.

Plaintiffs describe *Callahan* as "alleging a similar sequence of events in 2004 to 2006 in a complaint filed against AIG, Lalat, IPS, and others."  *Id.*  In *Callahan*, the Court partially granted American General's summary judgment motion in a published opinion quoting pertinent language from the Master Plan Documents.[1]  The Adoption Agreement provides only a life benefit with no future economic value or tax benefits:

> … the Life Benefit shall consist only of current protection, containing no economic value (such as paid-up or cash surrender value) extending beyond one Plan Year, irrespective of whether the provision of such Benefit is funded by the Trustee pursuant to the Master Plan with term or ordinary life Contracts. In the latter instance, the Participant shall have no rights in the Contract other than to the death Benefit protection. Accordingly a Participant shall have no rights in the Contract other than to the death Benefit protection…

*J & M Associates, Inc. v. Callahan*, 753 F. Supp. 2d 1183, 1191-92 (S.D. Ala. 2010). It further provides that "Other Benefits are not provided by the Plan," the "Benefits under the Plan are limited" by the Master Plan, the "Participating Employer assumes

---

[1] This Court can take judicial notice of these documents as Plaintiffs allege the use of common documents, and these allegedly non-compliant documents are central to their allegations. *Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001) (a court may take judicial notice of "matters of public record" without converting the motion to dismiss into a motion for summary judgment). The Master Agreement (*Callahan*, No. 07-00883 (Dkt. 159-9)), Adoption Agreement (*Id.* (Dkt. 159-8)), and the Romero Legal Opinion (*Id.* (Dkt. 159-17)) are in the public record in the *Callahan* case, and the Court should take judicial notice of these documents.

1  full responsibility for evaluating the tax consequences of adopting the Plan, and the

2  participating Employer shall hold harmless the Trustee and the Administrative

3  Service Provider from any liability regarding such matters." *Id.* at 1192, 1204.

4          The Master Plan, in turn, sets forth that "the Benefits provided by this Plan are

5  stated in the Adoption Agreement" subject to the limitations of section 5.02 of the

6  Master Plan. *Id.* at 1192.  Section 5.02 states that the Plan "may provide only Life

7  and other Benefits," and defines "Benefits" as "***life and other welfare benefits*** as

8  may be adopted by the Participating Employer pursuant to the Adoption Agreement

9  attached hereto and made part hereof." *Id.*  "Life benefits" in turn means:

10          a Benefit including a burial benefit or a wreath payable by reason of the

11          death of a Participant.  A "life benefit" may be provided directly or

12          through insurance.  It generally must consist of current protection, but

13          also may include a right to convert to individual coverage on

14          termination of eligibility for coverage through the Plan.  A "life benefit"

15          also includes the Benefit provided under any life Insurance Contract

16          purchased directly from the Plan by a Participant.

17  *Id.* (emphasis added).  The Master Plan further states that American General "shall

18  not be deemed to be a party to this Plan and its sole obligations shall be measured and

19  determined solely by the terms of its Contracts and other agreements executed by it."

20  *Id.*  Finally, the March 4, 2004 opinion letter from attorney Romero concludes only

21  that the Sea Nine VEBA programs are "more likely than not" not Listed Transactions

22  (implying the possibility that they may be Listed Transactions), and caveated that the

23  opinion "is not binding on the Internal Revenue Service" and "that it is possible that

24  the [IRS] may disagree with us."  *See* Amended Mtn. for Summ. J., *Callahan*, No.

25  07-00883 (Dkt. 159-18 at p. 7).

26          **F.  Plaintiffs participate in the SCMAPLE VEBA for five years before**

27  **"discovering" the plan was not tax compliant.**

28          Plaintiffs executed the form agreements and American General issued three

modified whole life policies insuring the lives of Ulti-Mate shareholders Bruce Billington, Stephen Brockman and Thierry Pombart (together, the "Policies").  FAC ¶¶ 77-78.  Between 2006 and 2011, Plaintiffs contributed $914,696.74 into the SCMAPLE VEBA program.  *Id.* ¶ 78.  Plaintiffs allege they discovered "the true nature of the VEBA Programs on or about September 8, 2011, when Plaintiffs received audit notices from the IRS, informing them that their federal tax returns had been selected for examination."  *Id.* ¶ 79.  Following the audit, the IRS assessed taxes, penalties, and interest against Plaintiffs.  *Id.*  Plaintiffs filed suit on July 9, 2014 [Dkt. 1], and amended it on August 4, 2014 [Dkt. 12].  The FAC alleges class claims for rescission of all contracts and insurance policies (Cause 1), violations of RICO, 18 U.S.C. § 1962(c) and (d) (Counts 2 and 3), violations of California's Unfair Competition and False Advertising Laws, BUS. & PROF. CODE §§ 17200, *et seq.* and §§ 17500, *et seq.* (Counts 4 and 5), fraudulent concealment (Count 6), common law fraud (Count 7), and aiding and abetting RICO violations solely against American General (Count 8).  By this Motion, American General and Peter Mordin seek dismissal of all claims brought against them.

### III.    STANDARD OF REVIEW

"Standing under Article III of the Constitution is an element of subject matter jurisdiction; consequently, a defense based on lack of Article III standing may be raised in a 12(b)(1) motion."  *Young v. Crofts*, 64 Fed. App'x. 24, 25 (9th Cir. 2003) (citation omitted.).  Such a motion can only succeed if the plaintiff has failed to make "general factual allegations of injury resulting from the defendant's conduct."  *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

A motion brought under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim."  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  In order to proceed to discovery and continue litigation, a plaintiff must present a complaint that contains sufficient factual allegations to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Upon granting a

1   motion to dismiss, a court need not permit the plaintiff to file an amended claim

2   where "it is clear that the complaint could not be saved by an amendment." *Livid*

3   *Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).

## IV.    ARGUMENT

### A. Plaintiffs' claims are time-barred.

6       Each of the FAC's causes of action is subject to a three or four-year statute of

7   limitations.[2]  Plaintiffs try to salvage their time-barred claims by alleging they first

8   learned about their claimed injury in September 2011 after receiving IRS audit

9   notices.  FAC ¶¶ 79-80.  This fails to avoid limitations, though, because since 2006

10  Plaintiffs were admittedly aware of prior IRS actions concerning VEBA plans, were

11  suspicious of Defendants' representations about the VEBA plan's tax benefits, and

12  were provided documentation for the proposed VEBA plan that conflicted with the

13  alleged representations about its benefits, and yet performed no due diligence.

### i.    Plaintiffs' claims accrued in 2006 with their suspicions of the VEBAs.

15      Plaintiffs' claims accrued when they "suspect[ed] or should have suspected"

16  their injury—not when they actually discovered it.  *See Grisham v. Philip Morris,*

17  *Inc.,* 670 F. Supp. 2d 1014, 1021 (C.D. Cal. 2009) ("…limitations begins to run [on

18  RICO claims] when the plaintiff suspects or should suspect that her injury was

19  caused by wrongdoing, that someone has done something wrong to her." (internal

20  quotations omitted)); *Rotella v. Wood*, 528 U.S. 549, 553-54 (2000) (RICO claim

21  accrues when plaintiff discovers or should have discovered the injury—not the date

22  he discovered the injury *and* the pattern of racketeering activity, and not the date of

---

24  [2] *Agency Holding Corp v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987)

25  (four year statute of limitations for RICO claims); Cal. Bus. & Prof. Code § 17208
    (four years for California UCL claims); Cal. Code Civ. Proc. § 338(h) (three years

26  for California False Advertising Act Claims); *Kline v. Turner*, 87 Cal. App. 4th 1369,

27  1373 (2001) ("An action for relief on the grounds of fraud or mistake must be
    commenced within three years.").

28

-9-

Case No. 8:14-cv-01051–JLS-JPR
American General & Peter Mordin's 12(b)(1) and (6) Memorandum of Points and Authorities ISO Motion to Dismiss

1    the "last predicate act."); *Kline*, 87 Cal. App. 4th at 1374 ("[C]ourts interpret

2    discovery [of fraud injury] to mean not when the plaintiff became aware of the

3    specific wrong alleged, but when the plaintiff suspected or should have suspected

4    that an injury was caused by wrongdoing."); *Wilson v. Household Fin. Corp.*, No.

5    12-1413, 2013 WL 1310589, at *10 (E.D. Cal. Mar. 28, 2013) (UCL claim accrued

6    when plaintiffs had "reason at least to suspect the factual basis for its elements").

7         The Third Circuit specifically addressed limitations in the context of RICO

8    and participation in a VEBA.  *Cetel v. Kirwan Financial Group, Inc.*, 460 F.3d 494,

9    501-502 (3d Cir. 2006).  Like here, the plaintiffs brought RICO claims against the

10   parties who facilitated the VEBA's creation and sold the life insurance policies that

11   funded it.  *Id.* at 501-502.  Also as here, the RICO claim was based on alleged

12   misrepresentations made about the VEBA's tax benefits.  *Id.*  In holding that the

13   RICO claim was time-barred, the court applied a two-step analysis to determine

14   when the injury was "discovered."  *Id.* at 506-507.  First, the Court found that the

15   existence of "storm warnings"—information that would alert a reasonable person to

16   the probability that misleading statements or omissions had been made—put

17   plaintiffs on notice of their claims.  *Id.* at 507.  The *Cetel* plaintiffs had constructive

18   notice because, among other things, the IRS had circulated a public notice stating it

19   had not approved contributions to VEBA plans as deductions.  *Id.*

20        In the presence of "storm warnings," the second prong of the analysis is

21   whether plaintiffs exercised the "due diligence expected of a reasonable investor of

22   ordinary intelligence" to discover his injury.  *Id.* at 507-508.  *Cetel*, and *Mathews*

23   which it cites, both hold that merely relying on the alleged misrepresentation or

24   seeking further assurances from the alleged fraudfeasor is insufficient: "By all

25   accounts, plaintiffs' only effort to discover their injuries was to inquire about the

26   validity of the plans with [the individuals] involved in the running and operation of

27   the plan. . . . In *Mathews*, we addressed a similar degree of diligence and concluded

28   that it did not constitute the exercise of due diligence expected of reasonable

1    investors." *Id.* (citing *Mathews v. Kidder, Peabody & Co., Inc.*, 260 F.3d 239, 255

2    (3d Cir. 2001)).  The Court prefaced this holding by approvingly noting the District

3    Court's finding that "it seems incredible … to argue they relied solely on the

4    defendants' assurances of a 'victory' over the IRS in the Tax Court…. Asking the

5    defendants whether the plans were legal does not constitute due diligence." *Id.* at

6    508.  The lack of due diligence to investigate storm warnings prevented the tolling of

7    the accrual of claims, and, accordingly, the Third Circuit found the RICO claims

8    were time-barred.  *Id.* at 508-509.

9         The same principles—that suspecting a representation may be false obligates a

10   party to conduct due diligence, and mere inquiry with the alleged fraudfeasor is not

11   enough—also apply to Plaintiffs' fraud, fraudulent concealment, UCL, and False

12   Advertising claims.  *Fox v. Ethicon Endo-Surgery, Inc.*, 110 P.3d 914, 921 (2005)

13   (describing the uniform application of the delayed discovery rule in California as

14   requiring that, "a plaintiff must plead that, despite diligent investigation of the

15   circumstances of the injury, he or she could not have reasonably discovered facts

16   supporting the cause of action within the applicable statute of limitations period.");

17   *Ortega v. Natural Balance Inc.*, No. 13-05942, 2013 WL 6596792, at *4 (C.D. Cal.

18   Dec. 16, 2013) (delayed discovery rule for UCL and False Advertising claims

19   requires pleading a "lack of means of obtaining knowledge," i.e., that "in the exercise

20   of reasonable diligence the facts could not have been discovered at an earlier date."

21   (citing *Gen. Bedding Corp. v. Echevarria*, 947 F.2d 1395, 1397 (9th Cir. 1991))).

22        Here, no need exists to conduct discovery or entertain factual debate over

23   when Plaintiffs learned of their alleged injury because they affirmatively plead their

24   suspicions about the VEBA's tax compliance and their skepticism of Defendants'

25   alleged misrepresentations (which American General and Peter Mordin emphatically

26   deny making).  Plaintiffs admit that when their financial planner, Sierk, was

27   approached about the VEBA in February 2006, he raised questions about earlier IRS

28   actions against such plans and inquired whether they were "Listed Transactions."

FAC ¶¶ 5, 67.  Plaintiffs allege that their agent Sierk "expressed concerns about the legitimacy of VEBA plans in general."  FAC ¶¶ 5, 67.  Yet, just like the *Cetel* and *Mathews* plaintiffs, Sierk did no diligence except to question Defendants, who supposedly "quelled Sierk's stated concern that these were Listed Transactions such that his clients would have to report their participation to the IRS."[3]  *Id.* ¶ 75. Without making further inquiry, Plaintiffs elected to participate in the VEBA. It was not until the known risk came to pass that they brought suit in a bout of buyer's remorse.

Because Plaintiffs were suspicious of Defendants' alleged representations yet conducted no independent due diligence, their claims accrued no later than February 2006.  As such, their claims are barred by limitations and should be dismissed.

### ii.   Plaintiffs' received documents in 2006 contradicting the alleged representations.

Where a party, as here, seeks to take advantage of the discovery rule, receiving documents that conflict with the alleged misrepresentation places the party on notice of its claim, and the cause of action accrues.  *Wilson*, 2013 WL 1310589, at 10 (E.D. Cal. Mar. 28, 2013).  This is a logical extension of the due diligence requirement—a party cannot simply ignore documents that would alert it to a misrepresentation.

This precise issue was already litigated with many of these claims and parties. In *J & M Associates, Inc. v. Callahan*, plaintiffs brought similar claims (fraud, fraudulent concealment) against many of the same defendants (American General, Lalat Pattanaik, IPS) for the same alleged conduct (the sale of life insurance policies through VEBA plans that allegedly resulted in tax liability).  753 F. Supp. 2d 1183 (S.D. Ala. 2010).  In *Callahan*, the court found that plaintiffs' claims accrued when they received written disclosures that contradicted purported oral representations

---

[3] Defendants, of course, have no knowledge of what Sierk in turn told the individual Plaintiffs, nor do they have any control over him or any of the Plaintiffs.

1   made by its alleged agents about (as here) the VEBA plan, its tax status, the

2   taxability of plan contributions, and information about its flexibility.  *Id.* at 1214.

3   Because those disclosures contradicted the alleged misrepresentations on which

4   plaintiffs relied, the Court dismissed plaintiffs' claims (including fraudulent

5   concealment).  *Id.*  The inconsistent plan documents put plaintiffs on notice that the

6   alleged misrepresentations were not accurate.

7       Plaintiffs allege that Defendants used a "common marketing plan and the same

8   basic modus operandi" in *Callahan* as those provided to Plaintiffs in October 2006.

9   FAC ¶ 85.  The Master Agreement and Adoption Agreement provided only for death

10  benefits and stated that participants would have no other rights in the insurance

11  policies. Since these statements contradicted the alleged oral representations about

12  the VEBA, Plaintiffs had notice of their claims in 2006, which must now be

13  dismissed.

14  **B. Plaintiffs' RICO claims fail.**

15      Plaintiffs seek to inflate garden-variety fraud allegations into RICO claims by

16  manufacturing an enterprise that consists of nothing more than the industry-standard

17  arrangement between an insurer and its agents, arriving only at an "enterprise" that is

18  not separate from the alleged fraudulent conduct.  Further, their entirely conclusory

19  vicarious liability allegations—that every Defendant is an agent of every other

20  Defendant—undermine any structure or distinctiveness between the enterprise and

21  the Defendants.  Moreover, the conduct comprising Plaintiffs' alleged predicate acts

22  is not actionable because the alleged misrepresentations are, at best, nothing more

23  than Defendants' nonactionable opinions and beliefs about the status of law.

24      **i.   The enterprise is not distinct from Defendants.**

25      "[T]o establish liability under § 1962(c) one must allege and prove the

26  existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not

27  simply the same 'person' referred to by a different name." *Negrete v. Allianz Life*

28  *Ins. Co. of N. Am.*, 926 F. Supp. 2d 1143, 1148 (C.D. Cal. 2013) (citation omitted)).

While nothing prohibits naming "all the members of an alleged association-in-fact enterprise as defendants" in a multi-party RICO claim, the plaintiff cannot plead the defendants and enterprise as identical, or distinctiveness is lost. *River City Markets, Inc. v. Fleming Foods W., Inc.*, 960 F.2d 1458, 1462 (9th Cir. 1992). By way of analogy to the corporate context, a parent and subsidiary named as defendants—two formally distinct entities—may qualify as a RICO enterprise only if "something more" is provided to satisfy the distinctiveness requirement. *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005) ("if the 'enterprise' consisted only of DuPont and its employees, the pleading would fail for lack of distinctiveness."). In the absence of that "something more," the parent and subsidiary "generally are not sufficiently distinct" because "a subsidiary that simply conducts its affairs as delegated by the parent company for the profit of the parent company is engaged in nothing more than a legitimate corporate and financial relationship, which is certainly not subject to RICO liability on that basis alone." *In re Countrywide Fin. Corp. Mortgage Mktg. & Sales Practices Litig.*, 601 F. Supp. 2d 1201, 1214 (S.D. Cal. 2009); *see also Chagby v. Target Corp.*, 358 F. App'x 805, 808 (9th Cir. 2009) ("Chagby's alternative theory that an enterprise existed between Target Corporation and its wholly-owned subsidiaries fails to meet the distinctiveness requirement of civil RICO claims.").

Even more complex variations of an entity, its subsidiaries, its employees, its officers, and/or its licensees taken together are insufficient. *Ice Cream Distributors of Evansville, LLC v. Dreyer's Grand Ice Cream, Inc.*, No. 09-5815, 2010 WL 3619884, at *5 (N.D. Cal. Sept. 10, 2010) *aff'd*, 487 F. App'x 362 (9th Cir. 2012) ("[A] § 1962(c) claim could not be based on a RICO enterprise comprised of a corporation, a wholly-owned subsidiary and an employee of that corporate family if these entities were also plead as the RICO persons."); *Moran v. Bromma*, No. 13-00487, 2014 WL 348952 (E.D. Cal. Jan. 31, 2014) ("Here, all Defendants [a parent, its subsidiary, its CEO, and its licenses/franchisee] are part of the same corporate

1    family and consequently, the distinctiveness requirement is not satisfied.").

2    Although Plaintiffs formally name separate persons as defendants and enterprise

3    members, which may otherwise be sufficient to plead a distinct enterprise, Plaintiffs

4    undermine the distinctiveness between them by affirmatively pleading that

5          each Defendant named in this action, including each of the DOE

6          defendants, was the agent, ostensible agent, servant, aider and abettor,

7          co-conspirator, partner, joint venturer, representative and/or associate

8          of each of the other Defendants, and was at all times relevant herein

9          acting within the course and scope of his, her, or its authority. . .

10   FAC ¶ 34.  In other words, Plaintiffs unify Defendants so that the enterprise is

11   "simply the same [defendant] 'person' referred to by a different name"—failing the

12   legal threshold for finding distinctiveness.  *Negrete*, 926 F. Supp. 2d at 1148.

13          Plaintiffs cannot have it both ways, pleading that all Defendants are a single

14   unit to impute liability, but are separate enough to meet RICO's distinctiveness

15   requirement.  Under analogous facts, this District held three years ago that pleading

16   that "the Toyota Defendants are 'persons' as defined by 18 U.S.C. § 1961(3),"

17   coupled with the allegation that "the Toyota Defendants, [their] worldwide affiliates,

18   and their salespersons' constitute the 'enterprise'" was insufficient to show

19   distinctiveness.  *In re Toyota Motor Corp.*, 785 F. Supp. 2d 883, 922 (C.D. Cal.

20   2011).  For that reason, the RICO claim was dismissed, as it should be here.

21          **ii.  Plaintiffs fail to plead an enterprise with decision-making structure.**

22          Plaintiffs' circular agency pleading also destroys their alleged enterprise by

23   eliminating a required structural feature.  An associated-in-fact enterprise must have,

24   among other things, some form of decision-making structure, even if decisions are

25   "made on an ad hoc basis and by any number of methods—by majority vote,

26   consensus, a show of strength, etc."  *Boyle v. United States*, 556 U.S. 938, 948

27   (2009).  Here, Plaintiffs allege that each Defendant was an agent of each other (FAC

28   ¶ 34), necessarily implying that each was also a principal of each other.  In this

1  Mobius strip of authority, each Defendant had authority over, but was also subject to

2  the authority of each other Defendant.  These logically inconsistent pleadings result

3  in an amorphous association with no structure whatsoever.  Without pleading a

4  sufficient enterprise, Plaintiffs' RICO claims fail.

5              **iii. The enterprise is not separate from its activities.**

6      A RICO enterprise must be "an entity separate and apart from the pattern of

7  activity in which it engages."  *United States v. Turkette*, 452 U.S. 576, 583 (1981).

8  The alleged enterprise here does not meet this requirement.  *Id.*  Plaintiffs face a

9  problem: by claiming that the industry-standard use of agents to distribute policies is

10 somehow an "enterprise" (FAC ¶ 109) and that the predicate acts conducted by that

11 enterprise are the marketing and selling of these policies, the alleged enterprise is

12 defined solely by its wrongful activities.  The lack of separateness between the

13 enterprise and the alleged conduct is clarified where the roles of individual enterprise

14 members are described: Plaintiffs allege only that Defendant American General

15 would sell policies and provide marketing materials, while Innovative, Lalat, IPS,

16 and Laban took the "leading role" in marketing and promoting the programs and

17 policies.  FAC ¶ 112.  By defining the enterprise as an insurance company (which

18 issues and sells policies) and its agents (who market and distribute them), then

19 issuing, selling, marketing, and distributing insurance policies is the whole of the

20 enterprise's conduct.  When that same issuing, selling, marketing, and distributing is

21 the entirety of the alleged racketeering activity (FAC ¶ 114), then the enterprise is

22 not separate from the racketeering.

23      While Plaintiffs imply that the enterprise is separate because it existed "since

24 2001 or 2002" (predating the alleged racketeering activity perpetrated against

25 Plaintiffs), they also allege that the enterprise employed its "fraudulent means" to

26 "convince at least 205 entities and/or individuals to participate in their VEBA

27 programs" during that time.  FAC ¶¶ 110, 114.  That is, while Plaintiffs suggest the

28 enterprise may be separate from the isolated fraud allegedly committed against *them*,

they do not plead that the enterprise is "separate and apart from the *pattern* of activity in which it engages." *Turkette*, 452 U.S. at 583 (emphasis added). Plaintiffs' RICO claims should be dismissed on this basis alone.  On other facts similar to these, and also in the VEBA context, courts dismiss RICO allegations where the pleading "does not allege that Defendants existed as an association-in-fact separate and apart from the alleged RICO activity, but rather that [they] came together strictly for the purpose of creating these allegedly fraudulent tax shelters." *Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 263 (S.D.N.Y. 2011).

### iv. Plaintiffs fail to plead predicate acts.

Plaintiffs allege that the predicate crimes supporting both civil RICO claims were wire and mail fraud under 18 U.S.C. §§ 1341 and 1343.  FAC ¶ 114.  These statutes require (1) formation of a scheme or artifice to defraud; (2) use of the United States mails or wires in furtherance of the scheme; and (3) specific intent to deceive or defraud.  *United States v. Andrews*, 681 F.3d 509, 518 (3d Cir. 2012).  The gravamen of the offense is the scheme to defraud.  *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008).

Plaintiffs' only alleged racketeering activities brought against American General and Mordin are that they marketed VEBAs after learning they were not tax compliant.  These "misrepresentations" are, at best, non-actionable statements of opinion (Defendants' belief about the status of tax law), statements of law (compliance with the I.R.C.), or predictions about the future conduct of a third party (that the IRS would not audit plaintiffs or challenge the VEBA's tax benefits). Viewed from any angle, the statement is not actionable. *See Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 940 (9th Cir. 2006) (opinions "may not be relied upon absent special circumstances," and therefore cannot ground mail/wire fraud claims); *Miller v. Yokohama Tire Corp.*, 358 F.3d 616, 622 (9th Cir. 2004) (employee's claim that employer violated RICO by falsely representing to him and other employees that they were not entitled to overtime pay was a non-actionable legal opinion); *Bayview*

1   *Hunters Point Community Advocates v. Metropolitan Transp. Com'n*, 366 F.3d 692,

2   698 (9th Cir. 2004) ("predictions as to future events are ordinarily non-actionable

3   expressions of opinion" (citations omitted)).  For this additional reason, Plaintiffs'

4   RICO claims should be dismissed.

5          **v.  Plaintiffs do not plead their RICO claims with specificity.**

6        To avoid dismissal for inadequacy under Rule 9(b), a complaint must "state

7   the time, place, and specific content of the false representations as well as the

8   identities of the parties to the misrepresentation." *Edwards v. Marin Park, Inc.*, 356

9   F.3d 1058, 1066 (9th Cir. 2004) (citation omitted).  And, because RICO claims are

10   subject to 9(b)'s heightened pleading, the allegations cannot be based on mere

11   "information and belief"—details are required. *Kearney v. Foley & Lardner*, No. 05-

12   2112, 2011 WL 1119047, at *6 (S.D. Cal. Mar. 28, 2011) (dismissing RICO claims

13   under 9(b) and finding that "even when pleading on information and belief, sufficient

14   facts must be alleged to support a showing of fraud"); *see also Zavala v. Wal-Mart

15   Stores, Inc.*, 393 F. Supp. 2d 295, 311 (D.N.J. 2005) (dismissing RICO allegations

16   made on "information and belief" as not meeting Rule 9(b)'s standard).

17        Here, the sufficient details are absent.  The only conduct Plaintiffs allege

18   American General or Peter Mordin performed in violation of 1962(c) (which they

19   deny violating) is:

20          •  Mordin "telephoned Sierk [] about the possibility of Sierk

21             recommending Defendants' VEBA Programs – and the life insurance

22             policies… to certain of Sierk's clients."  On the call, Mordin "assured

23             him that these plans had been thoroughly vetted by reputable counsel

24             and, further, that the VEBA Programs had historically passed all IRS

25             audits without change."  FAC ¶ 67.

26          •  Mordin "urged Sierk to recommend that his clients sign up for

27             Defendants' VEBA Programs and purchase Policies through those

28             programs."  *Id*. ¶ 114.

1    • In July 2006, Sierk received an American General Life Insurance
2       Application. *Id.* ¶ 72.

3       This is not enough. Simply making a phone call to encourage someone to buy
4   life insurance policies and describing the Program's prior treatment does not describe
5   a *fraudulent* act.  Obviously, receiving a life insurance application, where no mention
6   of *any* misrepresentation is made, is likewise insufficient. Indeed, where a written
7   notice or communication is used to ground a RICO claim, 9(b) requires detailing the
8   language used or attaching such notices in response to the complaint. *Edwards*, 356
9   F.3d at 1066 ("Nor did Edwards attach the notices to her complaint or to any other
10  filing in this case.  Edwards's RICO claim therefore fails to satisfy Rule 9(b).")

11      Yet another consequence of pleading American General and its distribution
12  network as an enterprise, and then pleading their ordinary sales as the racketeering
13  activities, is that Plaintiffs have not parsed which Defendant purportedly performed
14  the fraudulent acts.  Pervasively through the FAC, Plaintiffs inadequately point the
15  finger at "Defendants" generally.  (*See, e.g.*, FAC ¶¶ 74, 90, 114.)  The FAC
16  nowhere details, as it must, which Defendant performed which acts. *Edwards*, 356
17  F.3d at 1066 (a complaint must state "the identities of the parties" performing the
18  alleged conduct).  And, as noted above, RICO allegations cannot be sustained on
19  "information and belief." *Foley & Lardner*, 2011 WL 1119047, at *6.

20      Any act alleged in the FAC that might be construed as fraudulent is not
21  ascribed to American General or Peter Mordin, who were simply selling life
22  insurance in the ordinary course of their business.  Because Plaintiffs have not
23  pleaded wrongful conduct by American General or Peter Mordin with specificity, the
24  § 1962(c) claim against them should be dismissed.

25      **vi. Plaintiffs do not plead a RICO claim against Mordin.**

26      Plaintiffs bring their § 1962(c) claim against all defendants, but define the
27  enterprise as an association-in-fact comprised of American General, Innovative, IPS,
28  Sea Nine, Lalat, Laban, Elliott and/or the VEBA Programs themselves.  FAC ¶ 109.

-19-

Absent from this list is Mordin. *Id.* When describing the roles of individuals in the enterprise, Mordin is again omitted. *Id.* at ¶ 112. In other words, Mordin had no role in the enterprise. Plaintiffs allege only that he was aware of certain marketing materials that are not described with specificity (FAC ¶ 51), that he attended a pitch meeting (though no statements are credited to him) (FAC ¶ 70) and that he "telephoned Sierk [] about the possibility of Sierk recommending Defendants' VEBA Programs – and the life insurance policies… to certain of Sierk's clients. On the call with Sierk, Mordin "assured him that these plans had been thoroughly vetted by reputable counsel and, further, that the VEBA Programs had historically passed all IRS audits without change." FAC ¶ 67. As to this allegation, though, Plaintiffs do not claim the statements he made were false. This Court dismisses RICO claims where the alleged misrepresentations are not pleaded to be false. *Gustafson v. BAC Home Loans Servicing, LP*, No. 11-915, 2012 WL 7071469, at *5 (C.D. Cal. Dec. 20, 2012) ("Plaintiffs have not specifically alleged that these communications contained misrepresentations or omissions, nor have they pointed to anything in or about those correspondences that were misleading or misrepresented."). Given the dearth of allegations about Mordin and his relationship to the enterprise, the RICO claims against him should be dismissed.

### vii.  Plaintiffs' RICO conspiracy claim fails.

"The failure to adequately plead a substantive violation of RICO precludes a claim for conspiracy." *Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000). Because Plaintiffs fail to plead a substantive, § 1962(c) claim, their conspiracy claim should also be dismissed.

### C. Plaintiffs' UCL claim fails; the UCL cannot be applied extraterritorially.

Plaintiffs' UCL claim implicates California's judicial presumption against extraterritorial application. "However far the Legislature's power may theoretically extend, [California courts] presume the Legislature did not intend a statute to be operative, with respect to occurrences outside the state, unless such intention is

1   clearly expressed or reasonably to be inferred from the language of the act or from its

2   purpose, subject matter or history." *Sullivan v. Oracle Corp.*, 254 P.3d 237 (2011)

3   (internal quotation marks omitted).  "Neither the language of the UCL nor its

4   legislative history provides any basis for concluding the Legislature intended the

5   UCL to operate extraterritorially.  Accordingly, the presumption against

6   extraterritoriality applies to the UCL in full force." *Id.*

7         The UCL thus does not redress injuries "caused by conduct occurring outside

8   of California's borders, by defendants whose headquarters and principal places of

9   operations are outside of California."  *Norwest Mortg., Inc. v. Superior Court*, 72

10  Cal. App. 4th 214, 225 (1999); *Fontenberry v. MV Transp., Inc.*, 984 F. Supp. 2d

11  1062, 1067 (E.D. Cal. 2013) ("California's UCL may only be applied

12  extraterritorially where the unlawful conduct that forms the basis of the out-of-state

13  plaintiff's claim occurs in California."); *Smith v. SunTrust Mortgage Inc.*, No. 13-

14  0739, 2013 WL 5305651, at *8 (C.D. Cal. Sept. 16, 2013) (the fact that "Defendants

15  are all incorporated outside of California" and did not "have their principal place of

16  business or headquarters in California . . . weigh heavily against application of the

17  UCL[.]")  As courts have further noted, "the existence of personal jurisdiction over

18  the defendant does not alone permit application of the forum law to the claims of

19  nonresident plaintiffs."  *Id.* at 226 (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S.

20  797, 821 (1985)).

21        Here, none of the allegedly wrongful activities ascribed to American General

22  occurred in California, nor could they.  As a Texas-based insurance company with its

23  principal place of business in Houston, Texas (FAC ¶ 23), American General's

24  decisions regarding the wording of its insurance policies, the marketing information

25  placed into brochures and advertisements, and the creation and sending of policy

26  communications were all made at American General's corporate headquarters in

27  Texas.  As such, Plaintiffs have "not alleged with sufficient detail that the point of

28  dissemination from which advertising and promotional literature that [Plaintiffs] saw

1  or could have seen is California." *In re Toyota Motor Corp.* 785 F. Supp. 2d at 917

2  (emphasis omitted).

3      Further, while Plaintiffs claim that *some* of the policies were ultimately issued

4  to California residents, that fact is irrelevant to the misconduct charged here.  The

5  pertinent state of jurisdiction is the "point of dissemination" from which the

6  allegedly misleading information was sent.  *Id.*; *Fontenberry* 984 F. Supp. 2d at

7  1067.  Plaintiffs do not suggest that American General's alleged misconduct actually

8  took place outside of its "point of dissemination" in Houston, Texas.  Indeed,

9  Plaintiffs attempt to lump Mordin (and all other Defendants) into their UCL claim,

10  but do not plead that any defendant besides the Texas-based American General was

11  involved with the creation and dissemination of these materials from Houston.  Thus,

12  Plaintiffs seek to invoke a California consumer protection statute even though the

13  issuing entity is Texas based, all alleged misconduct originated in Texas, and there is

14  no pleading that the Policies were issued in California. Because no basis for applying

15  the UCL appears in the FAC, the UCL claim should be dismissed.  *Tidenberg v.*

16  *Bidz.com, Inc.* No. 08-5553, 2009 WL 605249, at *4-5 (C.D. Cal. Mar. 4, 2009); *see*

17  *also Sullivan*, 51 Cal. 4th at 1207-08.

18  **D. Plaintiffs' fraud and RICO claims fail for lack of justifiable reliance.**

19      The same pleaded facts that cause Plaintiffs' claims to accrue in 2006—their

20  stated suspicions of Defendants' alleged claims about the VEBA's tax benefits, and

21  their receipt of documents that contradicted those alleged representations—also mean

22  that Plaintiffs did not justifiably rely on those alleged representations.  To ground a

23  fraud claim, a party must have justifiably relied on the misrepresentation. *Gabriel*

24  *Technologies Corp. v. Qualcomm Inc.*, No. 08-1992, 2009 WL 3326631, *6 (S.D.

25  Cal. Sept. 3, 2009).  Where a party relies on a representation despite suspecting its

26  inaccuracy, that reliance is legally unjustified.  *Id.* at *8.  Similarly, and again in the

27  VEBA context, courts dismiss fraud claims as lacking justifiable reliance where the

28  plan documents refute the representations.  *J&M Associates, Inc.*, 753 F. Supp. 2d at

1210 (plaintiffs, "through ordinary prudence, ought to or should have discovered from these documents that Lalat's alleged misrepresentations contradicted the documents").  The same is true here, where Plaintiffs displayed their skepticism openly and held plan documents at odds with the representations they claim they justifiably relied on.

Plaintiffs' RICO claims also fail for lack of reliance.  While reliance is not strictly an element of mail and wire fraud, proximate causation is, and the Supreme Court recognizes that, as a practical matter, "[i]n most cases, the plaintiff will not be able to establish even but-for causation [let alone proximate causation] if no one relied on the misrepresentation."  *Bridge*, 553 U.S. at 658.  Because Plaintiffs here plead that their injuries were caused by reliance on Defendants' representations (FAC ¶¶ 74, 136, 141), their RICO claim fails for the same lack of reliance as their fraud claim.  To the extent Plaintiffs ground their proximate causation on something other than reliance, they have failed to plead that causation with specificity.  *See Hill v. Opus Corp.*, 841 F. Supp. 2d 1070, 1100 (C.D. Cal. 2011) (rejecting plaintiffs' RICO causation allegations as "legal conclusions cast as factual allegations" that "do not pass muster under Rule 9(b)'s requirement that alleged fraud be pled with particularity").  Either way, Plaintiffs failed to demonstrate that Defendants proximately caused their alleged RICO injuries.

**E. Plaintiffs' aiding and abetting claim fails.**

Plaintiffs bring their aiding and abetting claim against American General but "there is no private right of action for aiding and abetting a RICO violation."  *Urenia v. Pub. Storage*, No. 13-01934, 2014 WL 2154109, at *5 (C.D. Cal. May 22, 2014); *In re Countrywide Fin. Corp. Mortgage Mktg. & Sales Practices Litig.*, 601 F. Supp. 2d 1201, 1219 (S.D. Cal. 2009).  To the extent Plaintiffs' pleading is interpreted as bringing a claim for aiding and abetting other claims, it fails because it does not describe (a) what claims were aided and abetted, (b) whom American General aided and abetted, or (c) how they were aided and abetted, and so does not "present a

1  complaint that contains sufficient factual allegations to 'state a claim to relief that is

2  plausible on its face.'"  *Iqbal*, 556 U.S. at 678.

3  **F. Individual Plaintiffs lack standing for RICO, fraud, and rescission claims.**

4       "[P]otential plaintiffs who have suffered 'passed-on' injury—that is, injury

5  derived from a third party's direct injury—lack statutory standing [under RICO]."

6  *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1168-69 (9th Cir. 2002), *abrogated on*

7  *other grounds by Iqbal*, 556 U.S. 662.  This is because "directly injured victims can

8  generally be counted on to vindicate the law as private attorneys general, without any

9  of the problems attendant upon suits by plaintiffs injured more remotely[.]"  *Bridge*,

10  553 U.S. at 654-55.  Thus, two key questions in determining whether Plaintiffs have

11  standing to bring their RICO claims are "whether there are more direct victims of the

12  alleged wrongful conduct who can be counted on to vindicate the law" and "whether

13  the courts will have to adopt complicated rules apportioning damages to obviate the

14  risk of multiple recoveries."  *Negrete*, 926 F. Supp. 2d at 1155 (citation omitted).

15       Here, the individual Plaintiffs (Billington, Pombart, and Brockman) lack

16  standing because Ulti-Mate, as the employer who funded the plan, is the only

17  plaintiff who suffered direct injury.  Billington's, Pombart's, and Brockman's injuries

18  are derivative of Ulti-Mate's by virtue of their status as its shareholders. As explained

19  above, and as Plaintiffs admit, it is "the companies"—not the individuals—who

20  "make tax-deductible contributions to the [VEBA] trust, and the trust uses the funds

21  to purchase assets to provide benefits to participating employees," and reaps the

22  potential tax benefits of its contributions.  FAC ¶¶ 42-43.  Because Billington,

23  Pombart, and Brockman are not the corporate person making the contributions, they

24  experienced no direct damages.  Any damages felt by them, and any other individual

25  shareholder alleged as part of the class, are passed through the sponsoring company.

26  That company is a separate plaintiff who can "be counted on to vindicate the law as

27  [a] private attorney general," meaning its shareholders lack any RICO standing.

28       The same has long been true for other civil claims brought by shareholders,

1    like fraud, which should also be dismissed.  *Wisdom v. Centerville Fire Dist., Inc.*,

2    391 F. App'x 580, 582 (9th Cir. 2010) (dismissing shareholder's civil conspiracy,

3    breach of fiduciary duties, fraud, and civil RICO claims) (citing *Soranno's Gasco,*

4    *Inc. v. Morgan,* 874 F.2d 1310, 1318 (9th Cir.1989) (a plaintiff cannot "assert a

5    personal economic injury resulting from a wrong to the corporation.").

6    Finally, Plaintiffs lack standing to bring their rescission claim, which they

7    ground on the (false) allegation that "Defendants misrepresented that contributions to

8    the Programs would be tax deductible."  FAC ¶ 103.  California Insurance Code

9    Sections 331 and 359 permit only an "injured party" to rescind a contract.  Here,

10   Plaintiffs are not "injured parties" because they are not parties to the insurance policy

11   contracts at all, nor does the FAC plead that they are.  To avoid this obvious problem

12   with the relief they seek, Plaintiffs inexplicably ask to rescind "their agreement to

13   join the VEBA programs" (FAC ¶ 105), though sections 331 and 359 apply only to

14   insurance policies (not "agreements" to join "programs"), and Cal. Civ. Code 1689

15   can only be employed by a "party to a contract," which the Plaintiffs are not.  The

16   named Plaintiffs lack of contractual privity with American General and Mr. Mordin,

17   and the rescission claims Plaintiffs bring against them must be dismissed.

## V.    CONCLUSION

18

19   For all of the foregoing reasons, Plaintiffs claims are time-barred, their factual

20   allegations are otherwise insufficient to state a claim, and the individual Plaintiffs

21   lack standing to assert RICO and fraud claims.  American General and Peter Mordin

22   respectfully request that the Court dismiss Plaintiffs' claims and deny leave to amend.

23   DATED:  August 25, 2014            EDISON, MCDOWELL & HETHERINGTON LLP

24

25                                      */s/  Jodi K. Swick*
                                        Jodi Swick
26

27                                      Attorney for Defendants
                                        AMERICAN GENERAL LIFE INSURANCE
28                                      COMPANY AND PETER MORDIN